UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

MONSTER WORLDWIDE, INC.,

               Plaintiff,

- against -

RBC CAPITAL MARKETS CORPORATION,

               Defendant.

------------------------------------------------X

Index No. 09 CIV. 4542

BATTS

**COMPLAINT**

FILED MAY 13 2009 USDC WP SDNY

        Plaintiff, Monster Worldwide Inc., by and through its attorneys, Lowey Dannenberg Cohen & Hart, P.C., as and for its Complaint against Defendant RBC Capital Markets Corporation ("RBC"), alleges as follows:

## JURISDICTION AND VENUE

        1.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because Plaintiff asserts claims for violations of Sections 10(b) and 14(d) of the Exchange Act., and SEC Rules 10b-5 and 14d-10(a) promulgated thereunder.

        2.     This Court has supplemental jurisdiction over the state law claim asserted pursuant to 28 U.S.C. § 1367, as that claim is so related to the federal claims that it forms part of the same case and controversy under Article III of the United States Constitution.

        3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because both parties reside, may be found, and transact their affairs in this District, and a substantial part of the acts and events giving rise to the claims alleged herein occurred in this District.

4. This Court has personal jurisdiction over Defendant, because RBC has its principal place of business in the state of New York and has transacted and continues to transact business in New York.

## THE PARTIES

5. Plaintiff is a corporation created and existing under the laws of the State of Delaware, with its principal place of business in New York, NY. It is a leading online recruitment company which owns and operates the Monster.com website.

6. Defendant is a corporation created and existing under the laws of the State of New York, with its principal place of business in New York, NY. Defendant is a broker-dealer in securities, registered with the Securities and Exchange Commission (the "SEC"), and is a wholly-owned subsidiary of Royal Bank of Canada, a banking corporation created and existing under the laws of Canada, with its principal place of business in Canada.

## FACTS

A. **Auction Rate Securities**

7. Auction Rate Securities (ARS) are long-term bonds or preferred stock whose interest rates were, until February 12, 2008, re-set at predetermined periodic intervals, typically every 7, 14, 28 or 35 days, by means of a modified Dutch auction process.

8. In the modified Dutch auction, brokers for potential purchasers of ARS submitted bids to a broker-dealer designated by the issuer of the ARS. In the bid, potential purchasers specified to the designated broker-dealer the number of securities they wanted to purchase and the lowest interest rate they were willing to accept for purchasing these securities at par. The bids were collected by the designated broker-dealer and then submitted to an auction agent. The auction agent assembled the bids and determined the lowest interest rate that would

successfully "clear" the auction, by satisfying the supply of available securities that existing holders wanted to sell.

9. The auction mechanism was supposed to provide liquidity for ARS purchasers, despite the long-term nature of the underlying securities. Holders were supposed to be able to dispose of their ARS at any of the regularly scheduled auctions.

10. Issuers of ARS were able to obtain long-term financing at lower, short-term interest rates. Brokers marketed ARS as safe and liquid as money market instruments, but possessed a slightly higher yield to compensate for the intervals between auctions.

11. As of February 12, 2008, more than $330 billion in face value of ARS had been issued by thousands of issuers, and purchased by tens of thousands of investors throughout the United States. Among the issuers of ARS were municipalities, closed-end investment funds, various types of trusts, and providers of student loans.

12. Student Loan Auction Rate Securities ("SLARS") were ARS issued by trusts that held pools of student loans that were normally backed by U.S. government guarantees. Accordingly, rating agencies typically conferred AAA ratings on SLARS, enabling brokers, including RBC, to market those securities to investors like Plaintiff as safe, highly liquid instruments.

13. Broker-dealer firms such as RBC charged substantial fees and earned significant profits by advising and encouraging the proliferation and expansion of the ARS market. They performed several functions: They acted as underwriters of ARS and marketed their services to issuers, who would pay them large underwriting fees. They also marketed and sold ARS to their customers and other investors, charging substantial brokerage commissions each time a client bought or sold an ARS.

