UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
JUN 02 2009
U.S.D.C. S.D.N.Y.
CASHIERS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MONSTER WORLDWIDE, INC.,

                  Plaintiff,

  - against -

RBC CAPITAL MARKETS CORPORATION,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Index No. 09-CV-4542 (DAB)

**AMENDED COMPLAINT**

Plaintiff, Monster Worldwide Inc., by and through its attorneys, Lowey Dannenberg Cohen & Hart, P.C., as and for its Amended Complaint against Defendant RBC Capital Markets Corporation ("RBC"), alleges as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v, because Plaintiff asserts claims for violations of Section 12(a)(2) of the Securities Act.

2.    In addition, this Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because Plaintiff asserts claims for violations of Sections 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

3.    This Court has supplemental jurisdiction over the state law claims asserted, pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case and controversy under Article III of the United States Constitution.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because both parties reside, may be found, and transact their affairs in this District, and a substantial part of the acts and events giving rise to the claims alleged herein occurred in this District.

5. This Court has personal jurisdiction over Defendant, because RBC has its principal place of business in the state of New York and has transacted and continues to transact business in New York.

## THE PARTIES

6. Plaintiff is a corporation created and existing under the laws of the State of Delaware, with its principal place of business in New York, NY. It is a leading online recruitment company which owns and operates the Monster.com website.

7. Defendant is a corporation created and existing under the laws of the State of New York, with its principal place of business in New York, NY. Defendant is a broker-dealer in securities, registered with the Securities and Exchange Commission (the "SEC"), and is a wholly-owned subsidiary of Royal Bank of Canada, a banking corporation created and existing under the laws of Canada, with its principal place of business in Canada.

## FACTS

### A. Auction Rate Securities

8. Auction Rate Securities (ARS) are principally either long-term debt instruments issued by municipalities, student loan entities, and corporations, or preferred stock issued by closed-end mutual funds. ARS were designed to compete with CDs, money market funds, and similar "cash-equivalent" instruments by providing a fixed principal price ("par") with variable-interest rates or dividend yields, that were, until February 12, 2008, re-set at regularly scheduled periodic auctions, typically every 7, 14, 28 or 35 days, by means of a modified Dutch auction process. For the issuer, the ARS were tantamount to variable-rate loans,

with the issuers' rate obligations reset at each auction.

9. ARS may be backed by various types of assets such as collateralized debt obligations ("CDOs"), sub-prime mortgages, or government-backed student loans ("SLARS").

10. The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process.

11. In the modified Dutch auction, brokers for potential purchasers of ARS submitted bids to a broker-dealer designated by the issuer of the ARS. In the bid, potential purchasers specified to the issuer's designated broker-dealer (also known as an "auction dealer") the number of ARS they wanted to purchase and the lowest interest rate or dividend rate they were willing to accept for purchasing these securities at par. The bids were collected by the designated broker-dealer and then submitted to an auction agent. The auction agent assembled the bids and determined the lowest interest rate that would successfully "clear" the auction, by satisfying the supply of available securities that existing holders wanted to sell.

12. In the event that subsequent holders of ARS seeking to sell their securities at a given auction outnumbered investors bidding for those securities, the auction would be said to "fail," meaning that ARS holders would not be able to sell all of their securities; and such securities would become illiquid until the next scheduled auction. Following a failed auction, the issuer pays the ARS holders a "maximum rate," which is either a flat rate or a rate set by a predetermined formula described in the prospectus. In a failed auction, no current ARS holders can sell their ARS.

13. Until February 2008, broker-dealers, including RBC, intervened as bidders of last resort to help clear the auctions and prevent failed auctions. Since broker-dealers submit their bids after seeing all customer orders, they can prevent the auction from failing and dictate

the new interest or dividend rate.

14.     The auction mechanism was supposed to provide liquidity for ARS purchasers, despite the long-term nature of the underlying securities. Holders were supposed to be able to dispose of their ARS at par at any of the regularly scheduled auctions.

15.     Because of the liquidity provided by the auctions, issuers of ARS were able to obtain long-term financing at lower short-term interest rates than available from banks or other traditional lending sources. Broker-dealers, including RBC, marketed ARS to retail customers as comparable in risk and liquidity to money market instruments, but with slightly higher yields to compensate for the short intervals between auctions.

16.     As of February 12, 2008, more than $330 billion in face value of ARS had been issued by thousands of issuers, and purchased by tens of thousands of investors throughout the United States. Among the issuers of ARS were municipalities, closed-end investment funds, various types of trusts, and providers of student loans.

