# EXHIBIT A

ATTORNEY GENERAL OF THE STATE OF NEW YORK
INVESTOR PROTECTION BUREAU

---------------------------------------------------------------------x

IN THE MATTER OF                                              :
                                                             :
RBC CAPITAL MARKETS CORPORATION               :
                                                             :
---------------------------------------------------------------------x

## ASSURANCE OF DISCONTINUANCE
## PURSUANT TO EXECUTIVE LAW § 63(15)

On April 15, 2008, the Office of the Attorney General of the State of New York

(the "Attorney General"), commenced an investigation, pursuant to Article 23-A of the

General Business Law (the "Martin Act") and § 63(12) of the New York Executive Law,

of RBC Capital Markets Corporation and its subsidiaries and affiliates including Ferris,

Baker Watts, LLC and J.B. Hanauer & Co. ("RBC"), concerning RBC's marketing, sale

and distribution of auction rate securities (the "Investigation"). This Assurance of

Discontinuance ("Assurance") contains the findings of the Attorney General's

Investigation and the relief agreed to by the Attorney General and RBC.

## FINDINGS

The Attorney General finds as follows:

## I.    Relevant Entities

1.      RBC Capital Markets Corporation is a Minnesota Corporation that

maintains its principal executive offices, in New York, New York. RBC Capital

Markets Corporation is registered with the SEC as a broker-dealer pursuant to Section

15(b) of the Exchange Act and is a member of the NYSE and FINRA. A subsidiary of

Royal Bank of Canada, RBC Capital Markets Corporation was formerly known as RBC

Dain Rauscher Inc. and does business as RBC Wealth Management.

-1-

2.     On June 20, 2008, Royal Bank of Canada announced that it completed the acquisition of Ferris, Baker Watts, LLC. Ferris, Baker Watts, Inc. is a subsidiary of RBC Capital Markets Corporation.

3.     On May 18, 2007, RBC Capital Markets Corporation, a wholly owned subsidiary of Royal Bank of Canada, announced that it completed the acquisition of J.B. Hanauer & Co.

## II.     Background on Auction Rate Securities

4.     Auction rate securities are long-term bonds issued by municipalities, corporations and student loan companies, or perpetual equity instruments issued by closed end mutual funds, with variable interest rates that reset through a bidding process known as a Dutch auction.

5.     At a Dutch auction, bidders generally state the number of auction rate securities they wish to purchase and the minimum interest rate they are willing to accept. Bids are ranked, from lowest to highest, according to the minimum interest rate each bidder is willing to accept. The lowest interest rate required to sell all of the auction rate securities available at auction, known as the "clearing rate," becomes the rate paid to all holders of that particular security until the next auction. The process is then repeated, typically every 7, 28 or 35 days.

6.     When there are not enough orders to purchase all of the auction rate securities being sold, a "failed" auction occurs. In the event of a failed auction, investors cannot sell their auction rate securities.

7.     As an underwriter of auction rate securities, RBC also acted as the managing broker-dealer for certain issues of auction rate securities. When acting as sole

manager, RBC was the only firm that could submit bids into the auction on behalf of its clients and/or other broker-dealers who wanted to buy and/or sell any auction rate securities. When acting as lead manager, RBC was the primary firm that could submit bids into the auction, while other broker-dealers were able to submit orders on behalf of their clients as well. RBC received revenue in connection with auction rate securities, including an underwriting fee representing a percentage of total issuance and a fee for managing the auctions.

## III. RBC Made Misrepresentations to Certain Investors in Connection With the Sale of Auction Rate Securities

8. RBC represented to many of its customers that auction rate securities were highly liquid, safe, cash alternative investments.

9. These representations were misleading as to certain investors. Auction rate securities were in fact different from cash and money market funds. As discussed above, the liquidity of an auction rate security relied on the successful operation of the Dutch auction process. In the event of a failed auction, investors cannot sell their auction rate securities and are stuck holding long-term investments, not cash-equivalent securities. As discussed below, starting in the Fall of 2007, the auction rate securities market faced dislocation and an increased risk of failure.