14. In the event that holders of ARS seeking to sell their securities at a given auction outnumbered investors bidding for those securities, the auction would be said to "fail," meaning that none of the ARS holders would be able to sell their securities; and such securities would become illiquid until the next scheduled auction.

15. RBC routinely advised its institutional and corporate clients, including Plaintiff, that it had, in the past, and would, in the future, intervene to purchase, at par value, any ARS for which there were insufficient third-party bids, in order to ensure continuing liquidity and smooth operation of the auctions.

16. On or about February 12, 2008, the entire ARS market shut down, because large national broker-dealers, including RBC, stopped supporting ARS auctions.

B. **RBC's False Representations to Plaintiff and Plaintiff's Reliance Thereon**

17. On May 2, 2007, following a series of calls from RBC Managing Director John Piemonte, Plaintiff opened an investment account with RBC. Plaintiff was seeking to continue investing cash that it needed to be available for operations on short notice in ARS whose liquidity was assured. Mr. Piemonte assured Plaintiff that RBC could satisfy its needs for highly liquid short-term investments, paying a higher rate of interest than money market funds were paying. Mr. Piemonte advised Plaintiff that because RBC was an underwriter of SLARS, RBC had access to a wide variety of AAA-rated, short-term, highly-liquid SLARS that it could sell to Plaintiff.

18. Mr. Piemonte further advised Plaintiff that RBC ensured liquidity for the SLARS it underwrote, by buying SLARS at par for its own inventory whenever there were insufficient third-party bids to prevent failure of an auction. Mr. Piemonte also advised Plaintiff that because RBC acted as a market maker for the SLARS it sold, RBC could provide institutional and corporate investors like Plaintiff with higher returns by selling to those investors

SLARS from RBC's own inventory at a discount. Mr. Piemonte touted this system as providing the dual benefits of assured liquidity and higher returns for those investors who purchased SLARS from RBC.

19. In reliance upon the representations of Mr. Piemonte, in May, 2007, Plaintiff initially purchased $3.9 million of SLARS from RBC. Thereafter, and through mid-February, 2008, Plaintiff continued to purchase SLARS from RBC. When the ARS market shut down on February 12, 2008, Plaintiff was left holding fifteen issues of illiquid SLARS, with a combined par value of $71.6 million.

20. At all times during which RBC sold SLARS to Plaintiff, RBC touted the reliable short-term liquidity provided by the frequent auctions. By purchasing SLARS for its own account at auctions when there were insufficient bids to satisfy sell orders, RBC backed up its assurances to plaintiff that its SLARS were as good as cash, with liquidity as dependable as a money market fund. At all times the monthly account statements RBC sent to Plaintiff valued Plaintiff's SLARS at par value.

21. Throughout the entire period Plaintiff was holding SLARS purchased from RBC and up until February 12, 2008, RBC represented to Plaintiff that in the event Plaintiff wanted to sell its SLARS and an insufficient number of investors entered bids for the SLARS Plaintiff wanted to sell, then RBC would itself purchase Plaintiff's SLARS at par for RBC's own account.

22. On occasions during 2007, when Plaintiff needed to sell SLARS between auctions, in order to raise cash for immediate needs, RBC would purchase Plaintiff's SLARS at par for its own account.

23. RBC also provided Plaintiff with a daily listing of the SLARS RBC had in its own inventory, which RBC would then offer to Plaintiff, occasionally at a discount. This conduct reinforced for Plaintiff its expectation, based upon RBC's representations, that RBC would ensure the liquidity of Plaintiff's SLARS by intervening and buying SLARS at par for RBC's own inventory, whenever there were not sufficient bids at auction.

24. Starting in August, 2007, an increasing flow of SLARS into the auction market significantly outstripped third-party bids for such securities, forcing brokers, including RBC, to choose between buying ever increasing amounts of those securities for their own inventories, or allowing auctions for those instruments to fail. Because RBC and other brokers had marketed SLARS to investors as highly liquid securities, they knew that failed auctions and the resulting lack of liquidity would cause investors to stop buying those securities, destroying what had been a lucrative business for broker-dealers such as RBC.