17.     Broker-dealer firms such as RBC provided underwriting and brokerage services to issuers of ARS, and performed several functions in the ARS market. They acted as underwriters of ARS to issuers who paid them large underwriting fees, and thereafter maintained the after-market, serving as designated broker-dealers, soliciting bids for the ARS for which they received contractual fees based on the volume of sales from the issuers. RBC's and other broker-dealers' roles were principally to provide the retail customers necessary to make the ARS auction markets for their issuer clients and to step in as underwriters and market makers to buy clients' ARS if and when their retail customers did not, thereby perpetuating the auction market for their clients' ARS. RBC and other broker-dealers also made money from brokerage commissions when they bought ARS for, or sold ARS to, their retail customers.

18.     Student Loan Auction Rate Securities ("SLARS") are a form of ARS issued by trusts that held pools of student loans that were normally backed by U.S. government guarantees. Accordingly, rating agencies typically conferred AAA ratings on SLARS. RBC marketed SLARS to Plaintiff as highly conservative, highly liquid, cash equivalent instruments.

19.     As of January 1, 2008, approximately $85 billion in face value of SLARS had been issued and purchased by tens of thousands of investors throughout the United States.

20.     RBC acted as designated broker-dealer or auction dealer for $20.2 billion of the $85 billion SLARS market.

21.     A broker-dealer or auction dealer for a SLARS is designated in an agreement with the issuer to solicit bids for the SLARS from potential bidders and current holders of the SLARS. The broker-dealer is paid by the issuer based upon an agreed-upon annual rate that is applied to the principal amount of securities sold or successfully placed by the broker-dealer at each auction. RBC acted as broker-dealer for all of the SLARS at issue in this action.

22.     RBC repeatedly advised Plaintiff when it solicited Plaintiff to bid for, or hold and not sell, SLARS, that it would intervene to purchase, at par value, any SLARS for which RBC served as a designated broker-dealer and where there were insufficient third-party bids, in order to ensure the continuing liquidity of the SLARS it sold.

23.     On or about February 12, 2008, RBC and other large national broker-dealers suddenly, and without prior warning to retail customers, stopped supporting ARS auctions, including the auctions for the SLARS held by Plaintiff which are at issue in this action.

24.     As a result, Plaintiff's SLARS, which it had treated as cash equivalents in reliance upon RBC's assurances, became, and remain, illiquid.

## B. RBC's Initial False Representations to Plaintiff and Plaintiff's Reliance Thereon

25. On or about May 2, 2007, following a series of sales calls from RBC Managing Director John Piemonte soliciting Plaintiff to buy RBC-underwritten ARS, Plaintiff opened an investment account with RBC. Plaintiff[1] informed RBC that it was seeking to invest its cash, which it needed to have available for operations on short notice, in liquid short-term investments which did not put the principal at risk.

26. Mr. Piemonte advised Plaintiff that RBC was an underwriter and designated broker-dealer for numerous AAA-rated, short-term, highly liquid SLARS that it could sell to Plaintiff, and which RBC always had supported, and always would support, in their periodic auctions. Mr. Piemonte advised Plaintiff that RBC ensured liquidity for the SLARS it would sell to Plaintiff by buying SLARS at par for its own inventory whenever there were insufficient third-party bids to prevent failure of an auction. RBC also told Plaintiff that it could provide Plaintiff with higher returns by selling it SLARS from RBC's own inventory at a discount to par.

27. In reliance upon the representations of Mr. Piemonte, on May 2, 2007, Plaintiff initially purchased $3.9 million of SLARS from RBC. Thereafter, and until January 16, 2008, Plaintiff continued to purchase SLARS from RBC in reliance upon the representations of Mr. Piemonte.

28. At all times during which RBC sold SLARS to Plaintiff (May 2, 2007 through January 16, 2008), RBC touted the reliable short-term liquidity provided by the frequent auctions and assured that it would stand behind the SLARS if it ever became necessary by

---

[1]    All of Plaintiff's oral communications to RBC referenced in this complaint were made by Plaintiff's Treasurer, David Trapani.

buying SLARS at par for its own inventory if ever there were insufficient third-party bids.

29.     RBC further validated these assurances by buying Plaintiff's SLARS at par for its own account on several occasions during 2007 when Plaintiff needed to sell one or more of its SLARS before the next auction.

30.     Every monthly account statement RBC sent to Plaintiff covering the period from May 2007 through January 2008 valued Plaintiff's SLARS at par.

31.     During the period May 2007 through January 2008, Plaintiff was able to buy and sell a large number of the same SLARS through RBC.