10. Since the inception of the auction market, RBC submitted support bids, purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead broker. Support bids were RBC proprietary orders that would be filled, in whole or in part, if there was otherwise insufficient demand in an auction. When RBC purchased auction rate securities through support bids, those auction rate securities were then owned by RBC and the holdings were recorded on RBC's balance sheet. For risk

-3-

management purposes, RBC imposed limits on the amounts of auction rate securities it could hold in inventory.

11. Because many investors could not ascertain how much of an auction was filled through RBC proprietary trades, investors could not determine if auctions were clearing because of normal marketplace demand, or because RBC was making up for the lack of demand through support bids. Generally, investors were also not aware that the auction rate securities market was dependent upon RBC's use of support bids for its operation. While RBC could track its own inventory as a measure of the supply and demand for auction rate securities, ordinary investors had no comparable ability to assess the operation of the market. There was no way for investors to monitor supply and demand in the market or to assess when broker-dealers might decide to stop supporting the market, which could cause its collapse.

## IV. By the Fall of 2007, The Auction Rate Securities Market Faced Dislocation

12. In August 2007, the credit crisis and other deteriorating market conditions strained the auction rate securities market. Some institutional investors withdrew from the market, decreasing demand for auction rate securities.

13. The resulting market dislocation should have been evident to RBC. RBC support bids filled the increasing gap in the demand for auction rate securities, sustaining the impression that the market was functioning. As a result, RBC's auction rate securities inventory grew significantly, requiring RBC to raise its risk management limits on its auction rate securities inventory several times.

14. From the Fall of 2007 through February of 2008, demand for auction rate securities continued to erode and RBC's auction rate securities inventory reached

-4-

unprecedented levels. RBC was aware of the increasing strains on the auction rate securities market, increasingly questioned the viability of the auction rate securities market and planned for potential widespread market failure. RBC did not disclose these increasing risks of owning or purchasing auction rate securities to all of its customers.

15. In February 2008, RBC and other firms stopped supporting most auctions. Without the benefit of support bids, the auction rate securities market collapsed, leaving investors who had been led to believe that these securities were cash alternative and liquid investments, appropriate for managing short-term cash needs, holding long-term or perpetual securities that could not be sold at par value.

## V. **Violations**

16. The foregoing acts and practices of RBC violated the Martin Act, Article 23-A of the General Business Law.

17. The foregoing acts and practices of RBC violated § 349 of the General Business Law.

18. The foregoing acts and practices of RBC violated § 63(12) of the Executive Law.

## **AGREEMENT**

WHEREAS, the parties agree to settle allegations that RBC's conduct violated the Martin Act, General Business Law § 349 and Executive Law § 63(12) and the Attorney General can bring an action when misrepresentations are made in connection with the sale of securities and scienter need not be proven to establish a violation of the Martin Act, General Business Law § 349 and Executive Law § 63(12);

WHEREAS, RBC neither admits nor denies the Attorney General's Findings set forth above;

WHEREAS, the Attorney General is willing to accept the terms of the Assurance pursuant to New York Executive Law § 63(15), and to discontinue, as described in paragraph 58 below, its Investigation of RBC;

WHEREAS, the parties each believe that the obligations imposed by this Assurance are prudent and appropriate;

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the parties, that:

## I.    Relief for Auction Rate Security Investors

### A.    Buybacks from Auction Rate Securities Investors

19.    RBC will provide liquidity to Eligible Investors by buying back Eligible Auction Rate Securities that have failed at auction at least once between October 3, 2008 and the date of this Assurance, at par, in the manner described below.

20.    "Eligible Auction Rate Securities," for the purposes of this Assurance, shall mean auction rate securities purchased from or through RBC prior to February 11, 2008 into an account maintained in the custody of RBC at the time of purchase.