25. In late 2007 and early 2008, RBC continued to increase the support it was providing the SLARS auctions, thus enabling RBC to preserve its lucrative SLARS business. The level of funds necessary to support the SLARS markets kept increasing, and, ultimately, became too much for RBC.

26. In late 2007 and early 2008, brokers such as RBC began reducing their own burgeoning inventories of SLARS, and secretly took steps to unload their SLARS onto investors like Plaintiff. RBC and other brokers sought to induce investors like Plaintiff to purchase additional SLARS, by submitting inflated bids for their own accounts, thereby artificially boosting the interest rates the issuers of SLARS would pay to holders, making those securities appear more attractive as investments.

27. In late 2007 and early 2008, Plaintiff detected that RBC's SLARS inventory, as indicated in its daily listings sent to Plaintiff, began to swell significantly. Plaintiff inferred that RBC's growing daily inventory indicated that the SLARS market was becoming increasingly dependent on RBC's support to avoid failure. Plaintiff reported its concern that RBC would not be able to maintain its ability to manage the SLARS market to Mr. Piemonte. Mr. Piemonte reassured Plaintiff that RBC would continue to stand behind the auctions and that its fears were unfounded.

28. In late 2007 and early 2008, RBC knew that the demand for SLARS had plummeted, resulting in a substantial imbalance with the supply of ARS being offered for sale; that liquidity in those markets had deteriorated dramatically; and that the brokers themselves were creating artificially high interest rates by submitting inflated bids for their own accounts in an effort to make SLARS more attractive to third-party investors.

29. In late 2007 and early 2008, RBC knew that its representations to Plaintiff that RBC would continue to ensure liquidity for SLARS by purchasing at par value securities for which there were insufficient bids at auction, and thereby prevent failed auctions, were false. RBC was reconsidering its ability to continue serving as market maker and buyer of last resort for the SLARS it managed. RBC knew that ending this practice would trigger a collapse of the market for its SLARS.

30. In reliance on RBC's misrepresentations and material omissions, throughout 2007 and continuing through early 2008, Plaintiff continued to hold SLARS it had purchased from RBC, and continued to purchase additional SLARS from RBC. RBC continued to misrepresent the SLARS it was selling to Plaintiff as liquid securities.

31. On February 12, 2008, after weeks of secretly contemplating a full retreat from the ARS market, RBC joined with other major broker-dealer firms in ending its practice of buying at par SLARS and other ARS for which there was not sufficient investor demand. RBC and other broker-dealers understood that withdrawal of their support would trigger the collapse of the entire ARS market, leaving tens of thousands of investors stranded with billions of dollars worth of long-term securities. That is exactly what happened.

32. After RBC and other broker-dealer firms had triggered the collapse of the $330 billion ARS market, RBC expressly refused to honor Plaintiff's demand that RBC repurchase at par the SLARS that RBC had sold to Plaintiff, and which Plaintiff was still holding.

33. Since February 12, 2008, Plaintiff has been left holding illiquid SLARS it purchased from RBC with an aggregate par value of $66.35 million, which can now be sold only at distress prices.

### C. The NYAG and the SEC Threaten RBC With Enforcement Proceedings for Violations of the Anti-Fraud Provisions of Federal and State Law

34. Thousands of investors who were left holding illiquid ARS to their great financial distress after the February 12, 2008 market collapse, complained loudly and urgently to the SEC and to the Attorneys General of several states. They protested that they had been defrauded by the broker-dealers who had sold them ARS under false pretenses – *i.e.*, that ARS were as good as cash and that their ARS were as liquid as money market funds.

35. In response, among others, New York Attorney General ("NYAG") Andrew Cuomo commenced an investigation into the sales practices of ARS broker-dealers, to determine whether they had violated New York's Martin Act, which prohibits fraud or deceptive practices in connection with the purchase and sale of securities.