## C.     The SLARS Market Deteriorates

32.     For many years prior to February 2008, broker-dealers were net buyers in SLARS auctions and net sellers post-auction. Broker-dealers absorbed surplus SLARS supply into their inventories by acting as bidders of last resort during auctions, and resold the SLARS after auctions in the non-auction secondary market. Broker-dealers were able to provide liquidity at auctions because they could sell their inventory in the non-auction secondary market.

33.     As credit markets tightened in the late summer of 2007, and as there were periodic auction failures in some of the riskier ARS, it became increasingly difficult for broker-dealers to maintain liquidity, because there was less investor demand for ARS and SLARS. Demand dropped for several reasons, including the fallout from tightening credit markets, a March 2007 FASB rule change that prevented companies from treating ARS as cash equivalents on their balance sheets, and the auction failure of riskier ARS.

34.     Other factors also reduced demand for ARS and SLARS. Prior to August 2007, underwriters of ARS tied to CDOs and other complex derivatives routinely acted as market makers for those instruments, buying for their own inventories CDO-related ARS for

which there were insufficient third-party bids to prevent failed auctions. As the values of CDOs and other derivatives began to plummet, however, brokers chose to stop supporting auctions for ARS whose value was tied to such instruments in order to avoid getting stuck with those distressed securities. As a result, beginning August 2, 2007, many auctions for ARS tied to CDOs and other derivatives failed. Because these were private transactions and not reported publicly, Plaintiff was not aware of the auction failures and RBC did not inform Plaintiff of the evaporation of liquidity in the ARS markets, which had reduced the demand for ARS and SLARS.

35.     Also starting in August, 2007, an increasing flow of newly issued SLARS into the auction market significantly outstripped third-party bids for such securities, causing further stress on the designated broker-dealers, including RBC, to choose between protecting their retail customers by buying increasing amounts of those securities for their own inventories, or allowing auctions for those instruments to fail.

36.     In the first week of September through the end of November, 2007 there were five ARS bond (non-CDO) failures.

37.     Because RBC had marketed SLARS to Plaintiff and its other clients as highly liquid securities, RBC knew that disclosure to Plaintiff and other clients of failed auctions and the resulting lack of liquidity would cause Plaintiff and other customers to stop buying those securities, destroying what had been a lucrative business for RBC and the other large SLARS broker-dealers.

38.     At least as early as August 2007 and up until February 12, 2008, RBC continued to increase the support it was providing the SLARS auctions by purchasing more SLARS at auction to prevent auction failures, enabling RBC to perpetuate its lucrative SLARS

business. RBC also increased the amount of commissions it paid to outside brokers for selling SLARS from RBC's inventory. However, the level of funds necessary to support the SLARS markets kept increasing, and ultimately became too much for RBC to bear.

**C. RBC Misrepresented its Commitment
to Continue Supporting Its SLARS Auctions**

39.     Between 1984 (when the first preferred stock ARS was issued) and 2006, ARS auctions failed only 13 times out of over 100,000 auctions.

40.     Beginning in August 2007, auction dealers such as RBC realized that due to the ARS-CDO auctions failures and because of the dropping demand identified above, auction failure now constituted a very significant risk for their SLARS.

41.     At some point during the period October 2007 and December 2007, Plaintiff noticed that RBC's SLARS inventory, as indicated in its daily inventory listings sent to Plaintiff, was growing substantially. Plaintiff specifically raised the issue of whether RBC possessed sufficient financial resources to support the auctions for its SLARS with Mr. Piemonte in at least one telephone call, and asked whether Plaintiff would have risk of illiquidity or risk of loss of principal value if it retained any SLARS it had purchased from RBC or for any SLARS it might purchase from RBC in the future.

42.     Mr. Piemonte reassured Plaintiff that RBC's SLARS remained safe and liquid, and that RBC would continue to assure liquidity by purchasing SLARS for its own inventory in the event there was inadequate demand at any auction. Subsequent to that discussion, during the period from October through January, Plaintiff sought and obtained from Mr. Piemonte repeated reassurances from RBC that its SLARS were liquid, that the principal was not at risk, and that RBC would continue to support RBC's SLARS auctions by providing liquidity. As a result of these assurances, Plaintiff continued to purchase SLARS from RBC

through January 16, 2008.

43.    RBC's assurances of liquidity and safety were critical, and caused Plaintiff to agree to continue to purchase RBC's SLARS from October 2007 through January 2008.

44.    RBC knew or consciously and recklessly disregarded, and concealed from Plaintiff during the period October 2007 through January 2008 when it sold the SLARS to Plaintiff that it lacked the liquidity necessary to prevent auction failures in the $20.2 billion in SLARS for which it acted as broker-dealer.