21.    "Eligible Investors," for the purposes of this Assurance, shall mean:

> i. Natural persons (including their IRA accounts, testamentary trust and estate accounts, custodian UGMA and UTMA accounts, and guardianship accounts) who directly purchased Eligible Auction Rate Securities;

-6-

ii. Government entities and non-profits including charities, endowments or foundations with Internal Revenue Code Section 501(c)(3) status with $25 million or less in assets in their accounts with RBC net of margin loans, as determined by the customer's aggregate household position(s) as of October 8, 2008, that directly purchased Eligible Auction Rate Securities;

iii. Small Businesses that directly purchased Eligible Auction Rate Securities at RBC. For purposes of this provision, "Small Businesses" shall mean RBC customers not otherwise covered in paragraph 21(i) and (ii) above that had $10 million or less in assets in their accounts with RBC, net of margin loans, as determined by the customer's aggregate household position(s) as of October 8, 2008, or, if the customer was not a customer of RBC as of October 8, 2008, as of the date that the customer terminated its customer relationship with RBC. Notwithstanding any other provision, "Small Businesses" does not include broker-dealers, banks acting as conduits for their customers, investment managers or other financial intermediaries, or customers that had total assets of greater than $50 million as of October 8, 2008.

iv. In no event shall RBC be required by this Assurance to purchase more than $10 million of auction rate securities from any Small Business.

22. RBC shall offer to buy back from Eligible Investors, at par plus accrued interest or dividends, if any, Eligible Auction Rate Securities that have failed at auction at least once between October 3, 2008 and the date of this Assurance ("Buyback Offer").

The Buyback Offer shall remain open until June 30, 2009 ("Offer Period"). RBC may extend the Offer Period beyond this date.

23.     RBC shall have undertaken its best efforts to identify and provide notice to Eligible Investors who invested in Eligible Auction Rate Securities that have failed at auction at least once between October 3, 2008 and the date of this Assurance of the relevant terms of this Assurance, together with an explanation of what Eligible Investors must do to accept, in whole or in part, the Buyback Offer, by December 5, 2008. RBC will also undertake its best efforts to identify and provide notice of the relevant terms of this Assurance to such Eligible Investors not previously identified.

24.     To the extent that any Eligible Investor who invested in Eligible Auction Rate Securities that have failed at auction at least once between October 3, 2008 and the date of this Assurance has not responded to the Buyback Offer, RBC shall undertake best efforts to provide any such Eligible Investor a second written notice on or before 45 days before the end of the Offer Period informing them of the relevant terms of this Assurance, notifying such Eligible Investor of the impending expiration of the Offer Period, describing the state of the auction rate securities market at that time, and explaining the consequences of failing to sell their auction rate securities to RBC prior to the expiration of the Offer Period.

25.     Eligible Investors may accept the Buyback Offer by notifying RBC at any time before 5:00 p.m., Eastern Standard Time, June 30, 2009, or such later date and time as RBC may extend the Offer Period. For Eligible Investors who accept the Buyback Offer within the Offer Period, RBC shall purchase the Eligible Auction Rate Securities

on or before the next scheduled auction date that occurs after three (3) business days following RBC's receipt of notification.

26. No later than two days after execution of this Assurance, RBC shall establish: (a) a dedicated toll-free telephone assistance line, with appropriate staffing, to provide information and to respond to questions concerning the terms of this Assurance; and (b) a public Internet page on its corporate Website(s), with a prominent link to that page appearing on RBC's relevant homepage(s), to provide information concerning the terms of this Assurance and, via the telephone assistance line, together with an e-mail address or other reasonable means of communication, to respond to questions concerning the terms of this Assurance. RBC shall maintain the telephone assistance line and Internet page through June 30, 2009.

**B. Relief for Eligible Investors Who Sold Below Par**

27. By May 31, 2009, RBC shall have undertaken its best efforts to identify any Eligible Investor who sold Eligible Auction Rate Securities below par between February 11, 2008 and May 31, 2009 and paid such Eligible Investors the difference between par and the price at which the Eligible Investor sold the Eligible Auction Rate Securities. RBC will undertake its best efforts to identify and pay, as soon as reasonably possible, any Eligible Investors identified thereafter who sold Eligible Auction Rate Securities below par between February 11, 2008 and May 31, 2009.

**C. Reimbursement for Related Loan Expenses**

28. RBC shall undertake its best efforts to identify Eligible Investors who took out loans from RBC, between February 11, 2008 and the date of this Assurance, that were secured by Eligible Auction Rate Securities that were not successfully auctioning

at the time the loan was taken out from RBC, and paid interest associated with the auction rate securities based portion of those loans in excess of the total interest and dividends received on the auction rate securities during the duration of the loan. RBC shall reimburse such customers for such excess expense, plus reasonable interest thereon. Such reimbursement shall occur no later than May 31, 2009.