36. On April 17, 2008, Mr. Cuomo announced that he had subpoenaed a number of Wall Street broker-dealers, including RBC, to determine whether those firms had engaged in fraudulent marketing practices and had secretly supported ARS auctions, in order to maintain the illusion that ARS investments were as liquid as money market investments.

37. In connection with his investigation, Mr. Cuomo issued subpoenas to RBC to produce documents and for its employees to testify.

38. At around the same time, the SEC's Division of Enforcement also commenced an investigation into the fraudulent, deceptive and manipulative conduct of Wall Street broker-dealer firms, including RBC, in connection with their marketing and sale of ARS, in violation of the Federal securities laws.

39. RBC cooperated with the NYAG and SEC investigations, and produced documents and witnesses in compliance with the subpoenas issued.

40. In August, 2008, the NYAG and the SEC both announced that they had reached preliminary agreements with major Wall Street broker-dealer firms, including Merrill Lynch, Citigroup, UBS and Wachovia, to settle charges that those firms had committed fraud in the sale and marketing of ARS to their customers and the investing public.

41. The terms of those preliminary settlement agreements with the NYAG and the SEC, *inter alia*, required those broker-dealers to repurchase from their customers billions of dollars worth of ARS at par value.

42. On September 19, 2008, Linda Chatman Thomsen, then Director of the SEC's Division of Enforcement, testified regarding the ARS debacle before the Committee on Financial Services of the United States House of Representatives.

43. During her testimony, Ms. Thomsen stated that "[t]hrough their sales forces, marketing materials, and account statements, firms misrepresented to their customers that ARS were safe, highly liquid investments that were equivalent to cash or money market funds."

44. Ms. Thomsen also noted that such firms "failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions. By engaging in this conduct, those firms violated the Federal securities laws, including the broker-dealer antifraud provisions."

45. On October 8, 2008, RBC entered into a preliminary agreement with NYAG Cuomo to settle charges that RBC had made material misrepresentations in its marketing and sales of ARS and had fraudulently sold ARS to investors in New York State.

46. *Inter alia*, RBC agreed to pay a $9.8 million civil penalty to settle those charges and to repurchase illiquid ARS from its individual customers, charities, non-profit and government entities with less than $25 million on deposit, and other entities with less than $10 million on deposit.

47. Also, on October 8, 2008, the SEC's Division of Enforcement announced a separate preliminary settlement with RBC to settle charges that RBC made misrepresentations to its customers, when it told them that ARS were safe, highly liquid and equivalent to cash and money market investments. According to the Division of Enforcement, the liquidity of these securities was premised on RBC providing support bids for auctions when there was not enough customer demand. RBC did not adequately disclose the extent of this support to customers and continued to market ARS this way, despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market in February, 2008.

48. RBC's preliminary settlement with the Division of Enforcement called for RBC to repurchase at par more than $850 million in ARS from the categories of customers referred to in paragraph 46, and to use its best efforts to restore liquidity to all of its other ARS customers, who, like Plaintiff, were stuck holding them.

49. Pursuant to its preliminary settlement with the Division of Enforcement, RBC agreed to a cease and desist order, permanently enjoining it from further violations of Section 15(c) of the Exchange Act, which prohibits the use of manipulative or deceptive devises by broker-dealers, and to pay a civil penalty, to be determined at a later time.

**D.   The Tender Offer**

50. On December 1, 2008, RBC commenced a tender offer to purchase ARS at par, including SLARS of the type owned by Plaintiff, from certain customers defined as "eligible investors." The cover page of the tender offer is attached hereto as Exhibit A and made a part hereof.

51. To be an "eligible investor," an RBC customer must be a natural person, non-corporate trust, or a nonprofit, charitable or religious organization owning an account with an aggregate value of $25 million or less; or a small business or organization owning an account with an aggregate value of $10 million or less.