45.    As of October 31, 2007, RBC had net capital of only $489.1 million and a credit facility from its parent Royal Bank of Canada in the amount of only $1.47 billion. RBC knew or consciously and recklessly disregarded, and concealed from Plaintiff during the period October 2007 through January 2008 that it did not possess sufficient capital or financing to provide liquidity for the $20.2 billion in SLARS for which it acted as auction dealer.

46.    Between November 1, 2007 and February 12, 2008, RBC purchased approximately $3.627 billion of SLARS for its own inventory in order to support its SLARS auctions. After February 12, 2008, RBC stopped providing the liquidity it had promised Plaintiff.

47.    RBC did not disclose the aggregate amount of SLARS ($20.2 billion) for which it served as auction dealer until after February 12, 2008.

48.    In addition to failing to disclose its inability to provide liquidity for its SLARS, RBC also knew or consciously and recklessly disregarded, and concealed from Plaintiff during the period October 2007 through January 2008, that retail demand for its SLARS had plummeted resulting in a substantial imbalance with the supply of its SLARS being offered for sale and that, as a consequence, liquidity in those markets had deteriorated dramatically.

49.     RBC also knew or consciously and recklessly disregarded, and concealed from Plaintiff during the period October 2007 through January 2008 that SLARS broker-dealers had purchased ever increasing amounts of those securities to conceal the lack of liquidity in those markets; the SLARS broker-dealers themselves had created artificially high interest rates by submitting inflated bids for their own accounts in an effort to make SLARS more attractive to genuine, third-party investors such as Plaintiff; and the SLARS market would collapse entirely without the broker-dealers continuing their ever-increasing purchases.

50.     In reliance on RBC's representations that RBC would continue to ensure the liquidity and safety of the SLARS it sold by purchasing at par any SLARS for which there were insufficient bids at auction, and without knowledge of RBC's inadequate financial resources to fulfill that promise, Plaintiff did not sell its SLARS positions, but, rather, purchased additional SLARS from RBC.

51.     When RBC stopped supporting the ARS market on February 12, 2008, Plaintiff owned 15 different issues of illiquid SLARS sold to it by RBC, with a combined par value of $71.6 million, which Plaintiff had purchased for that same approximate amount.

52.     Since February 12, 2008, Plaintiff has been unable to sell any of these SLARS, which RBC sold to Plaintiff as liquid short-term investments at par.

53.     As a result of this lack of liquidity, the SLARS Plaintiff still holds (listed in Paragraph 55) are now valued significantly below the price Plaintiff paid.

54.     Plaintiff's SLARS currently yield interest rates (called "maximum rates" and listed at Paragraph 55) which are considerably lower than the interest rates for comparable illiquid securities. Such below-market rates fail to provide Plaintiff meaningful compensation for the illiquidity of the SLARS.

55.    The illiquid SLARS which RBC sold to Plaintiff between October 1, 2007

and January 16, 2008 and which today Plaintiff is left holding are:

| ISSUER | ISSUE DATE | BROKER | UNDER-WRITER | INVEST-MENT AMOUNT ($000) | PURCHASE DATE(S) | PRICE PAID | CURRENT MAXIMUM RATE (%) |
|---|---|---|---|---|---|---|---|
| ARIZONA HIGHER EDUCATION LOAN AUTHORITY Student Loan Revenue Bonds Senior Series 2006 A-1 (#04051BAE5) | 5/3/06 | RBC | RBC CAPITAL MARKETS | 5,000 | 12/18/07-12/20/07 | Par and 99.956 | 0.795 |
| ARIZONA HIGHER EDUCATION LOAN AUTHORITY Student Loan Revenue Bonds Senior Series 2007 A-1  (#04051BAH8) | 3/29/07 | RBC | RBC CAPITAL MARKETS | 7,000 | 1/10/08 | Par | 0.795 |
| Arkansas Student Loan Authority Student Loan Revenue Bonds Senior Series 2005 A-1 (# 041150DA8) | 5/12/05 | RBC | RBC CAPITAL MARKETS | 1,200 | 1/15/08 | Par | 1.100 |
| Arkansas Student Loan Authority Student Loan Revenue Bonds Senior Series 2005 A-2 (#041150DB6) | 5/12/05 | RBC | RBC CAPITAL MARKETS | 3,500 | 1/16/08 | Par | 1.080 |
| COLORADO STUDENT OBLIGATION BOND AUTHORITY Student Loan Revenue Bonds Senior 2003 Series VIII-A1 (#196777KG0) | 4/24/03 | RBC | William R. Hough & Co. | 6,000 | 1/9/08 | Par | 0.823 |
| CollegeInvest (Colorado) Student Loan Revenue Bonds Senior 2005 Series XI -A1 (#196777KP0) | 9/1/05 | RBC | RBC CAPITAL MARKETS | 8,000 | 1/16/08 | Par | 0.928 |
| Florida Educational Loan Marketing Corp Educational Loan Revenue Bonds Senior Series 2003 A-6 (#340640AR2) | 1/14/03 | RBC | RBC CAPITAL MARKETS | 1,200 | 1/8/08 | Par | 0.840 |
| Louisiana Public Facilities Authority Student Loan Revenue Bonds Senior 2003 Series A-1 (#546398FK9) | 6/11/03 | RBC | RBC CAPITAL MARKETS | 7,200 | 12/5/07 | Par | 0.940 |
| Finance Authority of Maine Education Loan Revenue Bonds 2007 Senior Series A-3 (#56041WAH5) | 5/23/07 | RBC | RBC CAPITAL MARKETS | 5,900 | 10/1/07 & 10/31/07 | Par | 1.246 |
| NEW MEXICO EDUCATIONAL ASSISTANCE FOUNDATION Education Loan Bonds Senior Series 2004 A-1 (#647110CT0) | 4/21/04 | RBC | RBC CAPITAL MARKETS | 5,500 | 10/1/07 | Par | 0.928 |
| State of North Carolina State Education Assistance Authority Tax Exempt Guaranteed Student Loan Revenue Bonds Senior 2002 Series K-1 (#658262DH0) | 12/18/02 | RBC | RBC CAPITAL MARKETS | 300 | 1/9/08 | Par | 0.823 |

| ISSUER | ISSUE DATE | BROKER | UNDER-WRITER | INVEST-MENT AMOUNT ($000) | PURCHASE DATE(S) | PRICE PAID | CURRENT MAXIMUM RATE (%) |
|---|---|---|---|---|---|---|---|
| South Carolina State Education Assistance Authority Education Loan Revenue Bonds Senior 2005 Series A-1 (#837114GL5) | 11/22/05 | RBC | RBC CAPITAL MARKETS | 6,000 | 12/13/07 | Par | 0.880 |
| South Carolina State Education Assistance Authority Education Loan Revenue Bonds Senior 2006 Series A-3 (#837114GR2) | 10/3/06 | RBC | RBC CAPITAL MARKETS | 8,000 | 1/9/08 | Par | 0880 |
| STUDENT LOAN FINANCE ASSOCIATION (Washington) Educational Loan Revenue Bonds Senior Series 2000 (#86386NAD4) | 7/26/00 | RBC | William R. Hough & Co. | 1,550 | 1/9/08 | Par | 0.823 |

56.    RBC refused to honor Plaintiff's demand that RBC repurchase at par these illiquid SLARS.

57.    As of today, and as a result of RBC's misrepresentations and omissions, Plaintiff is stuck holding illiquid, low yielding SLARS with a market value well below the price it paid for them.

## D.    The NYAG and the SEC Threaten RBC With Enforcement Proceedings for Violations of the Anti-Fraud Provisions of Federal and State Law

58.    Among others, New York Attorney General ("NYAG") Andrew Cuomo commenced an investigation into the sales practices of ARS broker-dealers, to determine whether they had violated New York's Martin Act, which prohibits fraud or deceptive practices in connection with the purchase and sale of securities.

59.    On April 17, 2008, Mr. Cuomo announced that he had subpoenaed a number of Wall Street broker-dealers, including RBC, to determine whether those firms had engaged in fraudulent marketing practices in order to maintain the illusion that ARS investments were as safe and liquid as money market investments.

60.    In connection with his investigation, Mr. Cuomo issued subpoenas to RBC to produce documents and for its employees to testify.

61. At around the same time, the SEC's Division of Enforcement also commenced an investigation into whether the conduct of Wall Street broker-dealer firms, including RBC, violated federal securities laws in connection with their marketing and sale of ARS.

62. RBC cooperated with the NYAG and SEC investigations, and produced documents and witnesses in compliance with the subpoenas issued.

63. In August 2008, the NYAG and the SEC both reached preliminary agreements with major Wall Street broker-dealer firms, including Merrill Lynch, Citigroup, UBS and Wachovia, to settle charges that those firms committed fraud in the sale and marketing of ARS to their customers and the investing public.

64. The terms of those preliminary settlement agreements with the NYAG and the SEC, *inter alia*, required those broker-dealers to repurchase from their customers billions of dollars worth of ARS at par value.