### D.    Consequential Damages Arbitration Process

29.    RBC shall consent to participate in a special arbitration ("Arbitration") for the exclusive purpose of arbitrating any Eligible Investor's consequential damages claim arising from their inability to sell Eligible Auction Rate Securities. RBC shall notify Eligible Investors of the terms of the Arbitration process through the notice described in paragraph 23.

30.    The Arbitration shall be conducted by a single public arbitrator (as defined by section 12100(u) of the NASD Code of Arbitration Procedures for Customer Disputes, eff. April 16, 2007), under the auspices of FINRA. RBC shall pay all applicable forum and filing fees.

31.    Any Eligible Investors who choose to pursue such claims in the Arbitration shall bear the burden of proving that they suffered consequential damages and that such damages were caused by their inability to access funds invested in Eligible Auction Rate Securities. In the Arbitration, RBC shall be able to defend itself against such claims; provided, however, that RBC shall not contest liability for the illiquidity of the underlying auction rate securities position or use as part of its defense any decision by an Eligible Investor not to borrow money from RBC.

32.     Eligible Investors who elect to use the special arbitration process provided for herein shall not be eligible for punitive damages, or for any other type of damages other than consequential damages.

33.     All customers, including but not limited to Eligible Investors who avail themselves of the relief provided pursuant to this Assurance, may pursue any remedies against RBC available under the law. However, Eligible Investors that elect to utilize the special arbitration process set forth above are limited to the remedies available in that process and may not bring or pursue a claim relating to Eligible Auction Rate Securities in another forum.

### E.     Municipal Issuers

34.     By May 31, 2009, or five business days from the date of this Assurance, whichever is later, RBC shall refund to municipalities (which, for avoidance of doubt, do not include student loan securitization vehicles or closed-end mutual funds) underwriting fees the issuers paid to RBC for the refinancing or conversion of their auction rate securities that occurred after February 11, 2008, where RBC acted as underwriter for the primary offering of the auction rate securities between August 1, 2007 and February 11, 2008.

### F.     Institutional Investors

35.     RBC shall endeavor to work with issuers and other interested parties, including regulatory and governmental entities, to expeditiously provide liquidity solutions for institutional investors not covered by Section I.A. above that purchased auction rate securities from RBC ("Institutional Investors").

36.    The Attorney General has refrained from taking legal action against RBC

with respect to Institutional Investors. The Attorney General shall issue continuances as

it deems appropriate.

37.    For the period beginning October 7, 2008 through December 31, 2009

RBC shall:

- (a) within 45 days of the end of each month, beginning with a report covering the period beginning October 8, 2008 and ending April 30, 2009 (due on June 15, 2009) and continuing monthly, through and including a report covering the month ended December 31, 2009 (due on February 16, 2010), submit written reports detailing RBC's progress with respect to its obligations pursuant to this Assurance; and

- (b) confer with the Attorney General on a quarterly basis to discuss RBC's progress.

Following every quarterly meeting, the Attorney General shall advise RBC of any

concerns regarding RBC's progress in providing liquidity solutions for Institutional

Investors and, in response, RBC shall detail the steps that RBC plans to implement to

address such concerns. The reporting or meeting deadlines set forth above may be

amended with written permission from the Attorney General.

## G.    **Penalty and Remedial Procedures**

38.    No later than ten business days after signing this Assurance, RBC shall

pay a total civil penalty of NINE MILLION EIGHT HUNDRED THOUSAND dollars

($9,800,000) to the State of New York and to those states and territories that enter

administrative or civil consent orders approving the terms of the NASAA settlement, of

which $2,378,386.29 shall be paid to the State of New York. The payment to the State

of New York shall be in the form of a certified or bank check made out to "State of New

York" and mailed to:

-12-

Office of the Attorney General
of the State of New York
120 Broadway, 23rd Floor
New York, New York, 10271
Attn: David A. Markowitz, Esq.
Chief, Investor Protection Bureau

39. RBC agrees that it shall not, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to paragraph 38 above.

### H. Other Relief

40. RBC admits the jurisdiction of the Attorney General. RBC will cease and desist from engaging in any acts in violation of the Martin Act, General Business Law § 349 and/or Executive Law § 63(12) and will comply with the Martin Act, General Business Law § 349 and Executive Law § 63(12).