52. RBC's tender offer has not been extended to Plaintiff, because Plaintiff does not fit RBC's definition of an "eligible investor." RBC's intentional exclusion of Plaintiff from its tender offer is arbitrary and unlawful.

53. RBC's tender offer is set to expire on June 30, 2009.

## FIRST CLAIM FOR RELIEF
### (For Violation of Section 14(d) of the Exchange Act)

54. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

55. RBC's outstanding tender offer is governed by and subject to the requirements of Section 14(d) of the Exchange Act, in that it involves active and widespread solicitation of public holders of ARS, solicitation for a substantial percentage of the outstanding ARS, including SLARS, at a premium over prevailing market prices, non-negotiable terms, a fixed maximum number of ARS to be purchased, and is open only for a limited period of time.

56. RBC's limitation of its tender offer only to "Eligible Investors" constitutes a clear violation of Section 14(d) of the Exchange Act, giving rise to a claim for relief under that section by Plaintiff and other customers not defined by RBC as "eligible" for the tender offer. *See Wellman v. Dickinson*, 475 F. Supp.783, 818 (S.D.N.Y. 1979):

> All shareholders of the target are within the class the Act was designed to protect.
> \* \* \*
> [W]here an offer to purchase was made only to a select group of shareholders, it would certainly defeat the purpose of the Act to deny standing to the shareholders to whom an offer to purchase was not made.

57. Plaintiff is an investor entitled to protection under the provisions of Section 14(d) of the Exchange Act, and has standing thereunder to bring this action for a mandatory injunction, directing RBC to purchase Plaintiff's SLARS at par.

58. Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
## (For violation of SEC Rule 14D-10(a)(1))
## (The "All-Holders Rule")

59. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

60. RBC's tender offer to purchase ARS from only certain "Eligible Customers" was not extended to all holders of the classes of securities subject to its tender offer, including Plaintiff, in violation of SEC Rule 14d-10(a)(1), the "All-Holders Rule."

61. Plaintiff has standing under the provisions of SEC Rule 14d-10(a)(1) to bring this action for a mandatory injunction, directing RBC to extend its tender offer to Plaintiff and to purchase Plaintiff's SLARS at par.

62. Plaintiff has no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
## (For Violations of Section 10(b) of the Exchange Act
## and Rule 10b-5 Promulgated Thereunder)

63. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

64. RBC knowingly and intentionally carried out a plan, scheme and course of conduct that was intended to and did deceive Plaintiff and other SLARS investors in connection with the purchase and sale of securities known as SLARS.

65. RBC knowingly made untrue statements of material fact to Plaintiff and knowingly omitted to state material facts necessary in order to make the statements made not misleading in connection with the purchase and sale of SLARS.

66. Plaintiff reasonably relied upon RBC's misrepresentations and was deceived by RBC's omissions to disclose material facts, in connection with the purchase and sale of its SLARS

67. Plaintiff has suffered significant damages as a consequence of Defendant's unlawful conduct.

## FOURTH CLAIM FOR RELIEF
(Common Law Fraud)

68. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

69. For the purpose of inducing Plaintiff to purchase and retain a total of $66.35 million in par value of supposedly liquid SLARS, RBC knowingly perpetuated a fraud upon Plaintiff.

70. RBC fraudulently represented to Plaintiff that the SLARS it was purchasing from RBC were liquid investments, equivalent to cash and money market investments, and that RBC would continue to assure a liquid market in those SLARS, by purchasing SLARS at par for its own account whenever there were an insufficient number of third-party offers to buy SLARS to match the number of SLARS offered for sale..

71. In reliance upon RBC's aforedescribed misrepresentations and omissions, and without knowledge of the true facts, during 2007 and up to February 12, 2008, Plaintiff purchased from RBC and holds today SLARS with a combined par value of $66.35 million.