65. On September 19, 2008, Linda Chatman Thomsen, then Director of the SEC's Division of Enforcement, testified regarding the ARS debacle before the Committee on Financial Services of the United States House of Representatives.

66. During her testimony, Ms. Thomsen stated that "[t]hrough their sales forces, marketing materials, and account statements, firms misrepresented to their customers that ARS were safe, highly liquid investments that were equivalent to cash or money market funds."

67. Ms. Thomsen also noted that such firms "failed to disclose the increasing risks associated with ARS, including their reduced ability to support the auctions. By engaging in this conduct, those firms violated the Federal securities laws, including the broker-dealer antifraud provisions."

## E. RBC's Preliminary Agreement with the NYAG

68. On October 8, 2008, RBC entered into a preliminary agreement with NYAG Cuomo to settle charges that RBC made material misrepresentations in its marketing and sales of ARS and fraudulently sold ARS to investors in New York State.

69. *Inter alia*, RBC agreed to pay a $9.8 million civil penalty to settle those charges and to repurchase illiquid ARS from its individual customers, charities, non-profit and government entities with less than $25 million on deposit, and other entities with less than $10 million on deposit.

## F. RBC's Preliminary Settlement in Principle With the SEC's Division of Enforcement

70. Also, on October 8, 2008, the SEC's Division of Enforcement announced a preliminary settlement in principle with RBC to settle charges to be filed in the U.S. District Court for the Southern District of New York that RBC made misrepresentations to its customers, when it told them that ARS were highly liquid and equivalent to cash and money market investments.

71. According to the Division of Enforcement, the liquidity of these securities was premised on RBC providing support bids for auctions when there was not enough customer demand, and RBC did not adequately disclose its limited ability to provide this support to customers. RBC continued to market ARS in this manner, despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market in February 2008.

72. The SEC's announcement proclaimed that: "The Division of Enforcement expects this settlement in principle to provide liquidity of up to $800 million to more than 2,000 aggrieved investors. **The agreement in principle also would require RBC to use its best**

efforts to provide liquidity to other larger ARS investors. The terms of the settlement are subject to finalization, review, and approval by the Commission."

73.     The announcement further proclaimed that: "The Division of Enforcement's settlement in principle with RBC will quickly restore liquidity to those individual, charitable, and small business investors who can least afford to have their funds unavailable in the short term. ... Soon, these investors will have restored to them the liquidity they thought they were getting when they invested in the ARS market. **Under the settlement in principle, pending Commission approval, RBC also must use its best efforts to restore liquidity to ARS holdings of institutional investors."**

74.     Pursuant to its preliminary settlement with the SEC's Division of Enforcement, RBC agreed to a cease and desist order and to pay a civil penalty, to be determined at a later time, permanently enjoining it from further violations of Section 15(c) of the Exchange Act, which prohibits the use of manipulative or deceptive devises by broker-dealers.

75.     Under the terms of RBC's agreement in principle with the SEC's Division of Enforcement:

> • No later than Dec. 15, 2008, RBC will offer to purchase, at par, all ARS from individual investors, small business investors with account values up to and including $10 million, and investors that are nonprofit, charitable or religious organizations with account values up to and including $25 million, that purchased ARS from RBC prior to the collapse of RBC's ARS market on Feb. 11, 2008, and for which ARS the auctions are not successful (Individual Investors). RBC's purchase offer will remain open for at least six months.

> • By Dec. 15, 2008, RBC will make whole any losses sustained by any Individual Investors described above who purchased eligible ARS before Feb. 11, 2008, and sold them after that date at a price below par.

> • Until RBC actually purchases the securities as set forth above,

RBC will offer Individual Investors non-recourse loans at no net cost to the borrower, which loans will remain outstanding until RBC purchases the ARS or until an investor declines RBC's purchase offer.

• To the extent that any of the Individual Investors described above have incurred consequential damages beyond the loss of liquidity in their ARS holdings (which should be restored pursuant to the purchase terms above), RBC will participate in a special arbitration process that the investor may elect, and that will be overseen by the Financial Industry Regulatory Authority (FINRA), whereby RBC will not contest liability related to the misrepresentations and omissions concerning the sale or liquidity of the underlying ARS, but may challenge the existence or amount of any consequential damages. At the investor's election, the arbitration claim may be heard by a single, non-industry arbitrator.

• This arbitration process will be voluntary on the part of the ARS investor, and if investors elect not to take advantage of these special procedures, they may pursue all other legal or equitable remedies available through any other available administrative or judicial process.