## II. Other Provisions

41. The Attorney General retains the right under Executive Law § 63(15) to compel compliance with this Assurance. Evidence of a violation of this Assurance proven in a court of competent jurisdiction shall constitute prima facie proof of a violation of the Martin Act, General Business Law §349 and/or Executive Law §63(12) in any civil action or proceeding hereafter commenced by the Attorney General against RBC.

42. Should the Attorney General prove in a court of competent jurisdiction that a material breach of this Assurance by RBC has occurred, RBC shall pay to the Attorney General the cost, if any, of such determination and of enforcing this Assurance, including without limitation legal fees, expenses and court costs.

-13-

43.     If RBC defaults on any obligation under this Assurance, the Attorney General may terminate this Assurance, at his sole discretion, upon 10 days written notice to RBC. RBC agrees that any statute of limitations or other time related defenses applicable to the subject of the Assurance and any claims arising from or relating thereto are tolled from and after the date of this Assurance. In the event of such termination, RBC expressly agrees and acknowledges that this Assurance shall in no way bar or otherwise preclude the Attorney General from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Assurance, against RBC, or from using in any way any statements, documents or other materials produced or provided by RBC prior to or after the date of this Assurance, including, without limitation, such statements, documents or other materials, if any, provided for purposes of settlement negotiations, except as may otherwise be provided in a written agreement with the Attorney General.

44.     Except in an action by the Attorney General to enforce the obligations of RBC in this Assurance or in the event of termination of this Assurance by the Attorney General, neither this Assurance nor any acts performed or documents executed in furtherance of this Assurance: (a) may be deemed or used as an admission of, or evidence of, the validity of any alleged wrongdoing, liability or lack of wrongdoing or liability; or (b) may be deemed or used as an admission of or evidence of any such alleged fault or omission of RBC in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. This Assurance shall not confer any rights upon persons or entities who are not a party to this Assurance.

45.    RBC shall cooperate fully and promptly with the Attorney General and

shall use its best efforts to ensure that all the current and former officers, directors,

trustees, agents, members, partners and employees of RBC (and of any of RBC's parent

companies, subsidiaries or affiliates) cooperate fully and promptly with the Attorney

General in any pending or subsequently initiated investigation, litigation or other

proceeding relating to auction rate securities and/or the subject matter of the Assurance.

Such cooperation shall include, without limitation, and on a best efforts basis:

(a)    production, voluntarily and without service of subpoena, upon the
request of the Attorney General, of all documents or other tangible
evidence requested by the Attorney General and any compilations
or summaries of information or data that the Attorney General
requests that RBC (or the RBC's parent companies, subsidiaries or
affiliates) prepare, except to the extent such production would
require the disclosure of information protected by the attorney-
client and/or work product privileges;

(b)    without the necessity of a subpoena, having the current (and
making all reasonable efforts to cause the former) officers,
directors, trustees, agents, members, partners and employees of
RBC (and of any of the RBC's parent companies, subsidiaries or
affiliates) attend any Proceedings (as hereinafter defined) in New
York State or elsewhere at which the presence of any such persons
is requested by the Attorney General and having such current (and
making all reasonable efforts to cause the former) officers,
directors, trustees, agents, members, partners and employees
answer any and all inquiries that may be put by the Attorney
General to any of them at any proceedings or otherwise except to
the extent such production would require the disclosure of
information protected by the attorney-client and/or work product
privileges; "Proceedings" include, but are not limited to, any
meetings, interviews, depositions, hearings, trials, grand jury
proceedings or other proceedings;

(c)    fully, fairly and truthfully disclosing all information and producing
all records and other evidence in its possession, custody or control
(or the possession, custody or control of the RBC parent
companies, subsidiaries or affiliates) relevant to all inquiries made
by the Attorney General concerning the subject matter of the
Assurance, except to the extent such inquiries call for the

-15-

disclosure of information protected by the attorney-client and/or work product privileges; and

(d) making outside counsel reasonably available to provide comprehensive presentations concerning any internal investigation relating to all matters in the Assurance and to answer questions, except to the extent such presentations or questions call for the disclosure of information protected by the attorney-client and/or work product privileges.