72. As a direct and proximate consequence of RBC's wrongful conduct, Plaintiff has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

(a) declaring and adjudging that RBC has violated and is continuing to violate Section 14(d) of the Exchange Act;

(b) declaring and adjudging that RBC has violated and is continuing to violate SEC Rule 14d-10(a)(1), the "All-Holders Rule";

(c) issuing a preliminary and permanent mandatory injunction, directing RBC to extend to Plaintiff the tender offer it has made to its "Eligible Customers" to purchase their SLARS at par;

(d) awarding Plaintiff compensatory and consequential damages against Defendant, in amounts to be proved at trial;

(e) awarding Plaintiff punitive damages against Defendant, on account of Defendant's willful fraud, in violation of the common law of New York;

(f) awarding Plaintiff the costs and expenses it has incurred and will incur in the prosecution of this action, including attorneys' fees and expert fees; and

(g) awarding Plaintiff such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable to a jury.

Dated: White Plains, New York
May 13, 2009

                                    LOWEY DANNENBERG COHEN & HART, P.C.

By: _____
       Stephen Lowey (SL-7677)
Geoffrey Horn (GH-4179)
Michael Goldklang (MG-4549)
1 North Broadway, Suite 509
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
slowey@lowey.com

*Attorneys for Plaintiff*

# EXHIBIT A

# Offer to Purchase for Cash
# Any and All Outstanding Eligible Securities
# from Eligible Investors

## at

## Par Value or Liquidation Preference

## by

## RBC Capital Markets Corp.
## Ferris, Baker Watts, Inc.
## JBHanauer & Co.

**THE OFFERS AND WITHDRAWAL RIGHTS EXPIRE AT
5:00 P.M., EASTERN TIME, ON JUNE 30, 2009.**

RBC Capital Markets Corp. (formerly RBC Dain Rauscher Inc.[1]) and its affiliates, Ferris, Baker Watts, Inc. and JBHanauer & Co. (collectively, "**RBC**") are offering to purchase illiquid auction rate securities whose last scheduled auction did not clear as of December 15, 2008, which we refer to as the "**Eligible Securities**," from individual investors who purchased the Eligible Securities prior to February 11, 2008 by placing an order directly with a representative of RBC for an account maintained at RBC. To be eligible for this offer, the Eligible Securities must have been sold to an RBC account held by:

- a natural person;

- a non-corporate trust;

- nonprofit, charitable or religious organization that owned an account at RBC with an aggregate value of $25 million or less; or

- a small business or organization that owned an account at RBC with an aggregate value of $10 million or less.

The above-referenced groups of investors are collectively referred to as "**Eligible Investors**." For more information on which securities are considered Eligible Securities, please contact your financial consultant or call the RBC Auction Rate Securities Call Center at 1-866-876-5469. Our records indicate that you may be an Eligible Investor of Eligible Securities.

**We are offering to purchase from Eligible Investors any and all Eligible Securities at their respective par value or liquidation preference, plus any accrued interest or dividends, if any, to the payment date.**

Each offer to purchase each individual series of Eligible Securities by RBC is a separate offer. Each offer is independent and is not conditioned upon any other offer and each offer may be amended individually.

**None of RBC, any of its affiliates or their Boards of Directors makes any recommendation as to whether the Eligible Investors should tender their Eligible Securities pursuant to this offer. Eligible Investors must make their own decisions with regard to tendering their Eligible Securities. See "Risk Factors," below. This offer is being made pursuant to the settlement described in "Background to Offer" on page 1 below.**

**You should read this entire document carefully before deciding whether to tender your securities.**

December 1, 2008

---

[1] RBC Capital Markets Corporation is a wholly-owned indirect subsidiary of Royal Bank of Canada. Prior to February 29, 2008, RBC Capital Markets Corp. was a separate broker-dealer and operated independently of its affiliate, RBC Dain Rauscher Inc. On that date, RBC Capital Markets Corp. merged into RBC Dain Rauscher Inc. The combined entity was renamed RBC Capital Markets Corp. simultaneous with the closing of the merger and began operations on Monday, March 3, 2008.

NY3:#7450945v10