• **RBC will use its best efforts to provide liquidity by the end of 2009 to its institutional and business ARS investors with accounts valued at more than $10 million,** and investors that are nonprofit, charitable and religious organizations with accounts valued at more than $25 million that purchased ARS from RBC prior to the collapse of RBC's ARS market on Feb. 11, 2008, and for which ARS the auctions are not successful (Institutional Investors).

## FIRST CLAIM FOR RELIEF
### (For violation of Section 12(a)(2) of the Securities Act)

76.     Plaintiff restates and realleges the foregoing allegations as if fully set forth

herein.

77.     RBC was the lead underwriter for the public offerings of all of the SLARS

listed at Paragraph 55 hereof, except for two of those issues, as to which it was a statutory

underwriter.[2]

78.     RBC offered those SLARS to Plaintiff and other public investors through means and instruments of interstate commerce, and by means of prospectuses, known as Forms G-36 – Official Statements, and by means of oral communications. *See* ¶ 55 for the "Issue Dates," which are the dates of the offerings on which each respective Form G-36 was issued.

79.     Subsequent to the public offerings of the SLARS listed at Paragraph 55, RBC was designated broker-dealer for the SLARS and responsible for marketing the SLARS to prospective investors on behalf of the issuers.

80.     In oral communications to Plaintiff related to the offerings of those SLARS, RBC made untrue statements of material fact and omitted to state material facts necessary in order to make other statements, in light of the circumstances under which they were made, not misleading, as set forth in Paragraphs 25 through 54 hereof.

81.     Plaintiff did not know, nor in the exercise of reasonable due diligence could have known, of such untruths and omissions.

82.     Defendant knew of such untruths and omissions.

83.     RBC continued to offer and redistribute those SLARS to Plaintiff and other public investors after their issuance. Each such redistribution constituted a new offering for each of those SLARS by reason of RBC's obligation to solicit bids from new buyers for each auction on behalf of the issuers of the SLARS.

84.     In oral communications to Plaintiff related to the offerings of those SLARS, RBC made untrue statements of material fact and omitted to state material facts

---

[2]     The two SLARS are the STUDENT LOAN FINANCE ASSOCIATION (Washington) Educational Loan Revenue Bonds Senior Series 2000 and the COLORADO STUDENT OBLIGATION BOND AUTHORITY Student Loan Revenue Bonds Senior 2003 Series VIII-A1. RBC subsequently acquired the underwriter of these SLARS in 2004 and assumed control of its operations.

necessary in order to make other statements, in light of the circumstances under which they were made, not misleading, as set forth in Paragraphs 25 through 56 hereof.

85.     Plaintiff brings this claim for relief pursuant to Section 12(a)(2) of the Securities Act against Defendant to recover the consideration Plaintiff paid Defendant for those SLARS, with interest thereon, less the amount of income received thereon.

86.     Plaintiff hereby tenders all of the SLARS listed in Paragraph 55 hereof to Defendant.

### SECOND CLAIM FOR RELIEF
**(For Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder)**

87.     Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

88.     By the use and means of instrumentalities of interstate commerce, RBC knowingly employed devices, schemes and artifices to defraud Plaintiff, in connection with the purchase of the securities known as SLARS listed in Paragraph 55.

89.     RBC also knowingly engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff, in connection with the purchase of those SLARS.

90.     RBC also knowingly made untrue statements of material fact to Plaintiff and knowingly omitted to state material facts necessary in order to make the statements made not misleading, in connection with the purchase of those SLARS, because, *inter alia*, RBC reportedly informed Plaintiff that RBC could and would continue to assure liquidity for its SLARS, if necessary, by purchasing SLARS for its own inventory, and that RBC's SLARS remained safe and liquid. As a result of these assurances, Plaintiff did not sell SLARS it had

bought from RBC, but, rather, continued to purchase SLARS from RBC through January 16, 2008.

91. RBC's promises of liquidity and safety caused Plaintiff to not sell SLARS it had purchased from RBC, and purchase additional SLARS from RBC from October 2007 through January 2008.

92. RBC knew or consciously and recklessly disregarded, and concealed from Plaintiff during the period October 2007 through January 2008 when it sold the SLARS to Plaintiff that it could not continue to provide the necessary liquidity to prevent auction failures in the $20.2 billion in SLARS for which it acted as broker-dealer because it did not have the necessary capital and financial support.

93. Plaintiff reasonably relied upon those misrepresentations and was deceived by RBC's omissions to disclose those material facts.