46. In the event RBC fails to comply with paragraph 45 of the Assurance, the Attorney General shall be entitled to specific performance, in addition to any other available remedies.

47. The Attorney General has agreed to the terms of this Assurance based on, among other things, the representations made to the Attorney General by RBC, its counsel, and the Attorney General's own factual Investigation. To the extent that any material representations are later found to be inaccurate or misleading, this Assurance is voidable by the Attorney General in its sole discretion.

48. RBC shall, upon request by the Attorney General, provide all documentation and information reasonably necessary for the Attorney General to verify compliance with this Assurance.

49. To the extent applicable, this Assurance hereby waives any disqualification from relying upon the registration exemptions or registration safe harbor provisions that may be contained in the federal securities laws, the rules and regulations thereunder, the rules and regulations of self regulatory organizations or any states' or U.S. Territories' securities laws. In addition, this Assurance is not intended to form the basis for any such disqualifications.

50.     All notices, reports, requests, and other communications to any party

pursuant to this Assurance shall be in writing and shall be directed as follows:

If to RBC:

George S. Canellos, Esq.
Milbank Tweed Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005-1413

If to the Attorney General:

Office of the Attorney General of the State of New York
120 Broadway, 23rd Floor
New York, New York 10271
Attn: David A. Markowitz, Esq.

51.     This Assurance and any dispute related thereto shall be governed by the

laws of the State of New York without regard to any conflicts of laws principles.

52.     RBC consents to the jurisdiction of the Attorney General in any

proceeding or action to enforce this Assurance.

53.     RBC agrees not to take any action or to make or permit to be made any

public statement denying, directly or indirectly, any finding in this Assurance or creating

the impression that this Assurance is without factual basis. Nothing in this paragraph

affects RBC's: (a) testimonial obligations; or (b) right to take legal or factual positions in

defense of litigation or other legal proceedings to which the Attorney General is not a

party. Nothing in this Assurance shall be considered an admission of fraud.

54.     This Assurance may not be amended except by an instrument in writing

signed on behalf of all the parties to this Assurance.

55.     This Assurance constitutes the entire agreement between the Attorney

General and RBC and supersedes any prior communication, understanding or agreement,

-17-

whether written or oral, concerning the subject matter of this Assurance. No representation, inducement, promise, understanding, condition or warranty not set forth in this Assurance has been relied upon by any party to this Assurance.

56. In the event that one or more provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

57. This Assurance may be executed in one or more counterparts, and shall become effective when such counterparts have been signed by each of the parties hereto.

58. Upon execution by the parties to this Assurance, the Attorney General agrees to suspend, pursuant to Executive Law § 63(15), this Investigation as and against RBC solely with respect to its marketing and sale of auction rate securities to Eligible Investors.

59. Any payments and all correspondence related to this Assurance must reference AOD # 08-178.

**WHEREFORE**, the following signatures are affixed hereto on the dates set forth

below.

**ANDREW M. CUOMO,**
Attorney General of the State of New York

By:

David A. Markowitz, Esq.

Chief, Investor Protection Bureau
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8198

Dated: May ___, 2009

RBC CAPITAL MARKETS CORPORATION

By: _Richard T. Chase_
Name: Richard T. Chase
Title: Managing Director and General Counsel

#### ACKNOWLEDGMENT

STATE OF NEW YORK )
                  :ss.
COUNTY OF NEW YORK )

On this 22nd day of May, 2009, before me personally came Richard T. Chase, known to me, who, being duly sworn by me, did depose and say that he is the Managing Director and General Counsel of RBC Capital Markets Corporation, the entity described in the foregoing Assurance, and is duly authorized by RBC Capital Markets Corporation to execute the same, and that he signed his name in my presence by like authorization.

Notary Public
My commission expires:
**Notary Public, State of New York**
**No.01HA6114766**
**Qualified in Queens County**
**Certificate Filed in New York County**
**Commission Expires August 23, 2012**

Assurance of Discontinuance
Reviewed By:

*Attorneys for RBC Capital Markets Corporation*

Dated: May 22, 2009

-20-