94. RBC's conduct violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

95. As a proximate consequence of RBC's aforedescribed wrongful conduct, Plaintiff has suffered substantial damages.

### THIRD CLAIM FOR RELIEF
### (Negligent Misrepresentation)

96. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

97. RBC served both as underwriter of the SLARS and as Plaintiff's broker recommending to Plaintiff that it purchase the SLARS, and, as such, a special relationship existed between the parties which required RBC to speak with candor and care.

98. As a direct seller of the SLARS to Plaintiff, RBC negligently made untrue statements of material fact and omitted to state material facts necessary in order to make other statements, in light of the circumstances under which they were made, not misleading, as set forth in Paragraphs 25 through 54.

99. RBC was aware that its misrepresentations and omissions of material facts would be relied upon by Plaintiff in deciding whether to purchase SLARS from RBC.

100. In reasonable reliance upon RBC's misrepresentations and omissions, and without knowledge of the truth, Plaintiff purchased from RBC the SLARS listed in Paragraph 55 hereof.

101. As a proximate consequence of RBC's aforedescribed wrongful conduct, Plaintiff has suffered substantial damages.

## FOURTH CLAIM FOR RELIEF
### (Common Law Fraud)

102. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

103. For the purpose of inducing Plaintiff to purchase the SLARS listed at Paragraph 55 hereof, RBC knowingly and intentionally defrauded Plaintiff, by making the misrepresentations and omitting to state material facts, as set forth in Paragraphs 25 through 54 hereof.

104. In reliance upon RBC's aforedescribed misrepresentations and omissions, and without knowledge of the true facts, Plaintiff purchased from RBC the SLARS listed at Paragraph 55 hereof.

105. As a proximate consequence of RBC's aforedescribed wrongful conduct, Plaintiff has suffered substantial damages, and is also entitled to recover punitive damages from Defendant.

## FIFTH CLAIM FOR RELIEF
### (Breach of Contract)

106. Plaintiff restates and realleges the foregoing allegations as if fully set forth herein.

107. RBC's preliminary settlement in principle with the SEC's Division of Enforcement, the terms of which are described in Paragraphs 65, 69-70 and 73-76 hereof, constitutes a contract, governed by New York law.

108. Plaintiff is an intended third-party beneficiary of that contract, as it is an "institutional investor" as defined in that contract, for whose ARS holdings RBC agreed, for good and lawful consideration, to use its best efforts to restore liquidity.

109. Notwithstanding its contractual undertaking, RBC has, to date, failed and refused to use its best efforts to restore liquidity to the SLARS held by Plaintiff listed in Paragraph 55 hereof, and is in breach of its aforedescribed contract with the SEC's Division of Enforcement.

110. Under New York law, Plaintiff is entitled to specific performance of the aforedescribed contract.

111. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

(a) on its First Claim for Relief, rescinding Plaintiff's purchases from Defendant of the SLARS listed in Paragraph 55 hereof, and directing Defendant to return to

Plaintiff the consideration paid for those SLARS, with interest thereon, less the amount of any income received thereon, Plaintiff having tendered those SLARS to Defendant;

(b)    on its Second, Third, Fourth and Fifth Claims for Relief, awarding Plaintiff compensatory and consequential damages against Defendant, in amounts to be proved at trial;

(c)    on its Fourth Claim for Relief, awarding Plaintiff punitive damages against Defendant, in an amount to be determined by the jury;

(d)    on its Fifth Claim for Relief, directing Defendant to perform its agreement with the SEC's Division of Enforcement to use its best efforts to restore liquidity to Plaintiff's SLARS holdings;

(e)    awarding Plaintiff the costs and expenses it has incurred and will continue to incur in the prosecution of this action, including attorneys' fees and expert fees; and

(f)    awarding Plaintiff such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable to a jury.

Dated: White Plains, New York
June 2, 2009

LOWEY DANNENBERG COHEN
& HART, P.C.

By: _____
Stephen Lowey (SL-7677)
Geoffrey Horn (GH-4179)
Michael Goldklang (MG-4549)
1 North Broadway, Suite 509
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
slowey@lowey.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Geoffrey M. Horn, hereby certify that on June, 2, 2009, I caused to be served

true and correct copies of Plaintiff's Amended Complaint by electronic mail on

Defendant's Counsel:


Sean M. Murphy, Esq.
Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005


DATED:
White Plains, New York
June 2, 2009

Geoffrey M. Horn (GMH 4179)
LOWEY DANNENBERG COHEN
    & HART, P.C.
One North Broadway, Suite 509
White Plains, NY 10601-2310
(914) 997-0500 (Telephone)
(914) 997-0035 (Facsimile)
ghorn@lowey.com


**ATTORNEY FOR PLAINTIFF**