# EXHIBIT C

**NEW ISSUE - BOOK-ENTRY ONLY**                                    **Ratings:**   See "RATINGS" herein

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein: (i) interest on the 2007 Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"); and (ii) interest on the 2007 Bonds is treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code. In addition, in the opinion of Bond Counsel, pursuant to the Act (as defined herein), the 2007 Bonds, their transfer and the income from them, including any profit made on their sale, are exempt from taxation within the State. See "TAX MATTERS" herein for a description of certain other provisions of the Code that may affect the tax treatment of interest on the 2007 Bonds for certain Bondholders.*



**$140,000,000**

**FINANCE AUTHORITY OF MAINE**

**$50,000,000 EDUCATION LOAN REVENUE BONDS, 2007 SENIOR SERIES A-1 (CUSIP #56041W AF9)**
**$50,000,000 EDUCATION LOAN REVENUE BONDS, 2007 SENIOR SERIES A-2 (CUSIP #56041W AG7)**
**$40,000,000 EDUCATION LOAN REVENUE BONDS, 2007 SENIOR SERIES A-3 (CUSIP #56041W AH5)**

**Dated:** Date of Delivery            **Price:** 100%            **Due:** June 1, 2037

The Finance Authority of Maine Education Loan Revenue Bonds, 2007 Senior Series A-1, 2007 Senior Series A-2 and 2007 Senior Series A-3 (the "2007 Bonds") are issuable in fully-registered form and when issued shall be registered in the name of Cede & Co. as nominee for The Depository Trust Company, New York, New York ("DTC"), which shall act as Securities Depository for the 2007 Bonds. Purchasers of the 2007 Bonds will not receive certificates representing their beneficial ownership interests in the 2007 Bonds. Purchases and sales by the Beneficial Owners (as defined herein) of the 2007 Bonds shall be made in book-entry form in the principal amount of $100,000 or any integral multiple thereof. See "BOOK-ENTRY SYSTEM" herein.

Payments of principal, redemption price, and interest with respect to the 2007 Bonds are to be made directly to DTC by The Bank of New York (the "Trustee" and "Paying Agent") or its successor as Trustee, so long as DTC or Cede & Co. is the registered owner of the 2007 Bonds. Disbursements of such payments to DTC Participants (as defined herein) are the responsibility of DTC and the disbursements of such payments to the Beneficial Owners are the responsibility of DTC Participants as more fully described herein.

The 2007 Bonds are being issued by the Finance Authority of Maine (the "Authority"), a body corporate and politic and a public instrumentality of the State of Maine, and pursuant to the provisions of the Indenture of Trust dated as of December 1, 2003 (the "General Indenture") and pursuant to the Third Supplemental Indenture dated as of May 1, 2007 (the "Third Supplemental Indenture" and, together with the General Indenture, the "Indenture").

The 2007 Bonds are being issued as auction rate bonds (the "Auction Rate Bonds") in denominations of $100,000 or any integral multiple thereof. Interest on the 2007 Bonds, prior to a change in the Interest Payment Dates as described herein, shall be payable on June 1, 2007 and semiannually on each June 1 and December 1 thereafter until maturity or earlier redemption.

Payment of the principal of and interest on the 2007 Bonds when due will be insured by a financial guaranty insurance policy to be issued by Ambac Assurance Corporation simultaneously with the delivery of the 2007 Bonds.

***Ambac***

The 2007 Bonds are being issued to finance Student Loans (as defined herein) and to refund the Outstanding Subordinate Obligations. The 2007 Bonds will be equivalent in right of payment under the General Indenture with all other Senior Obligations (as defined herein) that are currently Outstanding (as defined herein) or that may be issued thereunder in the future, and are senior in right of payment under the General Indenture to all Senior Subordinate Obligations (as defined herein) that may be issued thereunder in the future and to all Subordinate Obligations (as defined herein) that are currently Outstanding or that may be issued thereunder in the future. The 2007 Bonds are subject to redemption prior to maturity and mandatory tender for purchase as described herein. See "PLAN OF FINANCE" herein.

**THE 2007 BONDS ARE SPECIAL AND LIMITED OBLIGATIONS OF THE AUTHORITY, SECURED BY AND PAYABLE FROM SPECIFIC REVENUES, FUNDS, AND ASSETS PLEDGED THEREFOR AS HEREIN DESCRIBED. NONE OF THE STATE, ANY POLITICAL SUBDIVISION OF THE STATE OR THE AUTHORITY ARE OBLIGATED TO PAY THE 2007 BONDS OR THE INTEREST THEREON EXCEPT FROM THE SPECIFIC REVENUES, FUNDS AND ASSETS SO PLEDGED AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OR ANY POLITICAL SUBDIVISION OF THE STATE IS PLEDGED TO SUCH PAYMENT. THE ISSUANCE OF THE 2007 BONDS DOES NOT DIRECTLY OR INDIRECTLY OR CONTINGENTLY OBLIGATE THE STATE OR ANY POLITICAL SUBDIVISION OF THE STATE TO LEVY OR TO PLEDGE ANY FORM OF TAXATION WHATEVER OR TO MAKE ANY APPROPRIATION FOR THE PAYMENT OF THE 2007 BONDS. THE 2007 BONDS DO NOT CONSTITUTE ANY DEBT OR LIABILITY OF THE STATE, OR OF ANY POLITICAL SUBDIVISION OF THE STATE OR THE AUTHORITY, A LOAN OF THE CREDIT OF THE STATE OR A PLEDGE OF THE FAITH AND CREDIT OF THE STATE, OR OF ANY POLITICAL SUBDIVISION OF THE STATE OR THE AUTHORITY, BUT ARE PAYABLE SOLELY FROM THE FUNDS PROVIDED FOR PAYMENT OF THE 2007 BONDS. THE AUTHORITY HAS NO TAXING POWER.**

The 2007 Bonds are offered when, as and if received by the Underwriter, subject to prior sale, to withdrawal or modification of the offer without notice and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel. Certain legal matters in connection with the 2007 Bonds will be passed upon for the Authority by its General Counsel and for the Underwriter by its counsel, Preti, Flaherty, Beliveau & Pachios, LLP, Augusta, Maine. The 2007 Bonds are expected to be available for delivery through the facilities of DTC on or about May 23, 2007.

**RBC Capital Markets**

Dated: May 10, 2007

The information set forth herein has been provided by the Authority and by other sources that are believed by the Authority to be reliable. The information and expressions of opinion contained herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority or that the information or opinions or estimates contained herein are correct as of any date subsequent to the date hereof. The Underwriter has provided the following statement for inclusion in this Official Statement. The Underwriter has reviewed the information in this Official Statement in accordance with, and as part of, its responsibility to investors under federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of the information.

No dealer, broker, salesman or other person has been authorized by the Authority or the Underwriter to give any information or to make any representations with respect to the 2007 Bonds, other than those contained herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the 2007 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

**Except for any information provided by the Trustee concerning the Trustee, the Trustee has no responsibility for any information in this Official Statement. Further, the Trustee shall have no responsibility for compliance with any state or federal securities laws in connection with the 2007 Bonds.**

**IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE AUTHORITY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE 2007 BONDS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS OFFICIAL STATEMENT.**

THE PRICE AT WHICH THE 2007 BONDS ARE OFFERED TO THE PUBLIC BY THE UNDERWRITER MAY VARY FROM THE INITIAL PUBLIC OFFERING PRICE APPEARING ON THE COVER PAGE HEREOF. IN ADDITION, THE UNDERWRITER MAY ALLOW CONCESSIONS OR DISCOUNTS FROM SUCH INITIAL PUBLIC OFFERING PRICE TO DEALERS AND OTHERS. IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE 2007 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. SEE "APPENDIX E" HERETO FOR A MORE COMPLETE DESCRIPTION OF THE AUCTION PROCEDURES FOR THE AUCTION RATE BONDS.

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1
PLAN OF FINANCE ............................................................................................................. 2
SOURCES AND USES OF FUNDS .................................................................................... 3
   Initial Collateralization ..................................................................................................... 3
SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS ......................... 3
   Limited Liability ............................................................................................................... 3
   The Pledge of the General Indenture ............................................................................... 3
   Principal, Interest, Interest Subsidy and Special Allowance Payments on FFELP Loans ... 4
   Debt Service Reserve Fund .............................................................................................. 4
   Withdrawal of Excess Coverage ...................................................................................... 5
   Additional Obligations ..................................................................................................... 5
BOND INSURANCE ............................................................................................................ 5
   Payment Pursuant to Financial Guaranty Insurance Policy ............................................ 5
   Ambac Assurance Corporation ........................................................................................ 6
   Available Information ....................................................................................................... 7
   Incorporation of Certain Documents by Reference ......................................................... 7
CERTAIN RISK FACTORS ................................................................................................. 7
   Loan Purchase Risk .......................................................................................................... 7
   Changes in Federal Law ................................................................................................... 7
   Student Loan Market Risk ................................................................................................ 8
   Certain Considerations Affecting the Receipt of Revenues in the Trust Estate ............. 8
   Financial Health of the Guaranty Agency ....................................................................... 9
   Dependence Upon Third-Party Loan Servicers ............................................................... 9
   Noncompliance with Certain Higher Education Act Requirements ................................. 10
   Dependence Upon Third-Party Loan Originators ............................................................ 10
   Recapture of Revenue ...................................................................................................... 11
   Basis Risk ......................................................................................................................... 11
   Uncertainty as to Available Remedies ............................................................................. 11
   Actions Taken Based On Insurer Approvals or Rating Affirmations .............................. 12
   Secondary Market for the 2007 Bonds May Not Develop ............................................... 12
   Additional Obligations ..................................................................................................... 12
   Interest Rates on Investments .......................................................................................... 12
   Swap Agreements ............................................................................................................. 12
DESCRIPTION OF THE 2007 BONDS ............................................................................. 13
   General ............................................................................................................................. 13
   Redemption Provisions ..................................................................................................... 13
   Registration of Transfer and Exchange ........................................................................... 13
BOOK-ENTRY SYSTEM ................................................................................................... 14
AUCTION RATE BONDS ................................................................................................... 16
   General Terms ................................................................................................................... 16
   Auction Participants ......................................................................................................... 17
   Interest Rates on the 2007 Bonds .................................................................................... 18
   Auctions ........................................................................................................................... 19
   Adjustment in Percentages ............................................................................................... 20
   Changes in Auction Periods, Auction Dates, or Interest Payment Dates ........................ 20
   Disruption in Auction Procedures .................................................................................... 21
   Auctions May Not Be Held Because of Resignation of the Auction Agent or the Designated
      Broker-Dealer ............................................................................................................... 22
   Fixed Rate Conversion of Auction Rate Bonds ............................................................... 22
   Variable Rate Conversion of Auction Rate Bonds .......................................................... 22
   Mandatory Tender Upon Conversion; Certain Notices .................................................... 22
   Inadequate Funds for Tenders; Failed Conversion .......................................................... 23
   No Tender Purchases After Call for Redemption ............................................................ 23
   Undelivered Bonds ........................................................................................................... 24

CERTAIN CONSIDERATIONS AFFECTING AUCTION RATE BONDS........................................................ 24
    No Assurances Regarding Auction Outcomes.................................................................................... 24
    Existing Owner's Ability to Resell Auction Rate Securities May Be Limited ................................ 24
    Bidding by Designated Broker-Dealer ............................................................................................. 25
    Broker-Dealer Fees .......................................................................................................................... 26
    Price Talk ......................................................................................................................................... 26
    All-or-Nothing Bids ......................................................................................................................... 26
    Deadlines and Auction Periods......................................................................................................... 26
    SEC Inquiry ...................................................................................................................................... 27
THE AUTHORITY .................................................................................................................................... 27
    General ............................................................................................................................................. 27
    Governance and Management Personnel............................................................................................ 27
    The Authority's Education Finance Activities ................................................................................. 29
SERVICER INFORMATION .................................................................................................................... 29
    General ............................................................................................................................................. 29
    The Authority's Due Diligence Obligation ...................................................................................... 30
    Servicers .......................................................................................................................................... 30
    Edfinancial Services ........................................................................................................................ 30
    FISC ................................................................................................................................................. 31
    Servicing Agreements ...................................................................................................................... 31
GUARANTY AGENCY ............................................................................................................................ 31
CONTINUING DISCLOSURE................................................................................................................... 33
    General ............................................................................................................................................. 33
    Annual Financial Information ........................................................................................................... 34
    Event Notice .................................................................................................................................... 34
    Definitions........................................................................................................................................ 35
    Repositories ..................................................................................................................................... 35
TAX MATTERS ........................................................................................................................................ 35
    Opinion of Bond Counsel ................................................................................................................ 35
    Certain Ongoing Federal Tax Requirements and Covenants............................................................. 36
    Certain Collateral Federal Tax Consequences................................................................................... 36
    Information Reporting and Backup Withholding ............................................................................... 36
    Legislation ....................................................................................................................................... 37
CERTAIN STATE LEGISLATION ........................................................................................................... 37
LEGALITY FOR INVESTMENT .............................................................................................................. 37
ABSENCE OF MATERIAL LITIGATION................................................................................................. 37
APPROVAL OF LEGALITY ..................................................................................................................... 37
RATINGS................................................................................................................................................... 37
UNDERWRITING ..................................................................................................................................... 38
INDEPENDENT ACCOUNTANTS ........................................................................................................... 38
MISCELLANEOUS ................................................................................................................................... 38

APPENDIX A - SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY
            EDUCATION LOAN PROGRAM ......................................................................... A-1
APPENDIX B - DEFINITIONS OF CERTAIN TERMS ............................................................. B-1
APPENDIX C - SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE...................... C-1
APPENDIX D - PROPOSED FORM OF APPROVING OPINION OF BOND COUNSEL ............. D-1
APPENDIX E - AUCTION PROCEDURES FOR THE 2007 BONDS ......................................... E-1
APPENDIX F - SETTLEMENT PROCEDURES FOR THE 2007 BONDS.................................... F-1
APPENDIX G - CERTAIN INFORMATION CONCERNING THE AUTHORITY AND THE
            TRUST ESTATE................................................................................................... G-1
APPENDIX H - SPECIMEN FINANCIAL GUARANTY INSURANCE POLICY ........................ H-1

## OFFICIAL STATEMENT
### $140,000,000
### FINANCE AUTHORITY OF MAINE
**$50,000,000 Education Loan Revenue Bonds, 2007 Senior Series A-1**
**$50,000,000 Education Loan Revenue Bonds, 2007 Senior Series A-2**
**$40,000,000 Education Loan Revenue Bonds, 2007 Senior Series A-3**

### INTRODUCTION

This Official Statement sets forth certain information concerning the Finance Authority of Maine (the "Authority"), a body corporate and politic and a public instrumentality of the State of Maine (the "State"), established and existing under Title 10, Chapter 110 of the Maine Revised Statutes of 1964, as amended, and the issue of its $50,000,000 in aggregate principal amount of Education Loan Revenue Bonds, 2007 Senior Series A-1 (the "2007 A-1 Bonds"), its $50,000,000 in aggregate principal amount of Education Loan Revenue Bonds, 2007 Senior Series A-2 (the "2007 A-2 Bonds") and its $40,000,000 in aggregate principal amount of Education Loan Revenue Bonds, 2007 Senior Series A-3 (the "2007 A-3 Bonds" and, with the 2007 A-1 Bonds and the 2007 A-2 Bonds, the "2007 Bonds"). The 2007 Bonds are being issued pursuant to Title 20-A, Chapter 417-F of the Maine Revised Statutes of 1964 (the "Act"), the Indenture of Trust dated as of December 1, 2003 (the "General Indenture") and the Third Supplemental Indenture dated as of May 1, 2007 (the "Third Supplemental Indenture" and, collectively with the General Indenture, the "Indenture"). The Third Supplemental Indenture amends certain provisions of the General Indenture. Capitalized terms used and not otherwise defined herein shall have the meanings given them in Appendix B, "DEFINITIONS OF CERTAIN TERMS" and Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS." See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE."

The 2007 Bonds are the third issue of Bonds issued pursuant to the General Indenture by the Authority and the third financing of its Higher Education Loan Purchase Program (the "Loan Program"). As of the date hereof, the aggregate principal amount of Bonds Outstanding is $175,000,000, of which $164,000,000 constitute Senior Obligations and $11,000,000 constitute Subordinate Obligations. A portion of the initial proceeds of the 2007 Bonds is being used to refund, within 90 days after the date of issuance of the 2007 Bonds, all of the Authority's Outstanding Subordinate Obligations. See "PLAN OF FINANCE."

The General Indenture permits the issuance of additional bonds (the "Additional Bonds") or other Obligations through the adoption of additional Supplemental Indentures. The priority of claim as to payment of such Additional Bonds and certain other Obligations arising under the Indenture may be equal to or inferior to the 2007 Bonds. The General Indenture also permits the Authority to enter into Obligation Facilities or Swap Facilities the payment of which by the Authority shall have the same priority of claim as to payment under the General Indenture as does the Series of Bonds or other Obligations to which such Obligation Facilities or Swap Facilities relate.

The 2007 Bonds are being issued as auction rate bonds (the "Auction Rate Bonds"). This Official Statement, in general, describes the 2007 Bonds only while they are outstanding as Auction Rate Bonds.

Payment of the principal of and interest on the 2007 Bonds when due will be insured by a financial guaranty insurance policy (the "Policy") to be issued by Ambac Assurance Corporation (the "Insurer") simultaneously with the delivery of the 2007 Bonds. A specimen of the Policy is set forth in Appendix H hereto. In addition, the Insurer is expected, upon the issuance of the 2007 Bonds, to deliver a policy similar to the Policy with respect to each Series of Senior Obligations Outstanding as of the date hereof. See "PLAN OF FINANCE."

The 2007 Bonds will be equivalent in right of payment under the General Indenture with all other Senior Obligations (as defined herein) that are currently Outstanding (as defined herein) or that may be issued thereunder in the future, and are senior in right of payment under the General Indenture to all Senior Subordinate Obligations (as defined herein) that may be issued thereunder in the future and all other Subordinate Obligations (as defined herein) that are currently Outstanding or that may be issued thereunder in the future.

Subject to the provisions of the General Indenture, a Trust Estate including the following assets is pledged to the payment of the principal of, redemption price, if any, and interest on the 2007 Bonds, the currently Outstanding Bonds, any Additional Bonds and any other Obligations: (i) all moneys, including proceeds of Bonds, held in any of the funds and accounts (other than the Earnings Account and the Rebate Account) established and held under the

Indenture or received by the Trustee for deposit in such funds and accounts (other than the Earnings Account and the Rebate Account); (ii) all Loans, the Authority's right, title and interest in which is funded through the application of assets described in (i) above, along with all documentation thereof and all rights of the Authority with respect thereto; (iii) all guarantee or insurance payments with respect to Loans and interest thereon described in (ii) above; (iv) all other Revenues; (v) all rights of the Authority with respect to any Servicing Agreements; (vi) all Swaps or Swap Facilities; and (vii) all direct or indirect proceeds of any of the assets described in (i) through (vi) above. Such pledge is subject to the reserved rights of the Authority to administer and to direct the enforcement of contractual rights so long as no Event of Default, as defined for purposes of the Indenture, exists. See "SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS—The Pledge of the General Indenture."

The 2007 Bonds are subject to redemption as more fully described herein under the caption "DESCRIPTION OF THE 2007 BONDS—Redemption Provisions." Further, the Third Supplemental Indenture provides that the 2007 Bonds originally issued as Auction Rate Bonds may be converted to bear interest at a Variable Rate or a Fixed Rate. See "AUCTION RATE BONDS—Fixed Rate Conversion of Auction Rate Bonds," "—Variable Rate Conversion of Auction Rate Bonds" and "—Mandatory Tender Upon Conversion; Certain Notices." The Trustee is the initial Paying Agent and Registrar for the 2007 Bonds.

Descriptions of the 2007 Bonds, the Indenture and related documents are included in this Official Statement. The descriptions of such documents included in this Official Statement do not purport to be comprehensive or definitive and are qualified in their entirety by reference to such documents, which documents are on file with the Trustee.

## PLAN OF FINANCE

The Authority has previously issued its $69,500,000 Education Loan Revenue Bonds, 2003 Senior Series A (the "2003 Senior Series A Bonds"), its $5,500,000 Education Loan Revenue Bonds, 2003 Subordinate Series B (the "2003 Subordinate Series B Bonds"), its $47,500,000 Education Loan Revenue Bonds, 2005 Senior Series A-1 (the "2005 Senior Series A-1 Bonds"), its $47,500,000 Education Loan Revenue Bonds, 2005 Senior Series A-2 (the "2005 Senior Series A-2 Bonds"), and its $5,500,000 Education Loan Revenue Bonds, 2005 Subordinate Series B (the "2005 Subordinate Series B Bonds"). All such previously issued Bonds are Outstanding as of the date hereof.

The 2007 Bonds will be the first Series of Bonds to be issued by the Authority that are expected to be assigned ratings upon their initial issuance on the basis of the Policy that is expected to be delivered by the Insurer upon such issuance. The Insurer is also expected, upon the issuance of the 2007 Bonds, to deliver a separate financial guaranty insurance policy with respect to each of (i) the 2003 Senior Series A Bonds; and (ii) the 2005 Senior Series A-1 Bonds and the 2005 Senior Series A-2 Bonds. In addition, the Authority expects to apply a portion of the proceeds of the 2007 Bonds and certain other amounts held under the Indenture to refund all currently Outstanding 2003 Subordinate Series Bonds on June 20, 2007 and to refund all currently Outstanding 2005 Subordinate Series B Bonds on July 5, 2007. In conjunction with these actions, the Authority expects to amend the General Indenture, and to supplement the First Supplemental Indenture dated as of December 1, 2003 and the Second Supplemental Indenture dated as of June 1, 2005, for the purposes of granting certain rights to the Insurer and of effecting changes to, or superseding, certain provisions of such documents, including provisions addressing the Loan Program. The summaries of the Indenture included in this Official Statement reflect such amendments, which will be effective with respect to the 2007 Bonds upon their initial issuance. See "SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS" and Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE."

A portion of the proceeds of the 2007 Bonds is being used to provide funding for the purchase and the origination by the Authority of Student Loans in accordance with the Act and the Indenture. The Authority currently expects to apply all proceeds of the 2007 Bonds available therefor to finance, by April 1, 2010, Student Loans made pursuant to the Federal Family Education Loan Program (the "FFEL Program" and the "FFELP Loans") and to act as Guaranty Agency with respect to such Student Loans. The Authority further expects to offer fee, principal or interest rate reductions, or any combination of them, and other benefits to borrowers as part of its Loan Program. See "CERTAIN RISK FACTORS – Loan Purchase Risk," "DESCRIPTION OF THE 2007 BONDS – Redemption Provisions – *Mandatory Redemption of 2007 Bonds from Unexpended Bond Proceeds*," "THE AUTHORITY—The Authority's Education Finance Activities," "GUARANTY AGENCY" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

The Authority reserves the right to apply amounts held under the Indenture to finance FFELP Loans that are guaranteed by Guaranty Agencies other than the Authority and to finance Student Loans that are not FFELP Loans, subject to the provisions of the Indenture, which upon delivery of the 2007 Bonds will require the prior written consent of the Insurer ("Insurer Approval"). See "THE AUTHORITY—The Authority's Education Finance Activities." The Authority expects to apply a portion of the 2007 Bond proceeds to pay costs of issuance in connection with the 2007 Bonds. The Authority may transfer funds in the Revenue Account to the Loan Account as permitted by the Indenture to be used to acquire additional Student Loans until April 1, 2010, unless such date is extended by the Authority by delivery to the Trustee of a Certificate accompanied by an Insurer Approval. See "CERTAIN RISK FACTORS – Actions Taken Based On Insurer Approvals or Rating Affirmations."

## SOURCES AND USES OF FUNDS

The sources of funds and the uses thereof in connection with the 2007 Bonds are expected to be approximately as set forth below.

| Sources | |
|---|---|
| Net proceeds of the Series 2007 Bonds | $139,552,000 |
| Total Sources | $139,552,000 |

| Uses | |
|---|---|
| Deposit in Loan Account | $126,312,000 |
| Refunding of Bonds to be Refunded | 11,000,000 |
| Deposit in Debt Service Reserve Fund | 1,400,000 |
| Deposit in Revenue Account to pay Costs of Issuance, including the premium for the Policy | 840,000 |
| Total Uses | $139,552,000 |

**Initial Collateralization**

Upon completion of the application of the proceeds of the 2007 Bonds, it is anticipated that the value of the assets pledged under the General Indenture will be equal to approximately 98.4% of the aggregate principal amount of the then Outstanding Senior Bonds. The General Indenture does not require that this level of collateralization be established or maintained. See "PLAN OF FINANCE."

## SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS

**Limited Liability**

The 2007 Bonds are special and limited obligations of the Authority, secured by and payable from specific revenues, funds, and assets pledged therefor as herein described. None of the State, any political subdivision of the State or the Authority are obligated to pay the 2007 Bonds or the interest thereon except from the specific revenues, funds and assets so pledged and neither the faith and credit nor the taxing power of the State or any political subdivision of the State is pledged to such payment. The issuance of 2007 Bonds does not directly or indirectly or contingently obligate the State or any political subdivision of the State to levy or to pledge any form of taxation whatever or to make any appropriation for the payment of the 2007 Bonds. The 2007 Bonds do not constitute any debt or liability of the State, of any political subdivision of the State or the Authority, a loan of the credit of the State or a pledge of the faith and credit of the State, of any political subdivision of the State or of the Authority, but are payable solely from the funds provided for payment of the 2007 Bonds. The Authority has no taxing power.

**The Pledge of the General Indenture**

The Act provides that any pledge made by the Authority of income, revenues or other property is valid and binding from the time made and further provides that the income, revenues or other property so pledged and thereafter received by the Authority or on behalf of the Authority by any eligible lender, servicer, trustee, custodian or collection agent pursuant to any resolution or agreement authorized by the Act and pledged by the Authority for the benefit of Bondholders is immediately subject to the lien of such pledge without any physical delivery or further act, and that the

lien of any such pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Authority, or such other recipient on behalf of the Authority, irrespective of whether such parties have notice thereof.

The General Indenture establishes a pledge of the Trust Estate for the benefit of Owners of all Obligations on a basis of parity and, subject to the provisions of the General Indenture, permitting the application thereof for the purposes of and on the terms and conditions set forth in the General Indenture and provides that such pledge constitutes a first lien thereon. The Trust Estate includes, subject to certain reserved rights of the Authority, the following: (i) all moneys, including proceeds of Bonds, held in any of the funds and accounts (other than the Earnings Account and the Rebate Account) established and held under the Indenture or received by the Trustee for deposit in such funds and accounts (other than the Earnings Account and the Rebate Account); (ii) all Loans, the Authority's right, title and interest in which is funded through the application of assets described in (i) above, along with all documentation thereof and all rights of the Authority with respect thereto; (iii) all guarantee or insurance payments with respect to Loans and interest thereon described in (ii) above; (iv) all other Revenues; (v) all rights of the Authority with respect to any Servicing Agreements; (vi) all Swaps or Swap Facilities; and (vii) all direct or indirect proceeds of any of the assets described in (i) through (vi) above. Such pledge is subject to the reserved rights of the Authority to administer and to direct the enforcement of contractual rights so long as no Event of Default, as defined for purposes of the Indenture, exists.

## Principal, Interest, Interest Subsidy and Special Allowance Payments on FFELP Loans

Payments of the principal of and interest on the Loans, along with Interest Subsidy Payments and Special Allowance Payments (as such terms are defined in Appendix A), if any, with respect to FFELP Loans, are expected to be received by the Authority in amounts sufficient, together with other revenues and amounts held under the Indenture, to pay the principal of and interest on the 2007 Bonds when due. The Authority is entitled to receive Interest Subsidy Payments from the Secretary of the United States Department of Education (the "Secretary") with respect to each Federal Subsidized Stafford Loan (as such term is defined in Appendix A) in the Trust Estate for the entire amount of interest due on such Loan during the period the student is in school, during grace periods, and during periods of deferment. During all other periods, interest on Federal Subsidized Stafford Loans is collected from the borrower. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Interest Subsidy Payments on Subsidized Stafford Loans." With respect to FFELP Loans in the Trust Estate, the Authority is also entitled to receive Special Allowance Payments which the Secretary is required by the Higher Education Act to pay on a quarterly basis. See "CERTAIN RISK FACTORS – Recapture of Revenues" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Special Allowance Payments." On Federal PLUS Loans, Federal SLS Loans, Federal Unsubsidized Stafford Loans, and Federal Consolidation Loans, the Authority collects interest payments from the borrower from the date of loan purchase. Repayment of Federal Consolidation Loans commences within 60 days of the discharge by the lenders of the consolidated loans.

## Debt Service Reserve Fund

The 2007 Bonds are secured by a Debt Service Reserve Fund that is created by the General Indenture and pledged to the security of all Obligations issued under the Indenture. The Indenture currently requires that the Debt Service Reserve Fund shall at all times be maintained at a level at least equal to 1% of the aggregate principal amount of Bonds Outstanding, subject to a $500,000 Debt Service Reserve Fund minimum requirement; and further subject, however, to reduction upon receipt of an Insurer Approval. There is no assurance that the Reserve Fund Requirement will be maintained at its current level or will be increased. Upon the issuance of any Additional Bonds or other Obligations, amounts in the Debt Service Reserve Fund shall also secure payment of such Additional Bonds or other Obligations in accordance with the priority of payment established under the Indenture. See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE—Establishment of Accounts."

Prior to using any moneys in the Debt Service Reserve Fund to make certain payments with respect to Obligations, the Trustee is required to use amounts credited to the Loan Account, without liquidating Loans credited thereto, for the purpose of making such payments on the Obligations. Under the General Indenture, the Trustee is required, on each Interest Payment Date, to transfer from the Revenue Account to the Debt Service Reserve Fund, the amount, if any, necessary to cause the Debt Service Reserve Fund to be funded at the Reserve Fund Requirement, subsequent to paying the amounts due on the 2007 Bonds or any other Senior Obligations or other Obligations equal in

priority with the 2007 Bonds, but prior to making any payment on any Subordinate Obligations. See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE—Loan Account," "—Debt Service Reserve and Liquidity Account," and "—Revenue Account."

The Authority reserves the right to deposit with the Trustee a Reserve Fund Facility in satisfaction of the Reserve Fund Requirement applicable to the 2007 Bonds upon receipt of an Insurer Approval. See "CERTAIN RISK FACTORS – Actions Taken Based On Insurer Approvals or Rating Affirmations."

**Withdrawal of Excess Coverage**

The General Indenture provides that the Authority may withdraw amounts from the Revenue Account, under certain circumstances, free and clear of the lien of the General Indenture if, as certified to the Trustee by an Authorized Officer, there exists Excess Coverage after such withdrawal, subject to receipt of an Insurer Approval as provided in the General Indenture. See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE — Revenue Account."

**Additional Obligations**

The General Indenture permits the issuance of Additional Obligations, including Obligations bearing interest on a basis that is different from the 2007 Bonds, subject to certain conditions specified in the General Indenture. The priority of claim as to payment of such Additional Obligations under the General Indenture may be equal to or inferior to that of the 2007 Bonds or any other Senior Obligations, may be superior, inferior or equal to that of any Senior Subordinate Bonds and may be superior or equal to that of any Subordinate Obligations.

The General Indenture also permits the Authority to undertake additional Obligations pursuant to certain types of contracts ("Obligation Facilities" or "Swap Facilities"). The priority of payment of Obligation Facilities or Swap Facilities may be equal to or inferior to that of the 2007 Bonds and any other Senior Obligations, may be equal, superior or inferior to that of any Senior Subordinate Obligations or may be superior, inferior or equal to that any Subordinate Obligations.

Prior to issuing Additional Bonds or entering into Obligation Facilities or Swap Facilities, the Trustee is required to receive an Insurer Approval. In addition, prior to issuing Additional Bonds, the Trustee is required to receive a Rating Affirmation from each Rating Agency maintaining a rating on the 2007 Bonds that issuing such Additional Bonds in and of itself will not have an adverse effect on the rating of any Outstanding Bonds. See "CERTAIN RISK FACTORS – Actions Taken Based On Insurer Approvals or Rating Affirmations."

## BOND INSURANCE

**The following information has been furnished by the Insurer for inclusion in this Official Statement. Neither the Authority nor the Underwriter has independently verified or guarantees or makes any representation as to the accuracy or completeness of such information or as to the absence of material change thereto subsequent to the date hereof. Reference is made to Appendix H for a specimen of the Policy which has been provided by the Insurer for use herein.**

**Payment Pursuant to Financial Guaranty Insurance Policy**

The Insurer has made a commitment to issue the Policy relating to the 2007 Bonds effective as of the date of issuance of the 2007 Bonds. Under the terms of the Policy, the Insurer will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the 2007 Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment (as such terms are defined in the Policy) by the Obligor. The Insurer will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which the Insurer shall have received notice of Nonpayment from the Trustee. The insurance will extend for the term of the 2007 Bonds and, once issued, cannot be canceled by the Insurer.

The Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the 2007 Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding 2007 Bonds, the Insurer will remain obligated to pay principal of and interest on outstanding 2007 Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the 2007 Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that the Insurer elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by the Obligor). Upon payment of all such accelerated principal and interest accrued to the acceleration date, the Insurer's obligations under the Policy shall be fully discharged.

The Policy does not insure against loss relating to payments made in connection with the sale of the 2007 Bonds at auctions or losses suffered as a result of a holder's inability to sell the 2007 Bonds.

In the event the Trustee has notice that any payment of principal of or interest on the 2007 Bonds which has become Due for Payment and which is made to a holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from the Insurer to the extent of such recovery if sufficient funds are not otherwise available.

The Policy does **not** insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Policy does **not** cover:

1.  payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

2.  payment of any redemption, prepayment or acceleration premium; or

3.  nonpayment of principal or interest caused by the insolvency or negligence of the Trustee.

If it becomes necessary to call upon the Policy, payment of principal requires surrender to the Insurance Trustee of the 2007 Bonds, together with an appropriate instrument of assignment so as to permit ownership of such 2007 Bonds to be registered in the name of the Insurer to the extent of the payment under the Policy. Payment of interest pursuant to the Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the holder's right to payment to the Insurer.

Upon payment of the insurance benefits, the Insurer will become the owner of the 2007 Bonds, appurtenant coupon, if any, or right to payment of principal of or interest on the 2007 Bonds and will be fully subrogated to the surrendering holder's rights to payment.

## Ambac Assurance Corporation

The Insurer is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth of Puerto Rico and the U.S. Virgin Islands, with admitted assets of approximately $10,015,000,000 (unaudited) and statutory capital of approximately $6,371,000,000 (unaudited) as of December 31, 2006. Statutory capital consists of the Insurer's policyholders' surplus and statutory contingency reserve. Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), Moody's Investors Service, Inc. ("Moody's") and Fitch Ratings ("Fitch") have each assigned a triple-A financial strength rating to the Insurer.

The Insurer has obtained a ruling from the Internal Revenue Service to the effect that the insuring of the 2007 Bonds by the Insurer will not affect the treatment for federal income tax purposes of interest on the 2007 Bonds and that insurance proceeds representing maturing interest paid by the Insurer under policy provisions substantially identical to those contained in the Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor.

The Insurer makes no representation regarding the 2007 Bonds or the advisability of investing in the 2007 Bonds and makes no representation regarding, nor has it participated in the preparation of, the Official Statement other than the information supplied by the Insurer and presented under the heading "BOND INSURANCE" and in Appendix H.

## Available Information

The parent company of the Insurer, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Copies of the Insurer's financial statements prepared in accordance with statutory accounting standards are available from the Insurer. The address of the Insurer's administrative offices is One State Street Plaza, 19th Floor, New York, New York 10004 and its telephone number is (212) 668-0340.

## Incorporation of Certain Documents by Reference

The following document filed by the Company with the SEC (File No. 1-10777) is incorporated by reference in this Official Statement:

1. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and filed on March 1, 2007; and

2. The Company's Current Report on Form 8-K dated and filed on April 25, 2007.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information."

# CERTAIN RISK FACTORS

Investors should consider the factors set forth below in light of the payment priorities of the 2007 Bonds and any other Senior Obligations over any Senior Subordinate Obligations and any Subordinate Obligations. See "SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS—Additional Obligations." **This section of this Official Statement does not include all risk factors, and does not constitute a comprehensive summary of the risk factors addressed, but is an attempt to summarize certain of such matters. Investors should read this Official Statement in its entirety.**

## Loan Purchase Risk

The Authority initiated its program of acquiring Student Loans in February 2004. The 2007 Bonds are the third issue of Authority bonds for the purpose of acquiring Student Loans. The Authority has established a program of acquiring FFELP Loans with benefits which the Authority believes are attractive to borrowers. The Authority has entered into forward purchase agreements with certain eligible lenders which will originate the FFELP Loans which the Authority expects to purchase with proceeds of the Series 2007 Bonds. There can be no assurance, however, that the Authority's expectations regarding purchase of FFELP Loans will be achieved.

## Changes in Federal Law

The Higher Education Act has been amended and reauthorized numerous times since its original enactment in 1965. The Department's authority to provide interest subsidies and federal insurance for loans originated under the

Higher Education Act terminates on a date specified in the Higher Education Act and currently extends to September 30, 2012 with respect to new FFELP Loans and to September 30, 2016 with respect to additional FFELP Loans to existing borrowers for purposes other than consolidation. The programs effected by the Higher Education Act have also been the subject of numerous statutory and regulatory changes over the last several years that have resulted in material modifications to such programs. There can be no assurance that relevant federal law, including the Higher Education Act, will not be changed in a manner which might adversely affect the Authority and its Loan Program. Proposed amendments to the Higher Education Act could alter the FFEL Program in ways which could restrict the future ability of secondary market participants, such as the Authority, to finance FFELP Loans. See Appendix A – "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

On January 17, 2007 the United States House of Representatives adopted the College Student Relief Act of 2007 ("H.R.5"). A separate bill entitled the Student Debt Relief Act of 2007 ("S.359") was introduced in the United States Senate on January 22, 2007 by Senate Health, Education, Labor and Pensions Chairman Edward Kennedy. In addition, the Budget of the United States Government, Fiscal Year 2008 (the "Executive Budget") was released on February 5, 2007. Each of H.R.5, S.359 and the Executive Budget contain numerous amendments to existing provisions of the Higher Education Act that might adversely affect the demand for FFELP Loans as well as amendments to such provisions that would have the direct effect of decreasing the value of FFELP Loans to some or all holders of FFELP Loans. Although certain provisions of the H.R.5, S.359 and the Executive Budget are similar, such provisions, in general, are not identical. Amendment of the provisions of the Higher Education Act as proposed by any of the H.R.5, S.359 and the Executive Budget would be substantially adverse to the interests of holders of FFELP Loans, including the Authority. In addition, several separate bills which would further regulate the practices of FFELP Loan lenders have been introduced in the United States Senate and the United States House of Representatives (collectively, with H.R.5, S.359 and the Executive Budget, the "Pending Federal Bills"), including the Student Loan Sunshine Act (H.R. 890), which was adopted by the United States House of Representatives on May 9, 2007. No assurance can currently be given as to whether any of the Pending Federal Bills will become law or, if any should become law, will do so in their current form. No assurance can be given that relevant federal laws, including the Higher Education Act, or regulations, will not be changed in the future in a manner that might adversely affect the Trust Estate. Both Title IV of the Higher Education Act and the regulations promulgated thereunder have been the subject of frequent and extensive amendments in recent years and there can be no assurance that further amendment will not materially change the provisions described herein or the effect thereof. In addition, the operation of the FFEL Program has recently been, and may in the future be, affected by proposed and enacted federal budgetary, bankruptcy and tax legislation.

**Student Loan Market Risk**

The Loan Program must compete with numerous lenders who offer FFELP Loans, and other loans, on a regional or national basis for the purpose of funding higher education costs, including other lenders whose lending programs are financed through application of proceeds of tax-exempt obligations, State-sponsored and for profit lenders whose lending programs benefit from economies that result from the size and repayment characteristics of their existing portfolios of FFELP Loans and the federal Department of Education through the Federal Direct Student Loan Program. Moreover, the overall demand for FFELP Loans is strongly influenced by federal and state higher education finance policies. Such policies directly affect student costs of attendance. Such policies, which make available to students and their families a variety of grants, loans and tax incentives, also affect payment of, or saving to pay, such costs of attendance by students and their families. Such policies, including those of the State, are subject to frequent change. No assurance can be given concerning the likelihood and nature of future changes in federal and State education finance policies including those of the State. See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE –Agreement of State."

**Certain Considerations Affecting the Receipt of Revenues in the Trust Estate**

The availability under the General Indenture of adequate amounts to fund the timely payment of Obligation debt service and other expenses required to be paid thereunder is dependent upon the performance of the Loans to be acquired as part of the Trust Estate pledged thereunder. The Authority currently expects to apply all 2007 Bond proceeds that are available to finance Student Loans by April 1, 2010. The Authority's current expectations that it will be able to fully apply available 2007 Bond proceeds to finance Student Loans and that Revenues received with respect to the Loan portfolio will be sufficient to fund General Indenture requirements, and to maintain the initial ratings

assigned to the 2007 Bonds by the Rating Agencies, are based upon cash flow projections derived from certain assumptions relative to Loan portfolio composition and performance. The Authority believes such assumptions to be reasonable, based in part upon its experience operating a program of financing Student Loans since February, 2004 and in part upon its historic and current experience as a guaranty agency under the FFEL Program. There can be no assurance, however, that actual Loan portfolio results will conform to such projections. See "PLAN OF FINANCE," "THE AUTHORITY — The Authority's Education Finance Activities," "GUARANTY AGENCY" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM – Legislative and Administrative Matters."

Revenues actually received with respect to the Loans may vary greatly in both timing and amount as a result of a variety of economic, social and other factors, including both individual factors, such as additional periods of deferral or forbearance prior to or after a borrower's commencement of repayment, loan consolidations or refundings, and general factors, such as a general economic downturn that could increase the incidence of delinquent and defaulted Loans. The Higher Education Act currently provides that holders of defaulted FFELP Loans are generally entitled to receive reimbursement from the Guaranty Agency for 97% of loss incurred with respect to most defaulted FFELP Loans that were first disbursed on or after July 1, 2006. Failures by borrowers, guaranty agencies and the federal Department of Education (the "Department") to make payments with respect to Loans on a timely basis, and the incidence of borrower defaults and prepayments, will affect the amount of Revenues received by the Authority. With respect to certain servicers, the reimbursement rate for such defaulted FFELP Loans can be up to 99%. Because Federal Consolidation Loans are fixed rate loans, low-interest rate environments create an increased risk that borrowers may consolidate variable rate Loans which could result in a decrease in the aggregate balance of Loans held in the Trust Estate. There can be no assurance that the Authority will be able to apply the proceeds resulting from any such consolidations to the financing of additional Loans in a manner consistent with the assumptions utilized by the Authority in structuring the 2007 Bonds. See "PLAN OF FINANCE." Congress has periodically adopted legislation, which provides certain relief to certain borrowers, such as teachers and members of the military, the effects of which could be adverse to holders of Loans. Payments received by the Authority on Loans made to borrowers who qualify for such relief may be subject to such limitations. There can be no assurance that additional legislation of this type will not be adopted in the future. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Certain Recent Developments," "—The Consolidation Loan Program" and "—Federal Insurance and Reinsurance and Reimbursement of Guaranty Agencies."

## Financial Health of the Guaranty Agency

The FFELP Loans are not secured by any collateral of the borrowers. Payments of principal and interest are guaranteed in whole or in part by the Guaranty Agency as herein further described in Appendix A – "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM." Excessive borrower defaults could impair the Guaranty Agency's ability to meet its guarantee obligations. The financial health of the Guaranty Agency could affect the timing and amount of available funds for any collection period and the Authority's ability to pay principal of and interest on the 2007 Bonds.

Although a holder of FFELP Loans could submit default claims for payment directly to the Department pursuant to the Higher Education Act if the Department determines that the Guaranty Agency is unable to meet its insurance obligations, there is no assurance that the Department would make such a determination or that it would pay claims in a timely manner. See "– Noncompliance with Certain Higher Education Act Requirements," "GUARANTY AGENCY" and Appendix A – "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

## Dependence Upon Third-Party Loan Servicers

The Authority is currently dependent on one or more third parties to service Loans. The Authority entered into its current Servicing Agreements with Financial Institutions Service Corporation ("FISC") as of May 1, 2007 and with Edfinancial Services, LLC, ("Edfinancial Services") effective as of May 1, 2007. The Authority reserves the right, however, to establish different Loan servicing arrangements in accordance with the Indenture. See "—Noncompliance with Certain Higher Education Act Requirements" and "SERVICER INFORMATION." The cash flow projections utilized by the Authority in structuring the 2007 Bonds were based upon assumptions with respect to servicing costs which the Authority believes are reasonable. The expiration dates of the Servicing Agreements are substantially before the maturity date of the 2007 Bonds. Upon scheduled or early termination of a

Servicing Agreement, no assurance can be given that the Authority will be able to extend the term of such Servicing Agreement, or to enter into a servicing agreement with another Servicer, on terms no less favorable to the Authority than the terms of the prior Servicing Agreements. Although a Servicer will be obligated to cause the Loans to be serviced in accordance with the terms of its Servicing Agreement, the timing of payments on the Loans will be directly affected by the ability of the Servicers to adequately service the Loans. In addition, investors will be relying on compliance by the Servicers with applicable federal and state laws and regulations.

In the event of default by a Servicer, resulting solely from certain events of insolvency or bankruptcy, a court, conservator, receiver or liquidator may have the power to prevent either the Trustee or the Bondholders from appointing a successor Servicer and delays in collections in respect of the Loans may occur. Delays in receipts of payments with respect to Loans in excess of the delinquency and default assumptions utilized by the Authority for purposes of preparing cash flow projections as a basis for structuring the 2007 Bonds may delay the timely payment of principal of and interest on the 2007 Bonds and Program Expenses.

## Noncompliance with Certain Higher Education Act Requirements

The provisions of the Higher Education Act applicable to FFELP Loans, and the implementing regulations thereunder, constitute a comprehensive federal program controlling the terms and conditions of FFELP Loans, including certain fees and other amounts payable by the holders thereof, the administrative requirements applicable thereto and the related duties and permitted activities of FFEL Program participants. Noncompliance with such requirements by the Authority or by any other entity with respect to FFELP Loans might adversely affect payment of principal of and interest on the Bonds when due. The Department has broad powers under the Higher Education Act to assure the compliance of FFEL Program participants with program requirements and a failure by a participant to so comply may result in substantial penalties, including the withholding by the Department of federal payments otherwise due to such participant under the program. The Department has additional powers under the Higher Education Act with respect to guaranty agencies and their reserves, including the ability, subject to certain requirements, to terminate the activities and to transfer the reserve fund assets of such entities. There can be no assurance that the exercise by the Department of such powers will not adversely affect the interests of Owners of the 2007 Bonds. See "GUARANTY AGENCY" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Federal Insurance and Reinsurance and Reimbursement of Guaranty Agencies" and "—Servicer Provisions and Third Party Servicer Requirements." Such provisions and regulations have been the subject of extensive amendment in recent years. There can be no assurance that further amendments thereto, or that other federal legislation, will not adversely affect the interests of Owners of the 2007 Bonds. See "CERTAIN RISK FACTORS—Changes in Federal Law" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Legislative and Administrative Matters."

The Higher Education Act and the applicable regulations thereunder require lenders, guaranty agencies and servicers to follow certain due diligence procedures in an effort to ensure that FFELP Loans are properly made and disbursed to, and timely repaid by, the borrowers. Such procedures are specifically set forth in the Code of Federal Regulations and certain other guidance issued by the Department, and no attempt has been made in this Official Statement to completely describe those procedures. Failure to follow such procedures with respect to FFELP Loans might result in the refusal by the Department to make reinsurance payments to a Guaranty Agency on such FFELP Loans or might result in the Guaranty Agency's refusal to honor its guarantee on such FFELP Loans to the Authority. Such action by the Department could adversely affect a Guaranty Agency's ability to honor guarantee claims with respect to FFELP Loans financed by the Authority, and loss or delay in receipt of guarantee payments to the Authority by a Guaranty Agency with respect to FFELP Loans could adversely affect the amount or timing of payment of principal of and interest on the 2007 Bonds. See "GUARANTY AGENCY" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

## Dependence Upon Third-Party Loan Originators

The Authority is currently dependent on third parties to originate certain FFELP Loans. The Authority has entered into forward purchase agreements (the "Purchase Agreements") to acquire FFELP Loans from certain eligible lenders doing business in the State. The cash flow projections utilized by the Authority in structuring the 2007 Bonds were based upon assumptions with respect to origination. Under the Purchase Agreements, the sellers make certain representations and warranties with respect to the FFELP Loans to be purchased by the Authority. Under the Purchase

Agreements, if the sellers fail to comply with certain representations and warranties set forth therein, the Authority, under certain circumstances, will be entitled to compel the repurchase of nonconforming FFELP Loans. For certain failures to comply with the representations and warranties, or for other breaches of contract, the Authority may also be indemnified for the loss. The sellers may not have sufficient assets to repurchase the FFELP Loans or to indemnify the Authority for such loss at such time. Failure of repurchase or receipt of adequate indemnification may cause some of the FFELP Loans held in the Trust Estate to be held as Loans, without Department reinsurance, Interest Subsidy Payments and Special Allowance Payments. Failure to receive adequate indemnification may cause the Trust Estate to suffer a loss. See "—Student Loan Market Risk" and "—Noncompliance with Certain Higher Education Act Requirements."

**Recapture of Revenue**

Currently applicable provisions of the Higher Education Act (a) limit the total loan revenue, inclusive of special allowance payments, that holders are entitled to retain with respect to FFELP Loans disbursed on or after April 1, 2006 to a "special allowance support level" which varies as a function of commercial paper rates and (b) require holders to rebate revenue upon such FFELP Loans in excess of such limit on a quarterly basis. This effectively limits such holders' returns upon affected FFELP Loans to the "special allowance support level" and could require such holders to rebate to the federal government revenues in excess of such "special allowance support level" that are accrued but not yet received. For holders of affected FFELP Loans bearing interest that is payable by borrowers as fixed rate loans, the excess revenues that may be payable to the federal government will be greater when commercial paper rates are relatively low, causing the "special allowance support level" to fall below the borrowing interest rate. No assurance can be given that continuance of such a condition for an extended period may not adversely affect the liquidity of the Trust Estate. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATIONAL LOAN PROGRAM—Special Allowance Payments."

**Basis Risk**

The interest rate for each Series of the 2007 Bonds will initially be an Auction Rate determined in accordance with the Auction Procedures. It is expected that the FFELP Loans will generally bear interest at an effective rate (taking into account Special Allowance Payments, or similar allowances, if any, authorized from time to time by federal law or regulations) (the "Loan Rates") equal to the rate borne by United States Treasury bills or by 90-day financial commercial paper rates plus specified margins. Special Allowance Payments on FFELP Loans disbursed before January 1, 2000 are computed based upon the average of the bond equivalent rate of the 91-day Treasury bill auctioned for the quarter (the "91-day T-Bill Rate") (or, in certain circumstances, the weekly average one-year constant maturity Treasury yield) plus margins specified for such FFELP Loans. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Legislative and Administrative Matters." As a result of these differences between the indices or methodologies used to determine the Loan Rates and the interest rates on each Series of the 2007 Bonds, the Loan Rates applicable to some or all FFELP Loans can be expected to vary from time to time from the interest rates applicable to the Bonds. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM – Stafford Loans Generally – *Interest*" and "PLUS and SLS Loan Programs – *Interest*."

**Uncertainty as to Available Remedies**

If an Event of Default occurs under the Indenture that causes Owners of Senior Obligations to fail to receive interest or principal payments when due, the Trustee is authorized, subject to certain conditions, to sell the Loans pledged thereunder. There can be no assurance, however, that the Trustee would be able to find a purchaser for such Loans in a timely manner or that the proceeds of any such sale, together with amounts then available in the Debt Service Reserve Fund, would be sufficient to fund payment of the Outstanding Bonds and accrued interest thereon. Due to numerous factors, the demand in the secondary market for FFELP Loans also could be reduced, resulting in fewer potential buyers of the FFELP Loans and lower prices available in the secondary market for those FFELP Loans. The Indenture provides that the Insurer may generally direct the exercise of remedies upon the occurrence of an Event of Default. See "SOURCES AND USES OF FUNDS —Initial Collateralization," "—Student Loan Market Risk" and Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE – Events of Default."

The remedies available to Owners of the Bonds upon an Event of Default under the Indenture or other documents described herein are in many respects dependent upon regulatory and judicial actions that often are subject

to discretion and delay. Under existing constitutional and statutory law and judicial decisions, including specifically Title 11 of the United States Code (the federal bankruptcy code), the remedies specified by the Indenture and such other documents may not be readily available or may be limited. The various legal opinions to be delivered concurrently with the issuance of the 2007 Bonds will be qualified, as to the enforceability of the various legal instruments, by limitations imposed by bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally. See "RATINGS."

## Actions Taken Based On Insurer Approvals or Rating Affirmations

The Indenture provides that the Authority and the Trustee may undertake various actions with respect to the 2007 Bonds based upon receipt by the Trustee of an Insurer Approval. Such actions include the execution and delivery of Additional Obligations, the inclusion in the Trust Estate of additional Student Loans that are other than as described herein, the extension of certain dates for the acquisition or origination of Student Loans, the continued origination or purchase of FFELP Loans after certain changes in the Higher Education Act, and the implementation of or certain amendments to certain programs to reduce costs to Student Loan borrowers. To the extent such actions are taken after the issuance of the 2007 Bonds, the consent of the Holders of the 2007 Bonds is not required and such actions will be taken upon receipt of an Insurer Approval, except during the continuance of an Obligation Facility Provider Default, and, with respect to the execution and delivery of Additional Obligations, upon receipt of Rating Affirmations. See "RATINGS."

## Secondary Market for the 2007 Bonds May Not Develop

RBC Dain Rauscher Inc. doing business under the name RBC Capital Markets ("RBC Capital Markets" or the "Underwriter") may assist in resales of the 2007 Bonds but is not required to do so. A secondary market for the 2007 Bonds may not develop. If a secondary market for the 2007 Bonds does develop, it might not continue or it might not be sufficiently liquid for resales of any of the 2007 Bonds. Furthermore, the auction procedures and transfer requirements described herein may limit the liquidity and marketability of 2007 Bonds and therefor may not yield a Bondholder the best possible price for a 2007 Bond. See "RATINGS."

## Additional Obligations

The Authority may, from time to time, issue Additional Bonds or incur other Obligations secured by the Trust Estate without the consent or approval of any existing beneficial owners. These Bonds or other Obligations may be senior or subordinate to, or on a parity with, certain Classes of Bonds in priority of payment under the Indenture. See "SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS – Additional Obligations."

## Interest Rates on Investments

Proceeds of the 2007 Bonds and other moneys invested in the accounts under the Indenture will be invested from time to time at different interest rates. There can be no assurance that the interest rates at which these proceeds and moneys are invested will equal or exceed the interest rates on the 2007 Bonds.

## Swap Agreements

Under the Indenture, the Authority may enter into swap agreements ("Swaps") with Insurer Approval as provided by the Indenture. In certain circumstances, a Swap is subject to early termination. In the event of an early termination of a Swap, and regardless of which party has caused the termination, the Trust Estate or the Swap Provider may be liable to pay the other a Termination Payment which will be based on the market value of such Swap computed in accordance with the procedures set forth therein. Any such Termination Payment required to be made by the Trust Estate could be substantial and could reduce the amounts otherwise available to pay (a) principal of and interest on the Bonds and (b) Program Expenses. As of the date of this Official Statement, the Authority has no Outstanding Swaps applicable to the Trust Estate and does not currently expect to enter into any Swap applicable to the Trust Estate. The Authority reserves the right to enter into a Swap in the future in accordance with the Indenture. See "SECURITY AND SOURCES OF PAYMENT FOR THE 2007 BONDS—Additional Obligations" and Appendix B, "DEFINITIONS OF CERTAIN TERMS" and Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE—Nature of Security for Obligations."

# DESCRIPTION OF THE 2007 BONDS

## General

The applicable Auction Rate is to be established from time to time pursuant to Auction Procedures described below under "AUCTION RATE BONDS—Interest Rates on the 2007 Bonds" as applied separately to the 2007 Series A-1 Bonds, the 2007 Series A-2 Bonds and the 2007 Series A-3 Bonds. The 2007 Bonds are expected to be delivered, are dated and will mature as set forth on the cover page hereof. The 2007 Bonds are issued as fully-registered bonds in denominations of $100,000 or any integral multiple thereof (an "Authorized Denomination"). Initially, the 2007 Bonds will only be registered in the name of Cede & Co. as nominee of The Depository Trust Company ("DTC"), New York, New York. See "BOOK-ENTRY SYSTEM." Interest on the 2007 Series A-1 Bonds, the 2007 Series A-2 Bonds and the 2007 Series A-3 Bonds, prior to a change in the Interest Payment Date as described below, shall be payable on June 1, 2007, and on each June 1 and December 1 thereafter until maturity or earlier redemption; provided, that if such date is not a Business Day, such interest will be payable on the next succeeding Business Day (but only for interest accrued through the preceding May 31 or November 30 as the case may be). Interest on the 2007 Bonds is payable to the Beneficial Owners thereof according to the procedures described under "BOOK-ENTRY SYSTEM." Principal of the 2007 Bonds is payable upon presentation and surrender of such Bonds at the principal corporate trust office of the Trustee. The 2007 Bonds are subject to acceleration and redemption, as described below. Further, the Third Supplemental Indenture provides that the 2007 Bonds originally issued as Auction Rate Bonds may be converted to bear interest at a Variable Rate or a Fixed Rate, as more fully described in the Third Supplemental Indenture.

## Redemption Provisions

The Indenture provides for the redemption and acceleration of the 2007 Bonds prior to maturity, as described below. In the event that the 2007 Bonds are to be redeemed in part, the 2007 Bonds are to be redeemed only in the then Authorized Denominations of such Series and in such maturity or maturities thereof as the Authority shall determine, and the 2007 Bonds of a Series to be redeemed within a maturity are to be selected by lot or such other manner as the Trustee shall determine in accordance with the Indenture, except as otherwise described below.

*Mandatory Redemption of 2007 Bonds from Unexpended Bond Proceeds.* The 2007 Bonds are subject to redemption prior to maturity by the Authority on the first day of any Auction Period, in whole or in part, as described below, at a redemption price equal to 100% of the principal amount of such Bonds or portions thereof to be redeemed, together with accrued interest thereon to the date of redemption, from proceeds of the 2007 Bonds deposited to the Loan Account upon the issuance thereof that have not been applied to finance Student Loans on or before April 1, 2010, unless such date is extended if an Insurer Approval is obtained.

*Optional Redemption of 2007 Bonds.* The 2007 Bonds bearing interest as Auction Rate Bonds are subject to redemption prior to maturity, at the option of the Authority on the first day of any Auction Period, in whole or in part, as described below at a redemption price equal to 100% of the principal amount of such Bonds or portions thereof to be redeemed, together with accrued interest thereon to the date of redemption.

*Selection of 2007 Bonds to be Redeemed.* Any 2007 Bonds to be redeemed shall be selected by the Authority or by the Trustee as directed by the Authority.

*Notice of Redemption of 2007 Bonds.* The Trustee will give notice of redemption by mailing a copy of the redemption notice by first class mail, postage prepaid, to the registered owners of any 2007 Bonds to be redeemed at the address of such owner appearing on the registration books of the Trustee. Notice of redemption will be given not more than 30 days nor less than 10 days prior to the redemption date. Such notice shall state whether the Trustee then holds sufficient moneys to fund such redemption and whether such redemption is dependent upon the issuance of refunding obligations or the deposit of funds from other sources by the Authority. Neither failure to give such notice nor any defect therein will affect the validity of the proceedings for redemption of any 2007 Bonds not affected by such failure or defect. While the 2007 Bonds are held by DTC or its nominee, notice of redemption shall be given to DTC or its nominee. See "BOOK-ENTRY SYSTEM."

*Effect of Redemption.* Notice having been given as aforesaid, the 2007 Bonds called for redemption will become due and payable on the Redemption Date at the redemption price, plus accrued interest to the Redemption

Date. If, on the Redemption Date, moneys for the redemption of the 2007 Bonds to be redeemed, together with interest to the Redemption Date, are held by the Trustee or any Paying Agent so as to be available therefor on said date, interest on the 2007 Bonds called for redemption will cease to accrue on the Redemption Date.

*Acceleration of the 2007 Bonds.* Upon the occurrence of certain Events of Default under the Indenture, the 2007 Bonds may be subject to acceleration as described herein. See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE."

The Indenture provides that nonpayment of the principal of or interest on Senior Subordinate Obligations or Subordinate Obligations occurring while there are any Senior Obligations Outstanding that are not affected by the nonpayment, shall not result in an Event of Default under the Indenture that would give rise to a right on the part of owners of affected Obligations to accelerate the 2007 Bonds or to exercise any other remedy. The Indenture provides that only owners of Controlling Obligations, which may include Obligation Facility Providers, may exercise any remedy or right of enforcement or consent to any action thereunder in the event of nonpayment of Outstanding Obligations, and requires the consent of all owners of Outstanding Obligations as a precondition of acceleration of Obligations under the Indenture as a remedy for any Event of Default other than nonpayment. The Indenture further provides that the Insurer may generally direct the exercise of remedies upon an Event of Default. See Appendix C, "SUMMARY OF CERTAIN PROVISIONS OF THE INDENTURE—Acceleration" and "—Other Remedies."

*Recycling Provision.* The Indenture permits the Authority to use revenues received on the Student Loans to finance Student Loans until April 1, 2010. After such date, no amount may be transferred from the Revenue Account to the Loan Account unless the Authority receives an Insurer Approval permitting the Authority to extend the date.

## Registration of Transfer and Exchange

In the event that the Book-Entry System is discontinued, and subject to the procedures for the transfer or exchange of Auction Rate Bonds as described under "AUCTION RATE BONDS," then upon surrender for transfer or exchange of any 2007 Bonds at the corporate trust office of the Trustee, the Authority will execute and the Trustee will authenticate and deliver in the name of the transferee or transferees, a new 2007 Series A-1 Bond, 2007 Series A-2 Bond or 2007 Series A-3 Bond, as applicable, in exchange for the 2007 Bonds being transferred or exchanged, of Authorized Denominations, of like aggregate principal amount and bearing numbers not previously assigned to such 2007 Bonds.

The Trustee will require the payment by any owner of 2007 Bonds requesting exchange or transfer of a sum sufficient to cover any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer. Any of the 2007 Bonds presented or surrendered for transfer or exchange must be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee, duly executed, by the owner thereof or his attorney duly authorized in writing, with signature guarantees satisfactory to the Trustee.

The Trustee is not required to transfer any of the 2007 Bonds (i) during a period beginning at the opening of business 15 days before any selection of 2007 Bonds of the same Series for redemption and ending at the close of business on the day of such selection, or (ii) selected for redemption in whole or in part.

## BOOK-ENTRY SYSTEM

**The following information has been furnished by DTC for inclusion in this Official Statement. Neither the Authority nor the Underwriter has independently verified or guarantees or makes any representation as to the accuracy or completeness of such information or as to the absence of material change thereto subsequent to the date hereof.**

Beneficial ownership interests in the 2007 Bonds will be available in book-entry form only. Purchases and sales by the Beneficial Owners of 2007 Series A-1 Bonds, 2007 Series A-2 Bonds and 2007 Series A-3 Bonds can be made in denominations of $100,000 or any integral multiple thereof. Purchasers of beneficial ownership interests in the 2007 Bonds will not receive certificates representing their interests in the 2007 Bonds purchased and will not be Holders under the Indenture, except as described below.

DTC will act as securities depository for the 2007 Bonds. The 2007 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered certificate will be issued for each Series of the 2007 Bonds, each in the respective aggregate principal amount of such Series, and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at **www.dtcc.com**.

Purchases of 2007 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2007 Bonds on DTC's records. The ownership interest of each actual purchaser of 2007 Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2007 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in 2007 Bonds, except in the event that use of the book-entry system for the 2007 Bonds is discontinued.

To facilitate subsequent transfers, all 2007 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of 2007 Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2007 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2007 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the 2007 Bonds within a Series are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such Series to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to 2007 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts 2007 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payments of principal of and interest and redemption premium, if any, on the 2007 Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee, on a payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to any Series of the 2007 Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, Bond certificates are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository) with respect to any Series of the 2007 Bonds. In that event, Bond certificates will be printed and delivered.

*Neither the Authority nor the Trustee shall have any responsibility or obligation to any DTC Participant, any Beneficial Owner or other persons claiming a beneficial ownership interest in the 2007 Bonds under or through DTC or any DTC Participant, with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participant with respect to the beneficial ownership interest in the 2007 Bonds; (ii) the payment by DTC or any DTC Participant of any amount in respect of the principal of and premium, if any, or interest on the 2007 Bonds to any Beneficial Owner or other person for the 2007 Bonds; or (iii) the delivery to any Beneficial Owner of the 2007 Bonds, or any other person, of any notice which is permitted or required to be given to owners under the Indenture. Neither the Authority nor the Trustee shall have any responsibility with respect to obtaining consents from anyone other than the registered owners.*

No assurance can be given by the Authority or the Trustee that DTC will distribute to the Participants or the Participants will distribute to the Beneficial Owners: (i) payment of debt service on the 2007 Bonds paid to DTC or its nominee, as the registered owner; or (ii) any redemption or other notices, or that DTC or the DTC Participants will serve or act on a timely basis or in a manner described in this Official Statement.

## AUCTION RATE BONDS

### General Terms

The Auction procedures described under this heading apply separately to the 2007 A-1 Bonds, the 2007 A-2 Bonds and the 2007 Series A-3 Bonds. The 2007 Bonds shall be issued as Auction Rate Bonds, shall be dated the date of initial delivery thereof and shall mature on the dates shown on the cover of this Official Statement. Any Series of the 2007 Bonds may be converted to bear interest at a Variable Rate or a Fixed Rate, as more fully described in the Third Supplemental Indenture. Certain capitalized terms used herein with respect to the 2007 Bonds are defined herein or in other parts of this Official Statement, including the Appendices hereto.

After the Initial Interest Period for each Series of the 2007 Bonds (as described under "—Interest Rates on the 2007 Bonds"), the 2007 Bonds will accrue interest at the Applicable Auction Rate Bonds Rate determined in the manner described herein under "—Interest Rates on the 2007 Bonds" and in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS."

Interest on the 2007 Bonds initially will be payable on June 1, 2007 and on each June 1 and December 1 thereafter (subject to change as described herein) (each an "Interest Payment Date") until the earlier of maturity or redemption. Interest on each Series of the 2007 Bonds will be computed on the basis of a 360-day year and actual number of days elapsed during the time such 2007 Bonds bear interest at an Auction Rate.

**Auction Participants**

*Existing Owners and Potential Owners.* Participants in each Auction will include: (a) "Existing Owners," which shall mean (i) with respect to and for the purpose of dealing with the Auction Agent in connection with an Auction, any Person who is a Broker-Dealer listed in the Existing Owner Registry at the close of business on the Business Day immediately preceding the Auction Date for such Auction, and (ii) with respect to and for the purpose of dealing with the Broker-Dealer in connection with an Auction, a Person who is a Beneficial Owner of Auction Rate Bonds; and (b) "Potential Owners," which shall mean any Person, (including any Existing Owner that is (i) a Broker-Dealer when dealing with an Auction Agent and (ii) a potential Beneficial Owner when dealing with a Broker-Dealer), who may be interested in acquiring Auction Rate Bonds (or in the case of an Existing Owner, an additional principal amount of Auction Rate Bonds).

By purchasing Auction Rate Bonds, whether in an Auction or otherwise, each prospective purchaser of Auction Rate Bonds or its Broker-Dealer must agree and will be deemed to have agreed: (a) to participate in Auctions on the terms set forth in Appendix E hereto; (b) so long as the beneficial ownership of the Auction Rate Bonds is maintained in book-entry form by the Securities Depository, to sell, transfer or otherwise dispose of Auction Rate Bonds only pursuant to a Bid or a Sell Order (each as defined in Appendix E hereto) in an Auction, or to or through a Broker-Dealer, provided that all transfers other than those pursuant to an Auction, the Existing Owner of Auction Rate Bonds so transferred, its agent member or its Broker-Dealer advises the Auction Agent of such transfer; and (c) to have its beneficial ownership of Auction Rate Bonds maintained at all times in book-entry form by the Securities Depository for the account of its Participant, which in turn will maintain records of such beneficial ownership, and to authorize such Participant to disclose to the Auction Agent such information with respect to such beneficial ownership as the Auction Agent may request.

*Auction Agent.* Wilmington Trust Company (the "Auction Agent") is appointed as the initial Auction Agent for the Auction Rate Bonds. The Trustee and the initial Auction Agent will enter into an Auction Agency Agreement dated as of May 1, 2007. Any successor Auction Agent shall be: (a) a bank or trust company duly organized under the laws of the United States of America or any state or territory thereof and having a combined capital stock, surplus and undivided profits of at least $25,000,000; or (b) a member of the National Association of Securities Dealers, Inc., having a capitalization of at least $25,000,000 and, in either case, authorized by law to perform all the duties imposed upon it under the Third Supplemental Indenture and under the Auction Agency Agreement. The Auction Agent may resign and be discharged of the duties and obligations created by the Third Supplemental Indenture by giving at least 90 days' written notice to the Authority, the Trustee and the Market Agent; provided, however, that if the Auction Agent has not been paid its fee for a period of more than 30 days, termination of the Auction Agency Agreement shall be effective upon the close of business on the second succeeding Auction Date, subsequent to the receipt of notice by the Authority, the Trustee and the Market Agent. The Auction Agent may be removed at any time by the Trustee if the Auction Agent is an entity other than the Trustee, acting at the direction of either: (a) the Authority or (b) the Beneficial Owners of at least 66-2/3% of the aggregate principal amount of the Auction Rate Bonds then outstanding by an instrument signed by the Trustee, and if by the Beneficial Owners, by an instrument signed by such Beneficial Owners or their attorneys, and filed with the Auction Agent, the Authority and the Market Agent upon at least 90 days' notice; provided that, if required by the Market Agent, an agreement in substantially the form of the Auction Agency Agreement shall be entered into with a successor Auction Agent. If the Auction Agent and the Trustee are the same entity, the Auction Agent may be removed as described above, with the Authority acting in lieu of the Trustee.

If the Auction Agent shall resign or be removed or be dissolved, or if the property or affairs of the Auction Agent shall be taken under the control of any state or federal court or administrative body because of bankruptcy or insolvency, or for any other reason, the Trustee at the direction of an Authorized Officer shall use its best efforts to appoint a successor Auction Agent, and the Trustee and the Authority shall thereupon enter into an Auction Agency Agreement with such successor.

The Auction Agent is acting as agent for the Authority in connection with Auctions. In the absence of bad faith or negligence on its part, the Auction Agent shall not be liable for any action taken, suffered or omitted or for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining (or failing to ascertain) the pertinent facts necessary to make such judgment.

*Broker-Dealer.* Existing Owners and Potential Owners may participate in Auctions only by submitting orders (in the manner described below) through a "Broker-Dealer," including the Designated Broker-Dealer, any other

broker or dealer (each as defined in the Securities Exchange Act of 1934, as amended), commercial bank or other entity permitted by law to perform the functions required of a Broker-Dealer set forth below that (a) is a "Participant" (i.e., a member of, or participant in, DTC or any successor securities depository) or an affiliate of a Participant, (b) has been selected by the Authority with the approval of the Market Agent, and (c) has entered into a Broker-Dealer Agreement with the Auction Agent that remains effective, in which the Broker-Dealer agrees to participate in Auctions as described in the Auction Procedures, as from time to time amended or supplemented.

*Market Agent.* The "Market Agent," initially RBC Capital Markets, acting pursuant to the Market Agent Agreement with the Trustee and in connection with the Auction Rate Bonds, shall act solely as agent of the Authority and shall not assume any obligation or relationship of agency or trust for or with any of the Beneficial Owners.

## Interest Rates on the 2007 Bonds

*Interest Payments.* Interest on the Auction Rate Bonds shall accrue for each Interest Period and shall be payable in arrears on each succeeding Interest Payment Date. An "Interest Period" means, with respect to Auction Rate Bonds, (a) so long as interest is payable on June 1 and December 1 with respect thereto and unless otherwise changed as described under "—Changes in Auction Periods, Auction Dates, or Interest Payment Dates—*Changes in Auction Period or Periods,*" the Initial Interest Period and each successive period of generally 35 days thereafter, respectively, commencing on a Thursday (or the Business Day following the last day of the prior Interest Period, if the prior Interest Period does not end on a Wednesday) and ending on (and including) a Wednesday (unless such Wednesday is not followed by a Business Day, in which case such Interest Period will end on the next succeeding day that is followed by a Business Day), and (b) if, and for so long as, Interest Payment Dates are specified to occur at the end of each Auction Period, as described under "—Changes in Auction Periods, Auction Dates, or Interest Payment Dates—*Changes in Auction Period or Periods,*" each period commencing on an Interest Payment Date and ending on, but excluding, the next succeeding Interest Payment Date. An "Interest Payment Date" for each Series of the 2007 Bonds, while the 2007 Bonds are outstanding as Auction Rate Bonds, means June 1 and December 1 and at maturity or earlier redemption, commencing June 1, 2007, or if any such date is not a Business Day, the next succeeding Business Day (but only for interest accrued through the preceding last day of May or November, as the case may be).

The amount of interest distributable to holders of Auction Rate Bonds in respect of each $100,000 in principal amount thereof for any Interest Period or part thereof shall be calculated by the Trustee by applying the Applicable Auction Rate Bonds Rate for such Interest Period or part thereof to the principal amount of $100,000, multiplying such product by the actual number of days in the Interest Period or part thereof, divided by 360, and truncating the resultant figure to the nearest cent. Interest on the Auction Rate Bonds shall be computed by the Trustee on the basis of a 360-day year for the number of days actually elapsed. The Trustee shall make the calculation described above not later than the close of business on each Auction Date upon receipt of the relevant information from the Auction Agent.

Interest payments on the Auction Rate Bonds are to be made by the Trustee to the persons who are registered owners of the Auction Rate Bonds, as of the Record Date preceding each Interest Payment Date. The Auction Rate Bonds are to be initially registered in the name of Cede & Co., as nominee of DTC, which is acting as the depository for the Auction Rate Bonds. See "BOOK-ENTRY SYSTEM" for a description of how DTC, as registered owner, is expected to disburse such payments to the Beneficial Owners.

*Applicable Auction Rate Bonds Rate.* For a period beginning on the Closing Date and continuing through June 20, 2007 with respect to the 2007 A-1 Bonds, continuing through June 27, 2007 with respect to the 2007 A-2 Bonds and continuing through July 18, 2007 with respect to the 2007 Series A-3 Bonds, the Auction Rate Bonds will bear interest at rates to be determined shortly before their issuance. The rate of interest on the Auction Rate Bonds for each Interest Period subsequent to the Initial Interest Period, to but not including the Fixed Rate Conversion Date or the Variable Rate Conversion Date, if any, shall be equal to the annual rate of interest that results from implementation of the Auction Procedures described in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS" (the "Auction Rate"), unless the Auction Rate exceeds the Maximum Rate, in which case the rate of interest on the Auction Rate Bonds for such Interest Period shall be the Maximum Rate, or unless the Maximum Rate shall actually be lower than the All Hold Rate, in which case the rate of interest on the Auction Rate Bonds for such Interest Period shall be the Maximum Rate; provided that if, on any Auction Date, an Auction is not held for any reason, then the rate of interest for the next succeeding Interest Period shall equal the Maximum Rate on such Auction Date; provided further, however, that if an Auction is scheduled to occur for the next Interest Period on a date that was reasonably expected to

be a Business Day, but such Auction does not occur because such date is later not considered to be a Business Day, the Auction shall nevertheless be deemed to have occurred, and the applicable Auction Rate in effect for the next Interest Period will be the Auction Rate in effect for the preceding Interest Period and such Interest Period will generally be 35 days in duration, beginning on the calendar day following the date of the deemed Auction and ending on (and including) the applicable Auction Date (unless such date is not followed by a Business Day, in which case on the next succeeding day that is followed by a Business Day). If the preceding Interest Period was other than 35 days in duration, the Auction Rate for the deemed Auction will instead be the rate of interest determined by the Market Agent on the basis of equivalently rated auction securities with a comparable length of auction period. Notwithstanding the foregoing: (a) if the ownership of the Auction Rate Bonds is no longer maintained in book-entry form, the rate of interest on the Auction Rate Bonds for any Interest Period commencing after the delivery of certificates representing Auction Rate Bonds as described above shall equal the Maximum Rate on the Business Day immediately preceding the first day of such Interest Period; (b) if a Payment Default occurs, Auctions will be suspended and the Applicable Auction Rate Bonds Rate (as defined below) for the Interest Period commencing on or after such Payment Default and for each Interest Period thereafter to and including the Interest Period, if any, during which, or commencing less than two Business Days after, such Payment Default is cured, will equal the Default Rate; or (c) if a proposed conversion to a Fixed Rate or Variable Rate shall have failed, as described under "—Inadequate Funds for Tenders; Failed Conversion," and the next succeeding Auction Date shall be two or fewer Business Days after (or on) any such failed Fixed Rate Conversion Date or Variable Rate Conversion Date, then an Auction shall not be held on such Auction Date and the rate of interest on the Auction Rate Bonds subject to the failed conversion for the next succeeding Interest Period shall be equal to the Maximum Rate calculated as of the first Business Day of such Interest Period.

The rate per annum at which interest is payable on the Auction Rate Bonds for any Interest Period is herein referred to as the "Applicable Auction Rate Bonds Rate." Notwithstanding anything herein to the contrary, the Applicable Auction Rate Bonds Rate cannot exceed the Maximum Rate.

Notwithstanding anything herein to the contrary, if any Auction Rate Bonds or portion thereof have been selected for redemption during the next succeeding Interest Period, such Auction Rate Bonds or portion thereof, will not be included in the Auction preceding such redemption date, and will continue to bear interest until the redemption date at the rate established for the Interest Period prior to said Auction.

## Auctions

Prior to a Fixed Rate Conversion Date or a Variable Rate Conversion Date, Auctions to establish the Applicable Auction Rate Bonds Rate are to be held on each Auction Date, except as described under "—Interest Rates on the 2007 Bonds—*Applicable Auction Rate Bonds Rate*," by application of the Auction Procedures described in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS." "Auction Date" shall mean initially, with respect to the 2007 A-1 Bonds Outstanding as Auction Rate Bonds, June 20, 2007, with respect to the 2007 A-2 Bonds Outstanding as Auction Rate Bonds, June 27, 2007 and, with respect to the 2007 Series A-3 Bonds Outstanding as Auction Rate Bonds, July 18, 2007, and thereafter, the Business Day immediately preceding the first day of each related Auction Period, other than: (a) each Auction Period commencing after the ownership of the Auction Rate Bonds is no longer maintained in book-entry form, (b) each Auction Period commencing after the occurrence and during the continuance of a Payment Default; or (c) any Auction Period commencing less than the Applicable Number of Business Days after the cure or waiver of a Payment Default. Notwithstanding the foregoing, the Auction Date for one or more Auction Periods may be changed as described under "—Changes in Auction Periods, Auction Dates, or Interest Payment Dates—*Changes in Auction Period or Periods*."

The Auction Agent shall determine the Maximum Rate, the Maximum Interest Rate, and the All Hold Rate on each Auction Date. Upon receipt of notice from the Trustee of a failed Fixed Rate conversion or Variable Rate conversion as described under "—Inadequate Funds for Tenders; Failed Conversion," and if the next succeeding Auction Date shall be two or fewer Business Days after (or on) the failed Fixed Rate Conversion Date or Variable Rate Conversion Date, the Auction Agent shall not hold an Auction on such Auction Date, but shall calculate the Maximum Rate as of the first Business Day of the next succeeding Interest Period and give notice thereof as provided, and to the parties specified, in the Auction Agency Agreement. If the ownership of the Auction Rate Bonds is no longer maintained in book-entry form by the Securities Depository, the Trustee shall calculate the Maximum Rate on the Business Day immediately preceding the first day of each Interest Period commencing after delivery of certificates representing the Auction Rate Bonds. If a Payment Default shall have occurred, the Trustee shall calculate the Default Rate on the first day of (a) each Interest Period commencing after the occurrence and during the continuance of such

Payment Default and (b) any Interest Period commencing less than the Applicable Number of Business Days after the cure of any Payment Default. The Auction Agent shall determine the "AA" Financial Commercial Paper Rate for each Interest Period other than the Initial Interest Period; provided, that if the ownership of the Auction Rate Bonds is no longer maintained in book-entry form, or if a Payment Default has occurred, then the Trustee shall determine the "AA" Financial Commercial Paper Rate for each such Interest Period. The determination by the Trustee or the Auction Agent, as the case may be, of the "AA" Financial Commercial Paper Rate shall (in the absence of manifest error) be final and binding upon the Holders and all other parties. If calculated or determined by the Auction Agent, the Auction Agent shall promptly advise the Trustee of the "AA" Financial Commercial Paper Rate.

So long as the ownership of the Auction Rate Bonds is maintained in book-entry form by the Securities Depository, an Existing Owner may sell, transfer or otherwise dispose of Auction Rate Bonds only pursuant to a Bid or Sell Order (as defined in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS") placed in an Auction, or through a Broker-Dealer, provided that, in the case of all transfers other than pursuant to Auctions, such Existing Owner, its Broker-Dealer or its Participant advises the Auction Agent of such transfer. Prior to a Fixed Rate Conversion Date or a Variable Rate Conversion Date, Auctions shall be conducted on each Auction Date, if there is an Auction Agent on such Auction Date, in the manner described in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS." A description of the Settlement Procedures to be used with respect to Auctions is contained in Appendix F, "SETTLEMENT PROCEDURES FOR THE 2007 BONDS."

### Adjustment in Percentages

The Market Agent shall adjust the percentage used in determining the All Hold Rate, the Applicable Percentage used in determining the Maximum Rate and the Applicable Percentage of the BMA Index used in determining the Default Rate, if any such adjustment is necessary, in the judgment of the Market Agent, to reflect any Change of Preference Law such that Auction Rate Bonds paying the Maximum Rate, Auction Rate Bonds paying the All Hold Rate and Auction Rate Bonds paying the Default Rate shall respectively have equal market values before and after such Change of Preference Law. Prior to any such adjustment, the Authority shall give notice thereof to any Rating Agencies then rating the Auction Rate Bonds, and no such adjustment shall be made unless such adjustment will not adversely affect the rating on any Bonds, including the 2007 Bonds. In making any such adjustment, the Market Agent shall take the following factors, as in existence both before and after such Change of Preference Law, into account: (a) short-term taxable and tax-exempt market rates and indices of such short-term rates; (b) the market supply and demand for short-term tax-exempt securities; (c) yield curves for short-term and long-term tax-exempt securities or obligations having a credit rating that is comparable to the Auction Rate Bonds; (d) general economic conditions; and (e) economic and financial factors present in the securities industry that may affect or that may be relevant to the Auction Rate Bonds.

The Market Agent shall effectuate an adjustment in the percentage used in determining the All Hold Rate, the Applicable Percentage used in determining the Maximum Rate and the Applicable Percentage of the BMA Index used to determine the Default Rate by delivering written notice to the Authority, the Trustee and the Auction Agent at least 10 days prior to the Auction Date on which the Market Agent desires to effect such change. Such notice shall be effective only if it is accompanied by a Favorable Opinion.

### Changes in Auction Periods, Auction Dates, or Interest Payment Dates

*Changes in Auction Period or Periods.* While any 2007 Bonds are Outstanding as Auction Rate Bonds, the Market Agent may change, upon meeting certain conditions, including receipt of a Favorable Opinion, the length of one or more Auction Periods; provided, however, that any such changed Auction Period shall not be less than seven days unless an Authorized Officer has given prior written consent to such shorter period. In connection with any such change, or otherwise, the Market Agent may, upon receipt of a Favorable Opinion, change Interest Payment Dates. Any change in the length of the Auction Period requires the written consent of an Authorized Officer and must be made for the purpose of conforming to current market practice with respect to certain securities.

The change in the length of one or more Auction Periods shall not be allowed unless Sufficient Clearing Bids (as defined in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS") existed at both the Auction before the date on which the notice of the proposed change was given and the Auction immediately preceding the proposed change. Such change shall take effect only if certain requirements are met as described in the Third Supplemental Indenture.

*Changes in the Auction Date.*  While any of the 2007 Bonds are Outstanding as Auction Rate Bonds, the Market Agent:

(a)     to conform with then-current market practice with respect to similar securities, shall, or

(b)     to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date and the interest rate borne on the Auction Rate Bonds and upon receipt of a Favorable Opinion and with the written consent of an Authorized Officer, may

specify an earlier Auction Date (but in no event more than five Business Days earlier) than the Auction Date that would otherwise be determined in accordance with the definition of "Auction Date" with respect to one or more specified Auction Periods.  The Authorized Officer shall not consent to such change in the Auction Date, if such consent is required as described above, unless he or she shall have received from the Market Agent, not less than three days nor more than 20 days prior to the effective date of such change, a written request for consent together with a certificate demonstrating the need for change in reliance on such factors.  The Market Agent shall provide notice of any determination to specify an earlier Auction Date for one or more Auction Periods by means of a written notice delivered at least ten days prior to the proposed changed Auction Date to the Trustee, the Auction Agent, the Authority and the Securities Depository.

In connection with any change in the Auction terms described above, the Auction Agent shall provide such further notice to such parties as is specified in the Auction Agency Agreement.

No change shall be made to the Auction Period or Auction Date unless the Authority and the Trustee shall have received a Favorable Opinion and, in some instances, an Insurer Approval.

*Changes in the Interest Payment Dates.*  The Market Agent:

(a)     to conform with then-current market practice with respect to similar securities, shall, or

(b)     to accommodate economic and financial factors that may affect or be relevant to the Interest Payment Date and the interest rate borne by the Auction Rate Bonds and with the written consent of an Authorized Officer, may

change the Interest Payment Date with respect to the Auction Rate Bonds to or from semi-annual payments on June 1 and December 1 of each year to or from the Interest Payment Dates specified in the notice of such change.

The changes in Auction terms described above must be made with respect to all of the Auction Rate Bonds of a Series. In connection with any change in Auction terms described above, the Auction Agent will provide such further notice to such parties as is specified in the Auction Agency Agreement.

*Other Changes to Auction Procedures.*  The Market Agent, at the request of the Authority and with the prior consent of the Auction Agent, shall make such other changes to the Auction Procedures described herein with respect to the Auction Rate Bonds as it may deem reasonably necessary to conform with then current market practice with respect to similar securities.  The Market Agent shall provide notice of any determination to specify such a proposed change by means of a written notice to the Trustee, the Auction Agent, each Broker-Dealer, the Authority, the Designated Obligation Facility Provider and DTC at least 20 days prior to the Auction Date prior to the first Auction Date to be affected by such proposed change; provided, that no such proposed change shall become effective unless: (i) the notice is accompanied by a Favorable Opinion with respect to such proposed change; and (ii) Sufficient Clearing Bids exist on the Auction Date subsequent to receipt of such notice.

## Disruption in Auction Procedures

If an Auction with respect to the 2007 Bonds Outstanding as Auction Rate Bonds is scheduled to occur for the succeeding Interest Period on a day that was reasonably expected to be a Business Day, but such Auction does not occur because such date is later not considered to be a Business Day, the Auction shall, nevertheless be deemed to have occurred, and the applicable Auction Rate in effect for the next Interest Period will be the Auction Rate in effect for the preceding Interest Period and such Interest Period will generally be 35 days in duration, beginning on the

calendar day following the date of the deemed Auction and ending on (and including) the applicable Auction Date (unless that Auction Date is not followed by a Business Day, in which case on the next succeeding day that is followed by a Business Day). If the preceding Interest Period was other than generally 35 days in duration, the Auction Rate for the deemed Auction will instead be the rate of interest determined by the Market Agent on the basis of equivalently rated auction securities with a comparable length of auction period.

**Auctions May Not Be Held Because of Resignation of the Auction Agent or the Designated Broker-Dealer**

The Third Supplemental Indenture provides that the Auction Agent may resign from its duties as Auction Agent by giving at least 90 days written notice to the Authority, the Trustee and the Market Agent; provided, however, that if the Auction Agent has not been paid its fee for a period of more than 30 days, termination of the Auction Agency Agreement shall be effective upon the close of business on the second succeeding Auction Date, subsequent to the receipt of notice by the Authority, the Trustee and the Market Agent. The Broker-Dealer Agreement provides that the Designated Broker-Dealer may resign upon five days written notice to the Auction Agent and does not require, as a condition to the effectiveness of such resignation, that a replacement Broker-Dealer be in place. On any Auction Date on which there is no duly appointed Auction Agent, or on which there is no duly appointed Broker-Dealer, it will not be possible to hold an Auction and the Auction Agency Agreement provides that the interest rate on the Auction Rate Bonds for the next succeeding Interest Period will be the Maximum Rate on such Auction Date.

**Fixed Rate Conversion of Auction Rate Bonds**

All, but not less than all, of any Series of the Auction Rate Bonds may be converted by the Authority to bear interest at a Fixed Rate to their final maturity. If any Series of the Auction Rate Bonds is to be converted to bear interest at a Fixed Rate, a Fixed Rate Conversion Date for such Series of Auction Rate Bonds shall be specified.

Not later than the 15th day preceding the Fixed Rate Conversion Date, notice of the conversion shall be given by first class mail by the Trustee to the Auction Agent and the Owners of all Auction Rate Bonds of such Series, and that Series of the 2007 Bonds, which will be subject to mandatory tender as described below under "—Mandatory Tender upon Conversion; Certain Notices."

No such conversion shall occur unless the Authority has received a Rating Affirmation with respect to the rating on any of the Bonds Outstanding under the General Indenture. In the event that the Authority determines that the conversion to a Fixed Rate will not occur on a scheduled Fixed Rate Conversion Date, the Market Agent may schedule a new Auction Date for the series of Auction Rate Bonds as to which the conversion was to take place as provided in the Third Supplemental Indenture.

**Variable Rate Conversion of Auction Rate Bonds**

All, but not less than all, of any Series of the Auction Rate Bonds may be converted to bear interest at a Variable Rate by the Authority. If any Series of the Auction Rate Bonds is to be converted to bear interest at a Variable Rate, a Variable Rate Conversion Date for such Series of the Auction Rate Bonds shall be specified.

Not later than the 15th day preceding the Variable Rate Conversion Date, notice of the conversion shall be given by first class mail by the Trustee to the Auction Agent and the Owners of all Auction Rate Bonds of such Series, and that Series of the 2007 Bonds will be subject to mandatory tender as described below under "—Mandatory Tender Upon Conversion; Certain Notices."

No such conversion shall occur unless the Authority has received a Rating Affirmation with respect to the rating on any of the Bonds Outstanding under the General Indenture. In the event that the Authority determines that the conversion to a Variable Rate will not occur on a scheduled Variable Rate Conversion Date, the Market Agent may schedule a new Auction Date for the Series of Auction Rate Bonds as to which the conversion was to take place as provided in the Third Supplemental Indenture.

**Mandatory Tender Upon Conversion; Certain Notices**

*Mandatory Tender Upon Conversion.* Any Series of the 2007 Bonds to be converted to bear interest at a Fixed Rate or a Variable Rate shall be subject to mandatory tender for purchase on the Fixed Rate Conversion Date or

Variable Rate Conversion Date, at a price equal to the principal amount thereof plus accrued interest, if any, to the Fixed Rate Conversion Date or Variable Rate Conversion Date.

*Notice to Registered Holders.* Any notice of conversion given to Holders as described above under "—Fixed Rate Conversion of Auction Rate Bonds" or "—Variable Rate Conversion of Auction Rate Bonds" shall, in addition to the requirements described therein, specify that all Outstanding 2007 Bonds of such Series subject to such conversion are subject to mandatory tender pursuant to the provisions thereof and of the Third Supplemental Indenture and will be purchased on the Fixed Rate Conversion Date or the Variable Rate Conversion Date by payment of a purchase price equal to the principal amount thereof plus accrued interest, if any, to the Fixed Rate Conversion Date or the Variable Rate Conversion Date.

*Payment of Purchase Price by Trustee.* On any Fixed Rate Conversion Date or Variable Rate Conversion Date, the Trustee shall pay the purchase price of the 2007 Bonds required to be tendered for purchase, surrendered as described below properly endorsed for transfer in blank with all signatures guaranteed, to the selling Holders thereof on or before 3:00 P.M. Such payments shall be made in immediately available funds to any Person other than the Authority, but solely from moneys representing proceeds of the remarketing of the 2007 Bonds of such Series, and neither the Authority, the Trustee, the Paying Agent nor the Remarketing Agent shall have any obligation to use funds from any other source.

*Delivery of 2007 Bonds; Effect of Failure to Surrender Bonds.* The 2007 Bonds to be purchased on any Fixed Rate Conversion Date or Variable Rate Conversion Date shall be required to be delivered to the designated office of the Trustee or its designated agent for such purposes, at or before 12:00 Noon on such date. If the Holder of any 2007 Bonds that is subject to purchase as described herein fails to deliver such 2007 Bonds to the Trustee, or its designated agent for such purposes, for purchase on the purchase date, and if the Trustee, or its designated agent for such purposes, is in receipt of the purchase price therefor, such 2007 Bonds shall nevertheless be deemed tendered and purchased on the Fixed Rate Conversion Date or the Variable Rate Conversion Date and shall be an Undelivered Bond as described below under "—Undelivered Bonds" and registration of the ownership of such 2007 Bonds shall be transferred to the purchaser thereof as described below under "—Undelivered Bonds." The Trustee shall, as to any Undelivered Bonds, (a) promptly notify the Remarketing Agent, the Auction Agent, the Paying Agent and the Registrar of such non-delivery and (b) the Registrar shall place a stop transfer against an appropriate amount of 2007 Bonds subject to conversion registered in the name of the Holder(s) on the Bond Register. The Registrar shall place such stop transfer(s) on 2007 Bonds subject to conversion registered in the name of such Holder(s) (until stop transfers have been placed against an appropriate amount of 2007 Bonds of the appropriate Series) until the appropriate tendered 2007 Bonds are delivered to the Trustee or its designated agent. Upon such delivery, the Registrar shall make any necessary adjustments to the Bond Register. Pending delivery of such tendered 2007 Bonds, the Trustee, or its designated agent, shall hold the purchase price therefor uninvested in a segregated subaccount for the benefit of such Holder(s).

## Inadequate Funds for Tenders; Failed Conversion

If the funds available for the purchase of 2007 Bonds are inadequate for the purchase of all 2007 Bonds required to be tendered on any Fixed Rate Conversion Date or Variable Rate Conversion Date or if a proposed conversion to a Fixed Rate or Variable Rate otherwise fails as described above, the Trustee shall: (a) return all tendered 2007 Bonds to the Owners thereof; (b) return all moneys received for the purchase of such 2007 Bonds to the persons providing such moneys; and (c) notify the Authority, the Auction Agent, the Remarketing Agent and the Paying Agent of the return of such 2007 Bonds and moneys and the failure to make payment for tendered 2007 Bonds. After any such failed conversion, the 2007 Bonds subject to the failed conversion shall remain Outstanding as Auction Rate Bonds. Auctions shall be conducted beginning on the first Auction Date occurring more than two Business Days after the failed Fixed Rate Conversion Date or Variable Rate Conversion Date, and interest payable thereon shall be determined and paid according to the Third Supplemental Indenture.

## No Tender Purchases After Call for Redemption

2007 Bonds (or portions thereof) called for redemption shall not be subject to tender and purchase on a subsequent Fixed Rate Conversion Date or a Variable Rate Conversion Date.

**Undelivered Bonds**

Any 2007 Bonds that are required to be tendered on a Fixed Rate Conversion Date or Variable Rate Conversion Date and that are not delivered on such date, and for the payment of which there has been irrevocably held in trust in a segregated subaccount for the benefit of such Owner an amount of money sufficient to pay the purchase price, including any accrued interest due to (but not after) such purchase date with respect to such 2007 Bonds, shall be deemed to have been purchased, and shall be Undelivered Bonds. In the event of a failure by a Bondholder to tender its Bonds on or prior to the required date, such non-delivering Bondholder of such Undelivered Bonds shall not be entitled to any payment other than the purchase price due on the purchase date and such Undelivered Bonds in the hands of such non-delivering Bondholder shall no longer accrue interest or be entitled to the benefits of the General Indenture, except for the payment of the purchase price due on the purchase date; *provided, however,* that the indebtedness represented by such 2007 Bonds shall not be extinguished, and the Paying Agent and Registrar shall transfer, authenticate and deliver such 2007 Bonds as provided in the Third Supplemental Indenture. The Paying Agent shall give telephonic notice to the Trustee and the Registrar, promptly confirmed by mail of all Undelivered Bonds.

**CERTAIN CONSIDERATIONS AFFECTING AUCTION RATE BONDS**

**The following information has been furnished by RBC Capital Markets for inclusion in this Official Statement. The Authority has not independently verified and does not guarantee or make any representation as to the accuracy or completeness of such information or as to the absence of material change thereto subsequent to the date hereof.**

**No Assurances Regarding Auction Outcomes**

The Auction Rate Bonds are subject to certain auction procedures described in Appendix E, "AUCTION PROCEDURES FOR THE 2007 BONDS." In order to carry out such auction procedures, the Trustee and the Auction Agent will enter into the Auction Agency Agreement, the Auction Agent and RBC Capital Markets which will initially be the sole Broker-Dealer (the "Designated Broker-Dealer") will enter into the Broker-Dealer Agreement and the Trustee and the Market Agent will enter into the Market Agent Agreement. See "AUCTION RATE BONDS."

The Designated Broker-Dealer provides no assurance (a) as to the outcome of any Auction, (b) that any Bid will be accepted or (c) that the Auction will clear at a rate that a Bidder considers acceptable. Bids may be rejected or may be only partially filled, and the rate on any Auction Rate Bonds purchased or retained may be lower than the Bidder expected.

**Existing Owner's Ability to Resell Auction Rate Securities May Be Limited**

In any Auction, Existing Owners will be able to sell all of the Auction Rate Bonds that are the subject of submitted Sell Orders only if there are Bidders willing to purchase all those Auction Rate Bonds offered for sale in the Auction.

If sufficient clearing Bids have not been made, Existing Owners that have submitted Sell Orders will not be able to sell in the Auction all, and may not be able to sell any, of the Auction Rate Bonds subject to such submitted Sell Orders. As discussed above (see "Bidding by Initial Broker-Dealer"), the Designated Broker-Dealer may submit a Bid in an Auction to keep it from failing, but it is not obligated to do so. There may not always be enough Bidders to prevent an Auction from failing in the absence of the Designated Broker-Dealer bidding in the Auction for its own account or encouraging others to bid. Therefore, Auction failures are possible, especially if the Authority's credit were to deteriorate, a market disruption were to occur or if, for any reason, the Designated Broker-Dealer were unable or unwilling to bid.

Between Auctions, there can be no assurance that a secondary market for the Auction Rate Bonds will develop or, if it does develop, that it will provide Existing Owners the ability to resell the Auction Rate Bonds in the secondary market on the terms or at the times desired by an Existing Owner.

The Designated Broker-Dealer may, in its own discretion, decide to buy or sell the Auction Rate Bonds in the secondary market for its own account to or from investors at any time and at any price, including at prices equivalent to, below, or above the par value of the Auction Rate Bonds. The Designated Broker-Dealer is not, however, obligated to make a market in the Auction Rate Bonds and may discontinue trading in the Auction Rate Bonds without notice for any reason at any time. Existing Owners who resell between Auctions may receive less than par value, depending on market conditions.

The ability to resell the Auction Rate Bonds will depend on various factors affecting the market for the Auction Rate Bonds, including news relating to the Authority, the attractiveness of alternative investments, the perceived risk of owning the Auction Rate Bonds (whether related to credit, liquidity or any other risk), the tax or accounting treatment accorded the Auction Rate Bonds (including recent clarification of U.S. generally accepted accounting principles as they apply to the accounting treatment of auction rate securities), reactions of market participants to regulatory actions or press reports, financial reporting cycles and market conditions generally. Demand for the Auction Rate Bonds may change without warning, and declines in demand may be short-lived or continue for longer periods.

**Bidding by Designated Broker-Dealer**

The Designated Broker-Dealer is permitted, but not obligated, to submit Orders in Auctions for its own account either as a Bidder or an Existing Owner and routinely does so in the auction rate securities market in its sole discretion. If the Designated Broker-Dealer submits an Order for its own account, it would have an advantage over other Bidders because the Designated Broker-Dealer would have knowledge of some or all of the other Orders placed through the Designated Broker-Dealer in that Auction and, thus, could determine the rate and size of its Order so as to ensure that its Order is likely to be accepted in the Auction and that the Auction is likely to clear at a particular rate. For this reason, and because the Designated Broker-Dealer is appointed and paid by the Authority to serve as the sole Broker-Dealer in the Auction, the Designated Broker-Dealer's interests in conducting an Auction may differ from those of Existing Owners and Potential Owners who participate in Auctions. *See* "Broker-Dealer Fees." The Designated Broker-Dealer would not have knowledge of Orders submitted to the Auction Agent by any other Broker-Dealer that may in the future be appointed to accept Orders pursuant to a Broker-Dealer Agreement.

The Designated Broker-Dealer may routinely place one or more Bids in an Auction for its own account to acquire the Auction Rate Bonds for its inventory, to prevent an Auction failure (which would result in the Auction Rate being set at the Maximum Rate) or an Auction from clearing at a rate that the Designated Broker-Dealer believes does not reflect the market for the Auction Rate Bonds. The Designated Broker-Dealer may place such Bids even after obtaining knowledge of some or all of the other Orders submitted through it. When bidding for its own account, the Designated Broker-Dealer may also bid outside or inside the range of rates that it posts in its Price Talk. *See* "Price Talk."

The Designated Broker-Dealer also may routinely encourage bidding by others in Auctions, including to prevent an Auction failure or an Auction from clearing at a rate that the Designated Broker-Dealer believes does not reflect the market for the Auction Rate Bonds. The Designated Broker-Dealer may routinely encourage such Bids even after obtaining knowledge of some or all of the other Orders submitted through it.

Bids by the Designated Broker-Dealer or by those it may encourage to place Bids are likely to affect (i) the Auction Rate, including preventing the Auction Rate from being set at the Maximum Rate or otherwise causing Bidders to receive a higher or lower rate than they might have received had the Designated Broker-Dealer not bid or not encouraged others to bid and (ii) the allocation of Auction Rate Bonds being auctioned, including displacing some Bidders who may have their Bids rejected or receive fewer Auction Rate Bonds than they would have received if the Designated Broker-Dealer had not bid or encouraged others to bid. Because of these practices, the successful clearance of an Auction does not mean that an investment in the Auction Rate Bonds involves no significant liquidity or credit risk. The Designated Broker-Dealer is not obligated to continue to place such bids or encourage other Bidders to do so in any particular Auction to prevent an Auction from failing or clearing at a rate the Designated Broker-Dealer believes does not reflect the market for the Auction Rate Bonds. Investors should not assume that the Designated Broker-Dealer will do so or that Auction failures will not occur. Investors should also be aware that Bids by the Designated Broker-Dealer or by those it may encourage to place Bids may result in unfavorable Auction Rates.

In any particular Auction, if all outstanding Auction Rate Bonds are the subject of Submitted Hold Orders, the Auction Rate for the next succeeding Auction Period will be the All Hold Rate (such a situation is called an "All Hold Auction"). The Designated Broker-Dealer is under no obligation to advise Existing Owners when, in its opinion, an All Hold Auction is likely.

If the Designated Broker-Dealer holds any Auction Rate Bonds for its own account on an Auction Date, the Designated Broker-Dealer will submit a Sell Order into the Auction with respect to such Auction Rate Bonds, which would prevent that Auction from being an All Hold Auction. The Designated Broker-Dealer may, but is not obligated to, submit Bids for its own account in that same Auction, as set forth above.

**Broker-Dealer Fees**

With respect to the Auction Rate Bonds, the Designated Broker-Dealer has been appointed to serve as the sole Broker-Dealer in Auctions pursuant to the Broker-Dealer Agreement between the Authority and the Designated Broker-Dealer. That Agreement provides that the Designated Broker-Dealer will receive from the Authority a Broker-Dealer Fee at an annual rate of a percentage of the principal amount of the Auction Rate Bonds sold or successfully placed through the Designated Broker-Dealer. As a result, the Designated Broker-Dealer's interests in conducting Auctions may differ from those of investors who participate in Auctions.

The Designated Broker-Dealer may share a portion of the Broker-Dealer Fee with other broker-dealers that submit orders through the Designated Broker-Dealer that the Designated Broker-Dealer successfully places in the Auction. In general, auction dealers may share with the Designated Broker-Dealer a portion of the fees they receive from an issuer when those dealers submit orders for the Designated Broker-Dealer (on behalf of the Designated Broker-Dealer or its customers) into Auctions in which the Designated Broker-Dealer does not serve as a dealer. Similarly, with respect to Auctions for other Auction Rate Bonds for which the Designated Broker-Dealer does not serve as a dealer, the other broker-dealers who serve as dealers in those Auctions may share auction dealer fees with the Designated Broker-Dealer for orders that the Designated Broker-Dealer submits through those broker-dealers that those broker-dealers successfully place in those auctions.

**Price Talk**

Before the start of an Auction, the Designated Broker-Dealer may, in its discretion, make available to Existing Owners and Potential Owners the Designated Broker-Dealer's good faith judgment of the range of likely clearing rates for the Auction based on market and other information (hereinafter "Price Talk"). Price Talk is not a guaranty, and Existing Owners and Potential Owners are free to use it or ignore it. If the Designated Broker-Dealer provides Price Talk, the Designated Broker-Dealer will make the Price Talk available to all Existing Owners and Potential Owners. The Designated Broker-Dealer may occasionally update and change the Price Talk based on changes in issuer credit quality or macroeconomic factors that are likely to result in a change in interest rate levels, such as an announcement by the Federal Reserve Board of a change in the Federal Funds rate or an announcement by the Bureau of Labor Statistics of unemployment numbers. The Designated Broker-Dealer will make such changes available to all Existing Owners and Potential Owners that were given the original Price Talk.

**All-or-Nothing Bids**

The Designated Broker-Dealer does not accept "all-or-nothing" bids (*i.e.*, bids whereby the bidder proposes to reject an allocation smaller than the entire quantity bid) or any other type of bid that allows the bidder to avoid auction procedures that require the pro rata allocation of securities where there are not sufficient sell orders to fill all bids at the clearing rate.

**Deadlines and Auction Periods**

Each Auction has a Submission Deadline by which all Bids must be submitted by the Designated Broker-Dealer to the Auction Agent. To provide sufficient time to process and submit customer Bids to the Auction Agent before the Submission Deadline, the Designated Broker-Dealer imposes an earlier deadline, called the "Internal Submission Deadline," by which Bidders must submit Bids to the Designated Broker-Dealer. The Internal Submission Deadline is subject to change by the Designated Broker-Dealer. The Designated Broker-Dealer may allow for correction of clerical errors after the Internal Submission Deadline and prior to the Submission Deadline.

The Designated Broker-Dealer may submit Bids for its own account at any time until the Submission Deadline. Some auction agents allow correction of clerical errors for a specified period of time after the Submission Deadline.

During any Auction Period, the Authority may, pursuant to the Auction Procedures, change the length of the next Auction Period. In Auctions that are subject to the changed Auction Period, the Designated Broker-Dealer may place a bid to buy the Auction Rate Bonds that may effectively place an upper limit on the rate that can be set at the Auction at a rate that is below the Maximum Rate.

## SEC Inquiry

On January 9, 2007, the SEC announced that it had settled its investigation of three banks, including Wilmington Trust Company, that participate as auction agents in the auction rate securities market, regarding their respective practices and procedures in this market. The SEC alleged in the settlement that the three banks allowed broker-dealers in auctions to submit bids or revise bids after the submission deadlines and allowed broker-dealers to intervene in auctions in ways that may have affected the rates paid on the auction rate securities. As part of the settlement, each of the three banks agreed to pay a civil penalty. In addition, each bank, without admitting or denying the SEC's allegations, agreed to provide to broker-dealers and issuers written descriptions of its material auction practices and procedures and to implement procedures reasonably designed to detect and prevent any failures by that bank to conduct the auction process in accordance with disclosed procedures. No assurance is offered as to how the settlement may affect the market for the Auction Rate Bonds.

# THE AUTHORITY

## General

The Authority was created in 1983 by an act of the legislature of the State consolidating three former State agencies: the Maine Guarantee Authority, the Maine Veterans' Small Business Loan Authority, and the Maine Small Business Loan Authority. One of the Authority's purposes is to stimulate a larger flow of private investment funds to help finance expansion of industrial, manufacturing, fishing, agricultural and recreational enterprises in the State. Since 1990, the Authority has been responsible for administration of the State's higher education loan and grant programs and has been the State designated guaranty agency for purposes of the Federal Family Education Loan Program. In 2003, the Authority was authorized to issue bonds to purchase FFELP Loans as a secondary market participant. In 1998, the Authority was authorized to become the administrator of the State's qualified tuition program (the "Section 529 Qualified Tuition Program") established in accordance with section 529 of the Internal Revenue Code of 1986, as amended (the "Code") which began operation in 1999. The Authority currently has responsibility for the administration of a number of Maine student financial assistance programs that authorize the Authority to originate education loans other than FFELP Loans and may in the future be assigned responsibility for additional such programs. See "--The Authority's Education Finance Activities" and "CERTAIN STATE LEGISLATION." The Authority, through its Business Assistance Division, is also responsible for providing financial assistance for commercial, industrial and specialized development projects.

The Authority's main office is located at 5 Community Drive, Augusta, Maine 04330, and its telephone number is: (207) 623-3263.

## Governance and Management Personnel

There are 15 voting members of the Authority, as follows: the Commissioner of Economic and Community Development, the State Treasurer, one natural resources commissioner designated by the governor of the State (the "Governor") from either the Department of Agriculture, Food and Rural Resources, the Department of Conservation or the Department of Marine Resources, and twelve members appointed by the Governor (including a certified public accountant, an attorney, a commercial banker, two veterans, two persons knowledgeable in the field of natural resource enterprises or financing, an individual knowledgeable in the field of student financial assistance and an individual knowledgeable in the field of higher education), which appointments are subject to confirmation of the State legislature. The members elect a chair, a vice chair who also serves as secretary, and a treasurer, and employ a chief executive officer, who is nominated by the Governor and confirmed by the legislature.

The present members of the Authority, their terms of office and their principal occupations or affiliations are as follows:

| Name | Term Expires | Principal Occupation or Affiliation |
|---|---|---|
| Joyce A. Maker, Chair | September 2009 | Director, Financial Aid, Washington County Community College |
| James J. Conlon, Vice Chair | September 2008 | Chief Executive Officer, Bangor Savings Bank |
| M. Kelly Matzen, Treasurer | September 2009 | Attorney, Trafton & Matzen |
| William H. Beardsley | September 2009 | President, Husson College |
| J. Maurice L. Bisson | September 2006 | CPA |
| Geraldine R. Canning | September 2006 | Principal, Pine State Trading Company |
| John F. Conley | September 2008 | CPA, McCallum & Conley LLC |
| Theodora J. Kalikow | September 2009 | President, University of Maine at Farmington |
| Glenn Lamarr | September 2009 | Vice President, TD Banknorth, N.A. |
| Shepard Lee, | September 2007 | Owner, Lee Auto Mall |
| David G. Lemoine | ex officio | Treasurer, State of Maine |
| Kevin Mattson | September 2009 | President, Harper's Development, LLC |
| Patrick K. McGowan | ex officio | Commissioner, Department of Conservation |
| Karen Piper | September 2006 | Owner, Piper Farm |
| John Richardson | ex officio | Commissioner, Department of Economic and Community Development |

Members, other than members serving ex officio, serve until a successor is appointed and qualified.

As of March 31, 2007, the Authority had 43 full-time employees and 5 part-time employees.

The following are the principal Authority officers and employees with primary responsibility for the Authority's bond programs as of March 31, 2007:

John C. Witherspoon is the Authority's Chief Executive Officer and is responsible for coordinating personnel and instituting policies and programs of the Authority. Responsibilities of the Chief Executive Officer include oversight and administration of all programs of the Authority, and Authority administration. Mr. Witherspoon became Chief Executive Officer in April 2004, after having served as President and Chief Executive Officer of UnitedKingfield Bank and its predecessor Kingfield Savings Bank for twenty (20) years. Mr. Witherspoon holds a Bachelor of Science Degree in Business Administration from the University of Maine.

Elizabeth L. Bordowitz is the Authority's General Counsel and is responsible for supervising and coordinating all legal and human resource matters concerning the Authority. Ms. Bordowitz has served as General Counsel since May 1995. Prior to joining the Authority's Legal Division in March 1989, she was associated with a Portland law firm. She holds a B.A. and M.A. in political science from Rutgers College and Rutgers University, respectively, and earned her J.D. at Rutgers School of Law – Camden.

Duncan R. MacKellar is the Authority's Director of Finance and Operations and is responsible for coordinating and supervising all financial and operations activity of the Authority, including the Authority's accounting, bond administration, investment portfolio, and management information systems. Mr. MacKellar also has primary responsibility for the oversight of vendors, including loan servicers and the operations of the Authority. Mr. MacKellar joined the Authority in December 1983. Prior thereto, he was an accountant and financial analyst for GTE-Sylvania in Danvers, Massachusetts. He holds a Bachelor of Science Degree and a Master of Business Administration Degree from the University of Maine.

Christopher H. Roney has been the Authority's Deputy General Counsel since July 1996. Mr. Roney is responsible for many legal aspects of the Authority's Loan Program and for certain other Authority legal matters. Prior to joining the Authority, Mr. Roney was employed by two law firms in Portland, Maine. He graduated from the University of Maine School of Law with a J.D. in 1988 and graduated from Villanova University in 1985 with a Bachelor of Arts Degree, cum laude, in Economics.

Linda J. Cunningham is the Authority's Manager of Accounting & Finance and is responsible for managing the accounting functions of the Authority. Ms. Cunningham joined the Authority in April, 2005. Prior to working at the Authority she was in the banking profession for 20 years, holding compliance and accounting positions of increasing responsibility. After that, she was an auditor for KPMG and its Maine successor for five years and the Senior Manager of Financial Reporting for a mutual fund accounting servicer for three years. She holds a Bachelor of Science Degree in business administration (concentration in accounting) from the University of Maine and a Master of Business Administration Degree from the University of Southern Maine and is a CPA licensed in the State of Maine.

**The Authority's Education Finance Activities**

*Programs.* The Authority is statutorily charged with providing and administering a comprehensive, consolidated system of student financial assistance programs in the State. The Authority is the state-designated guarantor for the State, responsible for administering the FFEL Program, and also administers, or assists in the administration of, the following federal and State supported student financial assistance programs:

Federal Programs

- Leverage Educational Assistance Partnership (LEAP) Program
- Special Leverage Educational Assistance Partnership (SLEAP) Program
- Paul Douglas Teacher Scholarship Program
- Robert C. Byrd Honors Scholarship Program
- GEAR UP Scholarship Program

State Programs

- Maine State Grant Program
- Maine Health Professions Loan & Loan Forgiveness Program
- Maine Dental Loan and Loan Repayment Program
- Educators for Maine Loan & Loan Forgiveness Program
- Quality Child Care Grant Program
- Maine Access to Medical Education Program
- NextGen College Investing Plan®
- Outreach Activities

The Authority may in the future be assigned responsibility for additional student financial assistance programs. Although the Authority is currently authorized to finance certain such programs through the issuance of bonds, it has not issued bonds for this purpose. The Authority reserves the right, however, to apply Trust Estate assets to finance loans other than FFELP Loans in accordance with the Indenture and the Act and to issue bonds secured on a basis separate and apart from the Bonds for such purpose. See "CERTAIN RISK FACTORS--Student Loan Market Risk" and "--Actions Taken Based On Insurer Approvals or Rating Affirmations" and "CERTAIN STATE LEGISLATION."

*Availability of Student Loans.* The Authority expects to apply all proceeds of the 2007 Bonds that are available for loan acquisition to finance FFELP Loans prior to April 1, 2010. See "CERTAIN RISK FACTORS – Loan Purchase Risk" and Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM—Legislative and Administrative Matters." In addition, the Authority may transfer funds in the Revenue Account to the Loan Account as permitted by the Indenture to be used to acquire additional Student Loans until April 1, 2010 unless such date is extended by the Authority by delivery to the Trustee of a Certificate accompanied by an Insurer Approval.

## SERVICER INFORMATION

**General**

The Indenture provides that the Authority shall either directly, or through Servicers, diligently collect all principal and interest payments on all Loans held under the Indenture, and all applicable payments which may become

due from third parties with respect to such Loans; subject, however, to the reserved rights of the Authority: (i) to implement programs which have the effect of reducing Student Loan revenue received for purposes of reducing the overall costs of administering such Student Loans or of benefiting borrowers; and (ii) subject to certain Indenture requirements, including receipt of an Insurer Approval, to apply amounts in the Loan Account to finance Loans affected thereby. Currently, the Authority's Loans are being serviced by Edfinancial Services and FISC. The Indenture provides that certain specified entities, other than Edfinancial Services and FISC, may act as Servicers and that additional other entities may so act after receipt of an Insurer Approval. The Authority does not currently expect to appoint additional Servicers with primary servicing responsibility for Loans in the near future, but reserves the right to establish different Loan servicing arrangements in accordance with the Indenture. See Appendix G, "CERTAIN INFORMATION CONCERNING THE AUTHORITY AND THE TRUST ESTATE."

The Indenture further provides that the Authority covenants to duly and properly service or provide for the servicing of Loans and to cause to be diligently enforced and taken all reasonable steps, actions and proceedings necessary for the enforcement of all terms, covenants and conditions of all Servicing Agreements, including the prompt payment of all principal and interest payments and all other amounts due the Authority and the Trustee thereunder. In addition, the Indenture provides that the Authority will not permit the release of the obligations of any Servicer under any Servicing Agreement and shall at all times, to the extent permitted by law, cause to be defended, enforced, preserved and protected the rights and privileges of the Authority and the Trustee under or with respect to each Servicing Agreement.

**The Authority's Due Diligence Obligation**

The Authority is required under the Higher Education Act to use due diligence in the servicing and collection of FFELP Loans. Failure to comply with these due diligence standards may adversely affect the ability of the Authority to realize the benefits of guarantee payments and may result in the loss of Interest Subsidy Payments and Special Allowance Payments. See "APPENDIX A—SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

**Servicers**

The Authority is currently a party to Servicing Agreements with each of Edfinancial Services and FISC that require the respective Servicer to be generally responsible for servicing the Loans to which the Servicing Agreement relates in accordance with the requirements of the Higher Education Act. The Authority reserves the right to establish other Loan servicing arrangements in accordance with the Indenture. Such Servicing Agreements are intended to comply in all respects with the Act and the Higher Education Act. See "—Servicing Agreements" below. FISC has serviced Loans for the Authority since July 23, 2004 and Edfinancial Services has serviced Loans for the Authority since March 17, 2005.

**Edfinancial Services**

**The following information has been furnished by Edfinancial Services for inclusion in this Official Statement. Neither the Authority nor the Underwriter has independently verified or guarantees or makes any representation as to the accuracy or completeness of such information or as to the absence of material change thereto subsequent to the date hereof.**

Edfinancial Services is empowered by its Charter, among other things, to (a) contract with lenders and other makers of educational loans (including those made under the Higher Education Act) to provide marketing, administrative and loan origination services and loan servicing for such educational loans; (b) service all such educational loans made or acquired; and (c) contract with nonprofit companies organized for exempt purposes and with agencies or instrumentalities of the government of any state or of the United States of America to provide services in furtherance of the exempt purposes of such companies, agencies or instrumentalities.

Edfinancial Services' principal office is currently located at 298 North Seven Oaks Drive, Knoxville, Tennessee. Edfinancial Services also has remote offices located in Jacksonville, Florida and Little Rock, Arkansas. Currently, Edfinancial Services provides full student loan servicing for approximately sixteen major lenders and secondary markets involving approximately $6.8 billion of educational loans. Edfinancial Services provides servicing for student loans under a Remote System Agreement with American Education Services (AES). Edfinancial Services

employs a corporate staff of approximately 450 full-time and part-time personnel performing various functions, including marketing, loan and guarantee processing, disbursement services, loan servicing, regulatory compliance and internal accounting. Edfinancial Services currently maintains an "exceptional performer" designation from the U.S. Department of Education.

## FISC

**The following information has been furnished by FISC for inclusion in this Official Statement. Neither the Authority nor the Underwriter has independently verified or guarantees or makes any representation as to the accuracy or completeness of such information or as to the absence of material change thereto subsequent to the date hereof.**

FISC was incorporated in February 1977 pursuant to applicable laws of the State. FISC is empowered by its charter, among other things, to (a) contract with lenders and other makers of educational loans (including those made under the Higher Education Act) to provide marketing, administrative and loan origination services and loan servicing for such educational loans and (b) contract with nonprofit companies organized for exempt purposes and with agencies or instrumentalities of the government of any state or of the United States of America to provide services in furtherance of the exempt purposes of such companies, agencies or instrumentalities. FISC's principal office is currently located at 168 Lisbon Street, Lewiston, ME. Currently, FISC provides full student loan servicing for approximately seventy-five lenders and secondary markets involving over $139,000,000 of educational loans. FISC provides servicing for student loans under a Progress based, in-house proprietary software system. FISC is governed by shareholders of the Maine corporation Outsourcing Solutions, Inc. and employs a corporate staff of approximately twenty-four full-time and part-time personnel performing various functions, including marketing, loan and guarantee processing, disbursement services, loan servicing, regulatory compliance and internal accounting.

## Servicing Agreements

Each of the current Edfinancial Services Servicing Agreement and the current FISC Servicing Agreement became effective as of May 1, 2007 and will expire on a date which, unless extended, is substantially before the final maturity date of the 2007 Bonds. The Authority covenants in the Indenture that at all times the Loans will be serviced by a qualified commercial organization. The Servicers are required by the Servicing Agreements to service the Authority's FFELP Loans, including Loans subject to the lien of the Indenture, in accordance with the requirements of the Act and the Higher Education Act, and rules and regulations promulgated thereunder, including the taking of all steps necessary to maintain the insurance or guarantee coverage on each such FFELP Loan at all times and to exercise due diligence in its administration and collection of such FFELP Loans. The Servicers are also required to prepare and deliver to the Authority certain reports related to the Loans.

Under the Servicing Agreements, all Loan payments are made directly to the Servicers and are remitted weekly to the Trustee. Each Servicer charges the Authority a monthly servicing fee based upon the number of Loans serviced and the payment status of such Loans.

## GUARANTY AGENCY

The Authority currently expects that it will be the Guaranty Agency for Loans to be financed with the proceeds of the 2007 Bonds. The Authority reserves the right, however, to finance Loans that are guaranteed by other Guaranty Agencies through application of Loan Account funds in accordance with the Indenture. The Authority's FFELP Loan guarantee obligations are payable solely from the Authority's Federal Fund and no other asset of the Authority is available therefor.

The Authority has entered into certain agreements with the Department, under which the Secretary reimburses the Authority's Federal Fund at certain rates of the amount expended by the Authority's Federal Fund in discharging guarantee obligations as a result of default in the payment of principal or interest on "guaranteed loans." Pursuant to such agreements, the reimbursement rate is 80% for FFELP Loans guaranteed through May 31, 1977, 100% for FFELP Loans guaranteed from June 1, 1977 through September 30, 1993, 98% for FFELP Loans guaranteed from October 1, 1993 through September 30, 1998 and 95% for FFELP Loans guaranteed on or after October 1, 1998. In addition, the Authority's Federal Fund is reimbursed at the rate of 100% for discharging claims relative to certain lender-of-last-resort loans and claims resulting from bankruptcy, death, disability, false certification

or school closure. The Authority retains certain amounts on defaulted loans subsequently collected. A portion of the collection retentions covers administrative costs of collection, pre-claim service and monitoring loan repayment status under the current regulations and reinsurance agreement with the Department.

With respect to Subsidized Stafford Loans, Unsubsidized Stafford Loans, PLUS Loans and the SLS Loans, the Guaranty Agency must collect a 1% default fee for each Loan guaranteed. The fee must be credited to the Authority's Federal Fund.

Holders of FFELP Loans are required to exercise due diligence in making and servicing loans and to use practices which are at least as extensive and forceful as those used by financial institutions in the collection of other consumer loans. If a guaranty agency has probable cause to believe that the holder has made misrepresentations or if the holder has failed to comply with the terms of its contract with the guaranty agency, the guaranty agency may take reasonable action, including withholding reimbursement for claims.

The obligations of the guaranty agencies with respect to any FFELP Loan guaranteed by it are conditioned upon the satisfaction of certain conditions. These conditions include, but are not limited to, the following: (i) the origination and servicing of such FFELP Loan being performed in accordance with the Higher Education Act and other applicable requirements; (ii) the timely payment to the guaranty agencies of the guarantee fee payable with respect to such FFELP Loan; (iii) the timely submission to the guaranty agencies of all required pre-claim delinquency status notifications and of the claim with respect to such FFELP Loan; and (iv) the transfer and endorsement of the promissory note evidencing such FFELP Loan to the guaranty agencies upon and in connection with making a claim thereon. Failure to comply with any of the applicable conditions, including the foregoing, may result in the refusal of the guaranty agencies to honor guarantee claims with respect to such FFELP Loan, in the denial of guarantee coverage with respect to certain accrued interest amounts with respect thereto or in the loss of certain Interest Subsidy Payments and Special Allowance Payments with respect thereto. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM -- Federal Insurance and Reinsurance and Reimbursement of Guaranty Agencies."

Set forth below is certain current and historical information with respect to all FFELP Loans guaranteed by the Authority in its capacity as a guaranty agency. There can be no assurance, however, that the Authority's future FFELP Loan claim and recovery experience will be comparable to its prior experience or to the information set forth below.

*Guarantee Volume.* As of September 30, 2006, the student loan guarantee obligations of the Authority aggregated $990,728,927 with respect to 393,971 student loans. The following table sets forth the approximate gross aggregate principal amount of federally reinsured education loans that have first become guaranteed by the Authority in each of the last five federal fiscal years:

| Federal Fiscal Year | FFELP Loans Guaranteed |
|---|---|
| 2006 | $245,639,166 |
| 2005 | $302,810,079 |
| 2004 | $224,537,000 |
| 2003 | $232,750,000 |
| 2002 | $188,460,000 |

*Reserve Ratio.* The Higher Education Act currently requires that each guaranty agency which has entered into an agreement with the Secretary maintain a Federal Fund at a current minimum reserve level of at least .25 percent of the total attributable amount of all outstanding loans guaranteed by such guaranty agency. The term "reserve ratio" is defined by the Higher Education Act as (x) the amount held in the guaranty agency's reserve funds, divided by (y) the original principal amount of all loans for which the guaranty agency has an outstanding insurance obligation as of such date, including amounts of outstanding loans transferred to the guaranty agency from another guaranty agency. The term "reserve funds" is defined by the Higher Education Act in a manner which: (i) includes any reserve funds in cash or liquid assets held by the guaranty agency, or held by, or under the control of, any other entity, as part of the

guaranty agency's Federal Fund; and (ii) does not include building, equipment, other nonliquid assets or any asset not held in the Federal Fund.

*Claims Rate.* For the past five federal fiscal years, the Authority has not experienced a claims rate in excess of 5%. As a result, all claims of the Authority have been fully reimbursed to the maximum allowable by the Department. There can be no assurance that the Authority will continue to receive maximum allowable reimbursement for reinsurance claims. See Appendix A, "SUMMARY OF CERTAIN PROVISIONS OF THE FEDERAL FAMILY EDUCATION LOAN PROGRAM -- Federal Insurance and Reinsurance and Reimbursement of Guaranty Agencies" herein. The following table sets forth the claims rates of the Authority for each of the last five federal fiscal years:

| Federal Fiscal Year | Claims Rate |
|---|---|
| 2006 | 0.65% |
| 2005 | 1.00% |
| 2004 | 1.04% |
| 2003 | 1.02% |
| 2002 | 2.13% |

## CONTINUING DISCLOSURE

### General

In accordance with the requirements of Rule 15c2-12 (the "Rule") promulgated by the Securities and Exchange Commission (the "SEC"), the Authority will enter into a continuing disclosure agreement with the Trustee with respect to the 2007 Bonds which shall constitute a written undertaking for the benefit of the respective owners of such Bonds (the "Continuing Disclosure Agreement"), solely to assist the Underwriter in complying with subsection (b)(5) of the Rule.

The Authority will undertake in the Continuing Disclosure Agreement to provide to each nationally recognized municipal securities information repository and any public or private repository or entity designated by the State as a state repository for purposes of subsection (b)(5) of the Rule (each, a "Repository"), annual financial information and operating data (the "Annual Financial Information") relating to it and any Additional Obligated Persons (defined below) covering the matters described under "Annual Financial Information" below. The Authority will also undertake to provide to each Repository, in a timely manner, notice of any of the events ("Event Notice") if determined by the Authority to be material, as described under "Event Notices" below.

The ongoing disclosure obligations of the Authority shall terminate upon the full payment, prior redemption or legal defeasance of the 2007 Bonds, or with respect to any Additional Obligated Person, at the time that the party no longer meets the definition of Additional Obligated Person.

The Authority may appoint or engage a dissemination agent to assist in carrying out its obligations under the Continuing Disclosure Agreement.

The Authority may amend the Continuing Disclosure Agreement, and waive any provision thereof, by written agreement of the parties, without the consent of the respective owners of the 2007 Bonds (except to the extent required under clause (4)(ii) below) if all of the following conditions are satisfied: (1) such amendment is made in connection with a change in circumstances that arises from a change in legal (including regulatory) requirements, a change in law (including rules or regulations) or in interpretations thereof, or a change in the identity, nature or status of the Authority or any Additional Obligated Person or the type of business conducted thereby; (2) the Continuing Disclosure Agreement as so amended would have complied with the requirements of the Rule as of the date of the Continuing Disclosure Agreement, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; (3) the Authority shall have delivered to the Trustee an opinion of nationally recognized bond counsel or counsel expert in federal securities laws, addressed to the Authority and the Trustee, to the same effect as set forth in clause (2) above; (4) either (i) the Authority shall have delivered to the Trustee an opinion of nationally recognized bond counsel or counsel expert in federal securities laws, addressed to the Authority and the Trustee, to the effect that the amendment does not materially impair the interests of the Owners of the 2007 Bonds, or (ii) the Owners

of the 2007 Bonds consent to the amendment pursuant to the same procedures as are required pursuant to the Indenture for amendments to the Indenture with consent of Owners of the 2007 Bonds; and (5) the Authority shall have delivered copies of such opinion and amendment to each Repository.

In the event of default by the Authority of its obligations under the Continuing Disclosure Agreement to provide continuing disclosure, the Owners of the 2007 Bonds and the Trustee on behalf of such Owners may take action to compel compliance, provided that any enforcement action by any such person shall be limited to a right to obtain specific enforcement of the Authority's obligations under the Continuing Disclosure Agreement. No such default under the Continuing Disclosure Agreement shall constitute an Event of Default under the Indenture.

**Annual Financial Information**

The Authority will provide Annual Financial Information for the Authority and any Additional Obligated Person within 180 days after the end of such party's fiscal year (the "Reporting Date"), beginning with the fiscal year in each case ending on or after June 30, 2007. Such Annual Financial Information shall consist of the following information:

(I) Annual audited financial statements for the Authority and for any Additional Obligated Person prepared in accordance with generally accepted accounting principles;

(II) An update of the quantitative information presented under the heading "GUARANTY AGENCY" with respect to the Authority's Federal Fund and in Appendix G to this Official Statement entitled "CERTAIN INFORMATION CONCERNING THE AUTHORITY AND THE TRUST ESTATE;" and

(III) if applicable, a narrative explanation of the reasons for any amendments to the Continuing Disclosure Agreement resulting from any change in the type of financial information or operating date provided pursuant to the Continuing Disclosure Agreement and of the impact of such change and, if an amendment is made to the basis on which the financial statements are prepared, a qualitative and, to the extent reasonably feasible, quantitative discussion of such changes in the accounting principles and the impact of the change in the accounting principles on the presentation of the financial information.

If the audited financial statements for the Authority or any Additional Obligated Person, as the case may be, are not available by the Reporting Date, unaudited financial statements of the Authority or such Additional Obligated Person, as the case may be, are to be provided as part of the applicable Annual Financial Information and audited financial statements for the Authority or such Additional Obligated Person, as the case may be, when and if available, will be provided to the Trustee and to each Repository. If the fiscal year of the Authority or an Additional Obligated Person, as the case may be, changes, the Authority or such Additional Obligated Person, as the case may be, shall give notice of such change in the same manner and time as an Event Notice.

**Event Notice**

In addition to the Annual Financial Information described above, the Authority will also agree to provide an Event Notice upon the happening of and with respect to any of the following events, if material, with respect to the 2007 Bonds:

(1) Principal and interest payment delinquencies;
(2) Nonpayment related defaults;
(3) Unscheduled draws on the debt service reserves reflecting financial difficulties;
(4) Unscheduled draws on credit enhancements reflecting financial difficulties;
(5) Substitution of credit or liquidity providers, or their failure to perform*;
(6) Adverse tax opinions or events adversely affecting the tax exempt status of the 2007 Bonds;

_____
* The Authority does not currently expect to establish any liquidity facility with respect to the 2007 Bonds on or after the date of initial delivery thereof.

(7)     Modifications to rights of owners of the 2007 Bonds;
(8)     Calls of the 2007 Bonds;
(9)     Defeasances of the 2007 Bonds;
(10)    Release, substitution or sale of assets securing repayment of the 2007 Bonds; and
(11)    Rating changes.

## Definitions

"Additional Obligated Person" means, prior to receipt by the Authority and the Trustee of a Negative Opinion or the issuance of a written interpretation by the staff of the SEC, any Guaranty Agency that is guaranteeing Student Loans having an aggregate principal amount of at least 20% of the aggregate principal amount of all Student Loans.

"Negative Opinion" means an opinion with respect to a person or entity that is issued by a nationally recognized bond counsel firm or counsel expert in federal securities laws, which counsel and opinion are in form and substance acceptable to the Authority, to the effect that such person or entity does not constitute an "obligated person" with respect to the 2007 Bonds within the meaning of the Rule.

## Repositories

Contact information for each Repository is currently available on the SEC website at <http://www.sec.gov/info/municipal/nrmsir.htm>.  Certain of the current contact information for each Repository is set forth below:

Bloomberg Municipal Repository
100 Business Park Drive
Skillman, NJ  08558
E-Mail Address: Munis@Bloomberg.com
Telephone: (609) 279-3225
Fax: (609) 279-5962

DPC Data Inc.
One Executive Drive
Fort Lee, NJ  07024
E-Mail Address: nrmsir@dpcdata.com
Telephone: (201) 346-0701
Fax: (201) 947-0107

Standard & Poor's Securities Evaluations, Inc.
55 Water Street
45th Floor
New York, NY  10041
E-Mail Address: nrmsir_repository@sandp.com
Telephone: (212) 438-4595
Fax: (212) 438-3975

Interactive Data Pricing and Reference Data, Inc.
Attn: NRMSIR
100 William Street, 15th Floor
New York, NY  10038
E-Mail Address: NRMSIR@interactivedata.com
Telephone: (212) 771-6999; 800-689-8466
Fax:  (212) 771-7390

## TAX MATTERS

### Opinion of Bond Counsel

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Authority, under existing statutes and court decisions and assuming continuing compliance with certain tax covenants described herein, (i) interest on the 2007 Bonds is excluded from gross income for federal income tax purposes pursuant to Section 103 of the Code, and (ii) interest on the 2007 Bonds is treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code.  In rendering its opinion, Bond Counsel has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Authority in connection with the 2007 Bonds, and Bond Counsel has assumed compliance by the Authority with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the 2007 Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel, pursuant to the Act, the 2007 Bonds, their transfer and the income from them, including any profit made on their sale, are exempt from taxation within the State.

Bond Counsel expresses no opinion regarding any other Federal or state tax consequences with respect to the 2007 Bonds. Bond Counsel renders its opinion under existing statutes and court decisions as of the Issue Date, and assumes no obligation to update its opinion after the Issue Date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. Bond Counsel expresses no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion from gross income for Federal income tax purposes of interest on the 2007 Bonds, or under state and local tax law.

## Certain Ongoing Federal Tax Requirements and Covenants

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the 2007 Bonds in order that interest on the 2007 Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the 2007 Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the Federal government. Noncompliance with such requirements may cause interest on the 2007 Bonds to become included in gross income for Federal income tax purposes retroactive to their Issue Date, irrespective of the date on which such noncompliance occurs or is discovered. The Authority has covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the 2007 Bonds from gross income under Section 103 of the Code.

## Certain Collateral Federal Tax Consequences

The following is a brief discussion of certain collateral Federal income tax matters with respect to the 2007 Bonds. It does not purport to address all aspects of Federal taxation that may be relevant to a particular owner of a 2007 Bond. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the Federal tax consequences of owning and disposing of the 2007 Bonds.

Prospective owners of the 2007 Bonds should be aware that the ownership of such obligations may result in collateral Federal income tax consequences to various categories of persons, such as corporations (including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for Federal income tax purposes. Interest on the 2007 Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

## Information Reporting and Backup Withholding

Information reporting requirements will apply to interest paid after March 31, 2007 on tax-exempt obligations, including the 2007 Bonds. In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification", or unless the recipient is one of a limited class of exempt recipients, including corporations. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding", which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a 2007 Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the 2007 Bonds from gross income for Federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a refund or a credit against the owner's Federal income tax once the required information is furnished to the Internal Revenue Service.

**Legislation**

Legislation affecting municipal bonds is regularly under consideration by the United States Congress. There can be no assurance that legislation enacted or proposed after the date of issuance of the 2007 Bonds will not have an adverse effect on the tax-exempt status or market price of the 2007 Bonds.

## CERTAIN STATE LEGISLATION

The State Government Evaluation Act, 3 MRSA §§951-963 (the "Evaluation Act"), establishes a system for periodic review of agencies and independent agencies of Maine government in order to evaluate their efficacy and performance, and requires the Legislature to perform a financial and programmatic review, including, but not limited to, a review of agency management and organization, program delivery, statutory mandate and fiscal accountability. An agency may be reviewed at any time determined necessary or warranted by the Legislature. The next review of the Authority by the Legislature under the Evaluation Act is scheduled for 2009. The Evaluation Act provides that termination or modification of an agency shall not extinguish any legal claims against such agency and shall not relieve the agency of responsibility for making timely payment of the principal of and interest on any debt issued in the form of a bond or note.

## LEGALITY FOR INVESTMENT

Subject to any applicable federal requirements or limitations, the 2007 Bonds are securities in which all public officers and public bodies of the State, political subdivisions thereof, bank and savings associations and all other persons whose investment power is regulated by State law may properly and legally invest funds, including capital, in their control or belonging to them.

## ABSENCE OF MATERIAL LITIGATION

There is no controversy or litigation of any nature pending or threatened to restrain or enjoin issuance, sale, execution or delivery of the 2007 Bonds, or in any way contesting or affecting the validity of the 2007 Bonds, any proceedings of the Authority taken with respect to the issuance of sale thereof; and as of the date hereof, there is no litigation pending, or threatened that would materially adversely affect the pledge or application of any moneys or security provided for the payment of the 2007 Bonds or the powers of the Authority.

## APPROVAL OF LEGALITY

Certain legal matters in connection with the 2007 Bonds are to be passed upon by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel. Certain legal matters are to be passed upon for the Authority by its General Counsel and for the Underwriter by its counsel, Preti, Flaherty, Beliveau & Pachios, LLP. The unqualified approving opinion of Bond Counsel to the Authority shall accompany each of the 2007 Series A-1 Bonds, the 2007 Series A-2 Bonds and the 2007 Series A-3 Bonds substantially in the form set forth in Appendix D to this Official Statement.

## RATINGS

Fitch, Moody's and S&P are currently expected to assign their municipal bond ratings of "Aaa," "AAA" and "AAA," respectively, to the 2007 Bonds based on the issuance of the Policy by the Insurer. The assignment of such ratings is a condition precedent to the issuance of the Bonds. Such ratings reflect only the view of the respective Rating Agency and an explanation of the significance of such ratings can only be obtained from the respective Rating Agency. There is no assurance that such ratings will be continued for any given period of time or that they will not be revised downward or withdrawn entirely if, in the judgment of the respective Rating Agency, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect upon the market price or the marketability of the 2007 Bonds. Information on the ratings assigned to the 2007 Bonds can be obtained from Fitch at One State Street Plaza, New York, New York 10004 and at 212-908-0500, from Moody's at 99 Church Street, New York, New York 10007 and at 212-553-0300 and from S&P at 55 Water Street, New York, New York 10041 and at 212-438-2400.

## UNDERWRITING

The 2007 Bonds will be purchased by RBC Dain Rauscher Inc., doing business under the name RBC Capital Markets, as underwriter of the 2007 Bonds, at a purchase price of $139,552,000 (representing the principal amount of the 2007 Bonds less an underwriter's discount of $448,000).

## INDEPENDENT ACCOUNTANTS

The Authority's financial statements as of June 30, 2006 and for the year then ended, which have been audited by Baker Newman & Noyes Limited Liability Company, independent certified public accountants, as stated in their report which accompanies such financial statements, have been filed with each Repository and are incorporated herein by reference. Pursuant to continuing disclosure agreements with respect to the Outstanding Bonds and the Continuing Disclosure Agreement, the Authority has undertaken, and will undertake, to file its audited annual financial statements with each Repository on or before the Reporting Date. See "CONTINUING DISCLOSURE."

## MISCELLANEOUS

*Since the 2007 Bonds are special and limited obligations of the Authority, payable solely from the Trust Estate pledged under the Indenture, the overall financial status of the Authority does not indicate and does not necessarily affect whether revenues and other amounts will be available under the Indenture to pay the principal of and interest on the 2007 Bonds. The Authority is not obligated to pay any amounts in respect of principal and/or interest on the 2007 Bonds from any moneys legally available to the Authority for its general purposes other than those expressly pledged.*

All quotations from, and summaries and explanations of, the Higher Education Act, the Act, and the Indenture contained herein do not purport to be complete and reference is made to such laws and documents for full and complete statements of their provisions. The Appendices attached hereto are part of this Official Statement. Copies of the Act and the Indenture may be obtained upon written request directed to the Authority, Attn: Elizabeth L. Bordowitz, General Counsel, 5 Community Drive, P.O. Box 949, Augusta, ME 04332-0949.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

This Official Statement is not to be construed as a contract or agreement between the Authority and the purchasers or owners of any Bonds.

### FINANCE AUTHORITY OF MAINE

By:     s/John C. Witherspoon
        John C. Witherspoon
        Chief Executive Officer

Dated: May 10, 2007

## SUMMARY OF CERTAIN PROVISIONS OF
## THE FEDERAL FAMILY EDUCATION LOAN PROGRAM

Title IV of the Higher Education Act provides for a program (the "Federal Family Education Loan Program," the "FFEL Program") pursuant to which loans are made (collectively, "FFELP Loans") to students, former students and parents of dependent students, which loans are: (i) guaranteed by a state agency or private non-profit corporation and reinsured by the federal government; or (ii) directly insured by the federal government. Several types of FFELP Loans are currently authorized under the FFEL Program: (i) fully subsidized loans to students who demonstrate need on the basis of certain tests, currently known as Federal Stafford Loans ("Subsidized Stafford Loans"); (ii) generally similar loans to students who do not pass such need tests, currently known as Federal Unsubsidized Stafford Loans ("Unsubsidized Stafford Loans" and, collectively with Subsidized Stafford Loans, "Stafford Loans"); (iii) loans to borrowers who may include, effective July 1, 2007, graduate or professional students as well as parents of dependent students, currently known as Federal PLUS Loans ("PLUS Loans"); and (iv) loans to consolidate the borrower's obligations under various federally authorized student loan programs into a single loan, currently known as Federal Consolidation Loans ("FFEL Consolidation Loans"). The principal federal benefits which the FFEL Program provides to holders of loans originated thereunder are: (i) federal insurance by the federal Department of Education (the "Department") or federal reinsurance by the Department of guarantees provided by guaranty agencies; (ii) federal interest subsidy payments to holders of certain loans in lieu of borrower payments during certain periods defined by borrower status ("Interest Subsidy Payments"); and (iii) federal special allowance payments to holders of certain loans during certain periods defined by interest rate levels ("Special Allowance Payments"). See "— *Interest Subsidy Payments on Subsidized Stafford Loans,*" "— *Special Allowance Payments*" and "— *Federal Insurance and Reinsurance and Reimbursement of Guaranty Agencies.*"

**The Authority currently expects that the majority of Loans that may be added to the Trust Estate through the expenditure of 2007 Bond proceeds, or of other amounts becoming available under the Indenture, will be FFELP Loans which were or will be originated subsequent to January 1, 2002. The Authority does not currently expect that a material amount of FFELP Loans originated prior to July 1, 1998, or made to borrowers with outstanding FFELP Loans originated on or prior to such date, will be included in the Trust Estate.**

This summary of the FFEL Program and the Federal Direct Student Loan Program (the "FDSL Program") as established by the Higher Education Act generally describes certain elements of such programs applicable from July 1, 1998 to the date of this Official Statement, does not purport to be comprehensive or definitive and is qualified in its entirety by reference to the Higher Education Act and the regulations thereunder. No assurance can be given that FFELP Loans which may be financed by the Authority through the application of Bond proceeds in the future will have terms and conditions, or will be subject to federal requirements, identical with those applicable as of the date of this Official Statement. See "— *Legislative and Administrative Matters.*"

*Legislative and Administrative Matters*

The FFEL Program and the FDSL Program under Title IV of the Higher Education Act are subject to periodic legislative reauthorization. Authorization for the continuation of these programs was most recently extended through operation of the Higher Education Reconciliation Act of 2005 (the "2005 Amendments"). Origination of the new FFELP Loans is currently authorized to September 30, 2012 or, with respect to additional FFELP Loans to existing borrowers for purposes other than consolidation, to September 30, 2016. On January 17, 2007 the United States House of Representatives adopted the College Student Relief Act of 2007 ("H.R.5"). A separate bill entitled the Student Debt Relief Act of 2007 ("S.359") was introduced in the United States Senate on January 22, 2007 by Senate Health, Education, Labor and Pensions Chairman Edward Kennedy. In addition, the Budget of the United States Government, Fiscal Year 2008 (the "Executive Budget") was released on February 5, 2007. Each of H.R.5, S.359 and the Executive Budget contain numerous amendments to existing provisions of the Higher Education Act that might adversely affect the demand for FFELP Loans as well as amendments to such provisions that would have the direct effect of decreasing the value of such loans to some or all FFELP holders. Although certain such provisions of H.R.5, of S.359 and of the Executive Budget are similar, such provisions, in general, are not identical. Amendment of the

Higher Education Act as proposed by any of H.R.5, S.359 or the Executive Budget would be substantially adverse to the interests of FFELP holders, including the Authority. In addition, several separate bills which would further regulate the practices of FFELP Loan lenders have been introduced in the United States Senate and the United States House of Representatives (collectively, with H.R.5, S.359 and the Executive Budget, the "Pending Federal Bills"), including the Student Loan Sunshine Act (H.R. 890), which was adopted by the United States House of Representatives on May 9, 2007. No assurance can currently be given as to whether any of the Pending Federal Bills will become law or, if any should become law, will do so in their current form. No assurance can be given that relevant federal laws, including the Higher Education Act, or regulations, will not be changed in the future in a manner that might adversely affect the Trust Estate. Both Title IV of the Higher Education Act and the regulations promulgated thereunder have been the subject of frequent and extensive amendments in recent years and there can be no assurance that further amendment will not materially change the provisions described herein or the effect thereof. In addition, the operation of the FFEL Program has recently been, and may be, affected by proposed and enacted federal budgetary and tax legislation. Recent legislation substantially affecting the FFEL Program includes: (i) the Balanced Budget Act of 1997; (ii) the Emergency Student Loan Consolidation Act of 1997; (iii) the Intermodal Surface Transportation Efficiency Act of 1998 (the "1998 Transportation Act'); (iv) the Higher Education Amendments of 1998 (the "1998 Amendments"); (v) the Ticket to Work and Work Incentives Improvement Act of 1999 (the "1999 Amendments"); (vi) the 2002 Amendments to the Higher Education Act (the "2002 Amendments"); (vii) the Servicemembers Civil Relief Act of 2003 (the "2003 Civil Relief Act"); (viii) the 2005 Amendments; and (ix) the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror and Hurricane Recovery, 2006 (the "2006 Amendments").

The 1998 Transportation Act changed the previously applicable interest rate and Special Allowance Payment formulas for Stafford Loans and PLUS Loans disbursed during the period from July 1, 1998 through September 30, 1998. Stafford Loans originated during this period bear interest, during in-school grace and deferment periods, at the average bond equivalent rate of 91-Day Treasury bills (the "91-Day T-Bill Rate") plus 1.7 percent, with a maximum rate of 8.25 percent, and otherwise bear interest at a rate equivalent to the 91-Day T-Bill Rate plus 2.3 percent, with a maximum rate of 8.25 percent. PLUS Loans disbursed during this period bear interest at a rate equivalent to the 91-Day T-Bill Rate plus 3.1 percent, with a maximum rate of 9 percent. In addition, holders of such Stafford Loans are entitled to receive Special Allowance Payments, during in-school and grace periods, based upon the 91-Day T-Bill Rate plus 2.2 percent and, otherwise, based upon the 91-Day T-Bill Rate plus 2.8 percent. Holders of such PLUS Loans are entitled to receive Special Allowance Payments, when the 9 percent maximum rate applies, based upon the 91-Day T-Bill Rate plus 3.1 percent.

Under the 1998 Amendments, Stafford Loans disbursed during the period from October 1, 1998 through June 30, 2003 bear interest, during in-school, grace and deferment periods, at a rate equivalent to the 91-Day T-Bill Rate plus 1.7 percent, with a maximum rate of 8.25 percent, and otherwise bear interest at a rate equivalent to the 91-Day T-Bill Rate plus 2.3 percent, with a maximum rate of 8.25 percent. PLUS Loans disbursed during this period bear interest at a rate equivalent to the 91-Day T-Bill Rate plus 3.1 percent, with a maximum rate of 9 percent. FFEL Consolidation Loans disbursed during this period bear interest at a rate equal to the weighted average of the loans consolidated, rounded to the nearest higher one-eighth of 1 percent, with a maximum rate of 8.25 percent. In addition, holders of Stafford Loans disbursed during the period from October 1, 1998 through June 30, 2003 are entitled to receive Special Allowance Payments, during in-school and grace periods, based upon the 91-Day T-Bill Rate plus 2.2 percent and, otherwise, based upon the 91-Day T-Bill Rate plus 2.8 percent. Holders of PLUS and FFEL Consolidation Loans disbursed during this period are entitled to receive Special Allowance Payments, when the applicable maximum rates apply, based upon the 91-Day T-Bill Rate plus 3.1 percent.

Under the 1999 Amendments: (i) holders of Stafford Loans disbursed during the period from January 1, 2000 through June 30, 2003 are entitled to receive Special Allowance Payments, during in-school, grace and deferment periods, based upon the average of the bond equivalent rates of the 3-month commercial Paper (Financial) rate as reported by the Federal Reserve (the "CP Rate") plus 1.74 percent and, otherwise, based upon the CP Rate plus 2.34 percent; and (ii) holders of PLUS and FFEL Consolidation Loans disbursed during this period are entitled, when maximum rates apply, to receive Special Allowance Payments based upon the CP Rate plus 2.64 percent.

Under the 2002 Amendments, the pre-existing interest rate and Special Allowance Payment formulas established by the 1999 Amendments were extended with respect to Stafford Loans and PLUS Loans to loans disbursed by June 30, 2006, and with respect to FFEL Consolidation Loans for which an application is received by an eligible lender by June 30, 2006. Interest rates for FFELP Loans pursuant to the 2005 Amendments, however, are:

(i) a fixed rate of 6.8 percent, with respect to Stafford Loans disbursed on or after July 1, 2006; (ii) a fixed rate of 8.5 percent, with respect to PLUS Loans disbursed on or after July 1, 2006; and (iii) a fixed rate equal to the lesser of (A) the weighted average of the interest rates on the loans consolidated, rounded up to the nearest higher one-eighth of one percent or (B) 8.25 percent, with respect to FFEL Consolidation Loans for which an application is received by an eligible lender on or after July 1, 2006. The 2005 Amendments also modified the provisions addressing Special Allowance Payments, applicable to FFELP Loans that are first disbursed and to Special Allowance Payments made on and after April 1, 2006. See "— *Special Allowance Payments*" below. The 2005 Amendments modified a number of other Higher Education Act provisions affecting the FFEL Program. In addition, the 2006 Amendments eliminated certain restrictions upon the origination of FFEL Consolidation Loans and similar FDSL Program Loans that had benefited holders of FFELP Loans that are eligible for consolidation. See "— *The Consolidation Loan Program*" and "— *The Federal Direct Student Loan Program*."

The 2003 Civil Relief Act replaced and clarified certain benefits extended to military persons under the Soldiers' and Sailors' Civil Relief Act of 1940, providing relief to borrowers who enter active military service and to borrowers in reserve status who are called to active duty after the origination of their student loans. The Civil Relief Act provides that persons on active duty in military service who have incurred loans prior to their period of active duty may request to have the interest on their loans in excess of 6% per year forgiven under certain circumstances. The Higher Education Relief Opportunities for Students Act of 2003, as amended, authorizes the Secretary, during the period ending September 30, 2007, to waive or modify any statutory or regulatory provisions applicable to student financial aid programs under Title IV of the Higher Education Act as the Secretary deems necessary under certain circumstances for the benefit of borrowers serving on active military duty; however, the Secretary has yet to use this authority to provide specific relief to servicepersons with loan obligations. In addition, the 2005 Amendments provided FFELP Loan payment deferments of up to three years during which the borrower is serving on active duty as a member of the United States armed services or National Guard during a war, certain military operations or certain national emergencies. Congress has periodically adopted similar legislation, and may consider additional legislation, that provides for, among other things, interest rate caps and additional periods of deferment with respect to Loans made to members of the military, including reservists. There can be no assurance that additional legislation of this type will not be adopted in the future. Accordingly, payments received by the Authority on a Loan to a borrower who qualifies for such relief may be subject to limitations during the borrower's period of qualifying military or other public service. The number and aggregate principal balances of Loans that may be affected by the application of such legislation cannot be determined at this time.

Legislation under Congressional consideration as of the date of this Official Statement would amend the Higher Education Act to remove existing restrictions upon the origination of FFEL Consolidation Loans that favor certain holders of a borrower's FFELP Loans that are eligible for consolidation.

*Eligible Borrowers and Institutions*

FFELP Loans may only be made to Qualified Students and parents of dependent Qualified Students or to consolidate obligations under various federally authorized student loan programs. A "Qualified Student" is generally defined as a citizen, national or permanent resident of the United States or a person who is otherwise eligible under federal regulations and who: (i) has been accepted for enrollment or is enrolled and is maintaining satisfactory progress in a program leading to a recognized educational credential at an eligible institution; (ii) is carrying at least one-half of the normal full-time academic workload for the course of study the student is pursuing, as determined by such institution; (iii) meets the "need" requirements, if applicable, for the particular FFEL Program; and (iv) is not otherwise ineligible under the Higher Education Act. FFELP Loans are unsecured loans, which may be documented, and in which a security interest may be perfected, only as provided in the Higher Education Act.

Eligible institutions include institutions of higher education, postsecondary vocational institutions, proprietary institutions of higher education, and institutions outside of the United States that are approved by the Secretary. Eligible institutions of higher education must meet certain standards, which generally provide that the institution: (i) only admits persons who have a high school diploma or its equivalent, or persons who are beyond the age of compulsory school attendance; (ii) is legally authorized to provide a program of postsecondary education within a State; (iii) provides a program for which it awards an associate, baccalaureate, graduate or professional degree, a program of not less than two years acceptable for full credit toward a baccalaureate degree or a program of not less than one year to prepare students for gainful employment in a recognized occupation; (iv) is a public or

non-profit institution; and (v) is accredited or otherwise governmentally approved. Eligible postsecondary vocational institutions include educational institutions that provide an eligible program of training to prepare students for gainful employment in a recognized occupation, that otherwise comply with the standards applicable to institutions of higher education and that have been in existence for at least two years. Eligible proprietary institutions of higher education include schools, other than public or non-profit institutions, that provide an eligible program of training to prepare students for gainful employment in a recognized occupation, that otherwise comply with the standards applicable to institutions of higher education, that have been in existence for at least two years and that receive at least 10 percent of revenues from sources other than specified federal programs, including the FFEL Program. With certain exceptions, an institution with a cohort default rate that is higher over a period of time than 25 percent is not an eligible institution. An institution's cohort default rate is generally based on the percentage of its current and former students who default on their Stafford Loans within a specified period of time after entering repayment.

With specified exceptions, institutions are excluded from participation as eligible institutions if the institution: (i) offers more than 50 percent of its courses by correspondence (excluding certain courses offered by telecommunications); (ii) enrolls 50 percent or more of its students in correspondence courses (excluding certain courses offered by telecommunications); (iii) has a student enrollment in which more than 25 percent of the students are incarcerated; (iv) has a student enrollment in which more than 50 percent of the students are admitted without a high school diploma or its equivalent on the basis of their ability to benefit from the education provided (as defined by statute and regulation); or (v) has filed for bankruptcy, or if the owner, or its chief executive officer, has been convicted or pled *nolo contendere* or guilty to a crime involving the acquisition, use or expenditure of federal student aid funds, or has been judicially determined to have committed fraud involving funds under the student aid program.

*Financial Need Analysis*

FFELP Loans may generally be made in amounts, subject to certain limits and conditions, to cover the student's estimated costs of attendance, including tuition and fees, books, supplies, room and board, transportation and miscellaneous personal expenses, including personal computer costs (as determined by the institution) ("Cost of Attendance"). Each Subsidized Stafford Loan borrower must complete a need analysis, which requires the borrower to submit information to a multiple data entry processor, which forwards the information to a federal central processor. The central processor evaluates the parents' and student's financial condition under federal guidelines and calculates the amount that the student and/or the family must contribute towards the student's cost of education (the "Expected Family Contribution"). The institution then subtracts the Expected Family Contribution from its Costs of Attendance to determine the student's eligibility for federal assistance (the "Unmet Need"). Subject to certain annual and aggregate borrower specific limits, Subsidized Stafford Loans are generally available for an academic period to fund the difference between a borrower's Unmet Need for such period and the estimated financial assistance to be received by the student from sources other than FFELP Loans and FDSL Loans ("Estimated Financial Assistance") for such period. In addition, subject to separate annual and aggregate borrower specific limits, Unsubsidized Stafford Loans and PLUS Loans are generally available for an academic period to fund the difference between a student's Cost of Attendance for such period and the aggregate amount of Estimated Financial Assistance and of Subsidized Stafford Loans to be received by the student for such period. Provisions addressing the implementation of need analysis and the relationship between Unmet Need for financing and the availability of Subsidized Stafford Loan funding have been the subject of frequent and extensive amendments in recent years. There can be no assurance that further amendments to such provisions will not materially affect the availability of Subsidized Stafford Loan funding to borrowers or the availability of Subsidized Stafford Loans for secondary market acquisition. See "—*Stafford Loan Limits*" and "—*PLUS Loan Program.*"

*Stafford Loans Generally*

*Stafford Loan Interest Rates.* Stafford Loans first disbursed during the period from July 1, 1998 through June 30, 2006 bear interest, during the in-school and grace periods, at the 91-Day T-Bill Rate plus 1.7 percent, and otherwise at the 91-Day T-Bill Rate plus 2.3 percent, not to exceed 8.25 percent. Stafford Loans first disbursed on or after July 1, 2007 bear interest at a fixed rate of 6.8 percent. See "— *Special Allowance Payments.*"

*Stafford Loan Limits.* Subsidized Stafford Loans and Unsubsidized Stafford Loans made to any student are subject to annual and aggregate amount limitations. Currently, the annual limits applicable to Subsidized Stafford Loans are: (i) $2,625 for first-year undergraduate students and students engaged in necessary coursework preliminary

to undergraduate study; (ii) $3,500 for second-year undergraduate students; (iii) $5,500 for other undergraduate students and students engaged in necessary coursework preliminary to graduate or professional study; and (iv) $8,500 for graduate or professional students. The 2005 Amendments provide that two of these limits will change, effective July 1, 2007, to $3,500, for first-year undergraduate students and to $4,500, for second-year undergraduate students. Aggregate limits of $23,000, with respect to undergraduate students, and $65,500 (inclusive of Subsidized Stafford Loans, and similar loans made under the FDSL Program, actually received with respect to undergraduate study), with respect to graduate and professional students, apply to Subsidized Stafford Loans.

Currently, the annual limits applicable to Unsubsidized Stafford Loans for dependent undergraduate students, whose parents are not ineligible for PLUS Loans, are generally the same as apply to Subsidized Stafford Loans less Subsidized Stafford Loans actually received. Additional Unsubsidized Stafford Loans are available, however, for other undergraduate, and for graduate or professional, students, subject to separate annual limits of: (i) $4,000 for first and second-year undergraduate students and students engaged in necessary coursework preliminary to undergraduate study; (ii) $5,000 for other undergraduate students and students engaged in necessary coursework preliminary to graduate or professional study; and (iii) $10,000 for graduate and professional students. The 2005 Amendments provide that three of these limits will change, effective July 1, 2007, to $7,000, for students engaged in necessary coursework preliminary to undergraduate or to graduate or professional study, and to $12,000, for graduate and professional students. The Secretary has discretion to raise these limits to accommodate specialized training requiring exceptionally high costs. Aggregate limits of $46,000 with respect to undergraduate students (inclusive of Subsidized Stafford Loans, and similar loans made under the FDSL Program, actually received) and $138,500 (inclusive of Subsidized Stafford Loans, and similar loans made under the FDSL Program, actually received and Unsubsidized Stafford Loans, and similar loans made under the FDSL Program, actually received with respect to undergraduate study), with respect to graduate and professional students, apply to Unsubsidized Stafford Loans.

*Repayment.* Generally, repayment of principal on a Stafford Loan does not commence while a student remains a Qualified Student, but begins upon expiration of the applicable Grace Period, as described below. Such Grace Periods may be waived by borrowers. The Higher Education Act currently requires minimum annual payments of $600, including principal and interest, unless the borrower and the lender agree to lesser payments. The Higher Education Act currently requires lenders to offer and to allow the borrower to select among the following repayment plans: (i) a standard repayment plan with fixed payments scheduled over a period of not more than 10 years; (ii) a graduated repayment plan with graduated payments scheduled over a period of not more than 10 years; (iii) an income-sensitive plan with income-sensitive payments that are not less than the amount of interest due scheduled over a period of not more than 10 years; and (iv) with respect to first-time borrowers after October 1, 1998 with loan amounts in excess of $30,000, an extended repayment plan with fixed or graduated payments scheduled over a period of not to exceed 25 years. The Higher Education Act further requires that lenders notify all borrowers of the availability of income-sensitive repayment through loan consolidation and permits student borrowers to change repayment plans annually.

*Grace Periods, Deferment Periods, Forbearance Periods.* Repayment of principal on a Stafford Loan must generally commence following a period (a "Grace Period") of not more than 6 months, after the borrower ceases to pursue at least a half-time course of study. Such 6-month period excludes any period not in excess of 3 years (per single period) during which a borrower who is a member of a reserve component of the United States Armed Forces is called or ordered to active duty for a period of more than 30 days, including the period necessary to resume enrollment at the borrower's next available regular enrollment period. However, subject to certain conditions, principal repayment may be deferred by borrowers during a number of other periods ("Deferment Periods"), which may include periods during which the borrower (i) is engaged in half time study at an eligible educational institution or in a course of study under an eligible graduate fellowship program; (ii) is temporarily totally disabled, is engaged in a rehabilitative training program for disabled individuals or is unable to secure employment by reason of the care required by a dependent who is so disabled; (iii) conscientiously seeking, but unable to find, full time employment in the United States; (iv) an unemployed recent student who is pregnant or caring for his or her newborn or recently adopted child; (v) on active duty in the National Oceanic and Atmospheric Administration; (vi) a full time elementary or secondary school teacher in a designated teacher shortage area; (vii) a medical intern or resident; (viii) a mother of preschool children meeting certain income and work experience requirements; (ix) meets certain economic hardship criteria; or (x) serving on active duty as a member of the Untied States Armed Services or National Guard during a war, certain military operations or certain national emergencies. Certain such Deferment Periods are time-limited. Borrowers may utilize multiple Deferment Periods during their repayment periods. Interest continues to accrue and to

be payable by the borrower or, with respect to Subsidized Stafford Loans and Consolidation Loans for which Interest Subsidy Payments are authorized, the Secretary. Lenders must allow periods of forbearance upon written request, renewable at twelve-month intervals, on terms agreed to in writing by parties to the loan: (i) during the borrower's participation in certain medical or dental internships or residency programs; (ii) during periods not in excess of three years in which the borrower's student loan debt burden equals or exceeds 20 percent of gross income; and (iii) during periods in which the borrower is serving in the United States Armed Services or certain other national service positions and are permitted to grant administrative forbearance for shorter periods to avoid defaults (each, a "Forbearance Period").

### Interest Subsidy Payments on Subsidized Stafford Loans

The Secretary is responsible for making Interest Subsidy Payments to holders of Subsidized Stafford Loans while the borrower is a Qualified Student, during certain Grace Periods or during any Deferment Period. The Secretary makes quarterly Interest Subsidy Payments in the amount of interest accruing on the unpaid balance thereof prior to the commencement of repayment or during any Deferment Period. The Higher Education Act provides that the owner of an eligible Subsidized Stafford Loan shall be deemed to have a contractual right against the United States to receive Interest Subsidy Payments in accordance with its provisions. Receipt of Interest Subsidy Payments is conditioned on the eligibility of the loan for insurance or reinsurance benefits. Such eligibility may be lost if the requirements of the federal government and the guaranty agency relating to the servicing and collection of the loans are not met.

### Unsubsidized Stafford Loans

The Unsubsidized Stafford Loan program is designed for students who do not qualify for Subsidized Stafford Loans due to parental and/or student income and assets in excess of permitted amounts, or who need additional loans to supplement their Subsidized Stafford Loans. Annual loan limits are as described under "— *Stafford Loan Limits*" above. In other respects, the general requirements for Unsubsidized Stafford Loans are essentially the same as those for Subsidized Stafford Loans. The interest rate and the Special Allowance Payment provisions of the Unsubsidized Stafford Loans are the same as those of the Subsidized Stafford Loans. However, the terms of the Unsubsidized Stafford Loans differ materially from Subsidized Stafford Loans in that the federal government will not make Interest Subsidy Payments and the loan limitations are determined without respect to the expected family contribution. The borrower is required to pay interest from the time such loan is disbursed or to capitalize the interest until repayment begins and during Deferment Periods.

### PLUS Loan Program

The Higher Education Act authorizes PLUS Loans to be made to parents of eligible dependent students and to graduate and professional students. Only borrowers who do not have an adverse credit history are eligible for PLUS Loans. The basic provisions applicable to the PLUS Loan Program are similar to those of Stafford Loans with respect to the federal insurance and reinsurance on the loans. However, PLUS Loans borrowers need not demonstrate Unmet Need to qualify for PLUS Loans and Interest Subsidy Payments are not available under the PLUS Program.

*Loan Limits.* The only limit on the annual and aggregate amounts of PLUS Loans is the cost of the student's education less Estimated Financial Assistance.

*Interest.* PLUS Loans made during the period from July 1, 1998 through June 30, 2006 bear interest at a rate equivalent to the 91-Day T-Bill Rate plus 3.1 percent, with a maximum rate of 9 percent. PLUS Loans first disbursed on or after July 1, 2006 bear interest at a fixed rate of 8.5 percent. See "—*Special Allowance Payments.*"

*Repayment, Deferments.* Repayment of principal of PLUS Loans is required to commence no later than 60 days after the date of disbursement of such loan, subject to certain deferment provisions. The deferment provisions that apply to PLUS Loans are more limited than those that apply to Subsidized Stafford Loans. Although Interest Subsidy Payments are not available during a Deferment Period, interest may be capitalized during such periods upon agreement of the lender and borrower. Maximum loan repayment periods and minimum payment amounts are the same as for Stafford Loans.

A borrower may refinance all outstanding PLUS Loans under a single repayment schedule for principal and interest, with the new repayment period calculated from the date of repayment of the most recent included loan. The interest rate of such refinanced loan shall be the weighted average of the rates of all loans being refinanced. If a lender is unwilling to refinance the original PLUS Loan, the borrower may obtain a loan from another lender for the purpose of discharging the loan and obtaining a variable interest rate.

*The Consolidation Loan Program*

The Higher Education Act authorizes a program under which certain borrowers may consolidate their various federal education loans into a single FFEL Consolidation Loan insured and reinsured on a basis similar to that of Stafford Loans. FFEL Consolidation Loans may be made in an amount sufficient to pay outstanding principal, unpaid interest and late charges on all federally insured or reinsured FFELP Loans selected by the borrower, as well as loans made pursuant to various other student loan programs, including the FDSL Program, and which may have been made by different lenders. Under this program, a lender may make a FFEL Consolidation Loan to an eligible borrower at the request of the borrower. Prior to adoption of the 2006 Amendments, the Higher Education Act only permitted a lender to make such a loan if the lender held an outstanding loan of the borrower, if the borrower certified that he had been unable to obtain a FFEL Consolidation Loan with income-sensitive terms from the holder of the outstanding loans made to the borrower or if the borrower had multiple FFELP Loans with different holders. See "— *Legislative and Administrative Matters.*" and "— *The Federal Direct Student Loan Program.*"

FFEL Consolidation Loans are available to borrowers in repayment status or in a Grace Period preceding repayment. Delinquent or defaulted borrowers are eligible to obtain FFEL Consolidation Loans if they have made arrangements to repay the defaulted loan which are satisfactory to the holder. For applications received prior to July 1, 2006, married couples who agree to be jointly and severally liable were treated as one borrower for purposes of loan consolidation eligibility.

FFEL Consolidation Loans for which the application is received after October 1, 1998 bear interest at a rate equivalent to the weighted average of the interest rates on the loans consolidated, rounded upwards to the nearest one-eighth of 1 percent, with a maximum rate of 8.25 percent. The repayment schedules for FFEL Consolidation Loans will not exceed: (i) 10 years for loans less than $7,500; (ii) 12 years for loans greater than or equal to $7,500, but less than $10,000; (iii) 15 years for loans greater than or equal to $10,000, but less than $20,000; (iv) 20 years for loans greater than or equal to $20,000, but less than $40,000; (v) 25 years for loans greater than or equal to $40,000, but less than $60,000; and (vi) not more than 30 years for loans equal to or in excess of $60,000. The Secretary makes Interest Subsidy Payments on FFEL Consolidation Loans only with respect to that portion, if any, of a FFEL Consolidation Loan which repays Subsidized Stafford Loans and similar loans originated under the FDSL Program. The borrower is eligible for certain deferments of principal and interest payments for periods similar to those for Subsidized Stafford Loans, and, subject to the foregoing, Interest Subsidy Payments are made to the eligible holder during such periods. Deferred interest payments for which Interest Subsidy Payments are not available are capitalized. Borrowers may elect to accelerate principal payments without penalty. Further, no insurance premium may be charged to a borrower and no insurance premium may be charged to a lender in connection with a FFEL Consolidation Loan. However, a fee may be charged to the lender by the guaranty agency to cover the costs of increased or extended liability with respect to a FFEL Consolidation Loan. Holders of FFEL Consolidation Loans are required to make monthly rebate payments to the Secretary calculated on an annual basis equal to 1.05 percent of the principal plus accrued interest on such loans.

Repayment of Consolidation Loans begins 60 days after discharge of all prior loans that are consolidated. Repayment schedule options must include the establishment of graduated and income sensitive repayment plans, subject to certain limits applicable to the sum of the Consolidation Loan and the amount of the borrower's other eligible student loans outstanding. All eligible loans of a borrower selected for consolidation are discharged in the consolidation process and a new loan is issued.

The Higher Education Act currently provides that borrowers of a FFEL Consolidation Loan may not generally obtain subsequent FFEL Consolidation Loans, or obtain consolidation loans under the FDSL Program for which the application is received on or after July 1, 2006, with respect to the loans consolidated by such FFEL Consolidation Loan. Exceptions exists, however, for borrowers who receive additional FFELP Loans or FDSL Program loans to fund costs of attendance and for borrowers seeking FDSL Program consolidation loans with income contingent repayment terms for default aversion purposes. In addition, borrowers may add previously unconsolidated

FFELP Loans or FDSL Program loans to FFEL Consolidation Loans within 180 days of the making of the FFEL Consolidation Loans. The 2005 Amendments provide that the Secretary shall offer FDSL Program consolidation loans to borrowers whose application for a FFEL Consolidation Loan has been denied by a FFEL Program lender or whose application for a FFEL Consolidation Loan with income-sensitive repayment terms has been denied.

*Special Allowance Payments*

The Higher Education Act provides for Special Allowance Payments to be made by the Secretary to eligible lenders holding FFELP Loans. The rates for Special Allowance Payments are based on formulas that differ according to the type of loan (Stafford Loan, PLUS Loan or Consolidation Loan), the date the loan was originally made or insured and the type of funding used by the holder to finance such loan (tax-exempt or taxable). Generally, the sum of the stated interest on the loan and the applicable Special Allowance Payment for a quarter will be a statutorily specified number of percentage points (the "SAP Spread") above the 91-Day T-Bill Rate for that quarter, with respect to loans first disbursed on or prior to December 31, 1999, and above the CP Rate, with respect to loans first disbursed subsequent to January 1, 2000.

The SAP Spread applicable to Stafford Loans originated: (i) during the period from July 1, 1998 through December 31, 1999, during in-school periods and Grace and Deferment Periods, is 2.2 percent and, otherwise, is 2.8 percent; (ii) during the period from January 1, 2000 through June 30, 2006, during in-school periods and Grace and Deferment Periods, is 1.74 percent and, otherwise, is 2.34 percent; and (iii) on or after July 1, 2006, during in-school periods and Grace and Deferment Periods, is 1.74 percent and, otherwise, is 2.34 percent. The SAP Spread applicable to PLUS Loans originated: (i) during the period from October 1, 1992 through December 31, 1999 is 3.1 percent; and (ii) subsequent to January 1, 2000 is currently 2.64 percent. The SAP Spread applicable to FFEL Consolidation Loans originated: (i) during the period from October 1, 1992 through December 31, 1999 is 3.1 percent; and (ii) subsequent to January 1, 2000 is currently 2.64 percent. The 2005 Amendments modified the provisions addressing Special Allowance Payments, applicable to FFELP Loans that are first disbursed and to Special Allowance Payments made on and after April 1, 2006, to require a credit to the federal government against amounts that would otherwise be payable to the holders of such FFELP Loans in the amount by which interest accruing or payable upon such FFELP Loans during any 3-month period exceeds the amount that would have been received upon such loans if interest thereon was paid at an annual rate equivalent to the CP Rate plus: (i) 1.74 percent, with respect to Stafford Loans during in-school, grace and deferment periods; (ii) 2.34 percent, with respect to Stafford Loans otherwise; and (iii) 2.64 percent, with respect to PLUS and FFEL Consolidation Loans. As of the date of this Official Statement, the Department has indicated that it intends to require holders to make payments to it if the credit exceeds the amount that would otherwise be payable to the holder during a period.

Special Allowance Payments are generally payable, with respect to variable rate FFELP Loans to which a maximum borrower interest rate applies, only when such maximum rate is in effect. The rate of Special Allowance Payments is subject to reduction by the amount of certain origination fees charged to borrowers and may be reduced as a result of certain federal budget deficit reduction measures. The Secretary is required, however, to reduce the total amount of Interest Subsidy Payments and Special Allowance Payments by an amount equivalent to .50 percent of the principal amount of such loan.

The Higher Education Act provides that a holder of a qualifying loan who is entitled to receive Special Allowance Payments has a contractual right against the United States, during the life of the loan, to receive those Special Allowance Payments. Receipt of Special Allowance Payments, however, is conditioned on the eligibility of the loan for federal insurance or reinsurance benefits. Such eligibility may be lost due to violations of the federal or guaranty agency regulations specifying servicing and collection of the loan in the event of delinquency.

**Federal Insurance and Reinsurance and Reimbursement of Guaranty Agencies**

A loan made under the Federal Family Authority Loan Program is considered to be in default for purposes of the Higher Education Act when the borrower fails to make an installment payment when due, or to comply with other terms of the loan, and if the failure persists for 270 days beyond the payment due date, in the case of a loan repayable in monthly installments, or for 330 days beyond the payment due date, in the case of a loan repayable in less frequent installments. FFELP Loans which became delinquent prior to October 1, 1998 were considered in default after 180

days, in the case of a loan repayable in monthly installments, or after 240 days, in the case of a loan repayable in less frequent installments.

If the loan in default is covered by federal loan insurance in accordance with the provisions of the Higher Education Act, the Secretary is to pay the insurance beneficiary the amount of the loss sustained thereby, upon notice and determination of such amount, within 90 days of such notification, subject to reduction as described below.

The Higher Education Act provides that, subject to compliance with the Higher Education Act, the full faith and credit of the United States is pledged to the payment of insurance claims. It further provides that guaranty agencies shall be deemed to have a contractual right against the United States to receive reinsurance in accordance with its provisions. Federal reinsurance and insurance payments for defaulted loans are paid from the Student Loan Insurance Fund established under the Higher Education Act. The Secretary is authorized, to the extent provided in advance by appropriations acts, to issue obligations to the Secretary of the Treasury to provide funds to make such federal payments. In addition, the Higher Education Act provides that if the Secretary determines that a guaranty agency is unable to meet its insurance obligations, holders of loans may submit insurance claims directly to the Secretary until such time as the obligations are transferred to a new guaranty agency capable of meeting such obligations or until a successor guaranty agency assumes such obligations and further provide that the Secretary will pay to holders the full insurance obligations of such guaranty agency, in accordance with requirements which are no more stringent than those of such guaranty agency. There can be no assurance, however, that the Secretary will ever make such a determination or will do so in a timely manner. The Higher Education Act also provides that the Secretary is authorized, on terms and conditions satisfactory to the Secretary, to make advances to a guaranty agency in order to assist the guaranty agency in meeting its immediate cash needs and to ensure uninterrupted payment of default claims by lenders.

If the loan is guaranteed by a guaranty agency, the eligible lender is reimbursed by the guaranty agency pursuant to agreements for guarantee. Such agreements provide for reimbursement of the unpaid principal balance of the loan plus accrued unpaid interest on any loan defaulted so long as the eligible lender has properly serviced such loan. Pursuant to most agreements for guarantee between a guaranty agency and the originator of the loan, any eligible holder of a loan insured by such guaranty agency is entitled, subject to the preceding sentence, to reimbursement from such guaranty agency for (i) 98 percent of any proven loss incurred with respect to defaulted claims, with respect to FFELP Loans that were first disbursed prior to July 1, 2006; (ii) 97 percent of any such proven loss, with respect to FFELP Loans that are first disbursed on or subsequent to such date; (iii) 100 percent of any such proven loss, with respect to FFELP Loans administered by lenders and servicers designated by the Secretary for exceptional performance before July 1, 2006; (iv) 99 percent of any such proven loss, with respect to FFELP Loans administered by such FFELP participants so designated on or after July 1, 2006; and 100 percent of any such proven loss incurred with respect to claims regardless of date of first disbursement relative to certain lender-of-last-resort-loans or to claims resulting from bankruptcy, death, disability, false certification or school closure.

A holder of a loan is required to exercise due care and diligence in the servicing of the loan and to utilize practices that are at least as extensive and forceful as those utilized by financial institutions in the collection of other consumer loans. If a guaranty agency has probable cause to believe that the holder has made misrepresentations or failed to comply with the terms of its agreement for guarantee, the guaranty agency may take reasonable action including withholding of payments or requiring reimbursement of funds. The guaranty agency may also terminate the agreement for cause upon notice and hearing. Holders are required to request preclaims assistance from the guaranty agency in order to attempt to cure the delinquency. Holders may submit claims to the guaranty agency with respect to loans that default. At the time of payment of insurance benefits, the holder must assign to the guaranty agency all rights accruing to the holder under the note evidencing the loan.

Under the Higher Education Act, the Secretary enters into a guaranty agreement and an annually renewable supplemental guaranty agreement with each guaranty agency that provides for federal reinsurance for amounts paid to eligible lenders by the guaranty agency with respect to defaulted loans. Pursuant to such agreements, the Secretary is to reimburse a guaranty agency for a percentage of default losses and for 100 percent of the amounts expended in connection with a claim with respect to loans made under a qualifying lender-of-last-resort program or a claim resulting from the death, discharge in bankruptcy, or total and permanent disability of a borrower, the death of a student whose parent is the borrower of a PLUS Loan, or claims by borrowers who are unable to complete the programs in which they are enrolled due to school closure or whose borrowing eligibility was falsely certified by the

eligible institution. Such claims are not included in calculating a guaranty agency's claims rate experience for purposes of reducing federal reinsurance payments received by guaranty agencies as described in the following paragraphs.

Guaranty agencies are required to satisfy due diligence requirements prescribed by regulations with respect to defaulted loans. The Secretary may require repayment of reinsurance payments, and may require other remedial action, including the withholding of payments, imposition of fines and suspension or termination of agreements, in response to a guaranty agency's failure to comply with applicable regulations.

Under the Higher Education Act, reimbursement by the Secretary of a guaranty agency for any amounts paid to satisfy claims with respect to loans which are not made under a qualified lender-of-last-resort program and which do not result from death, bankruptcy, disability, school closure or false certification is subject to reduction as described in the following paragraphs.

The original principal amount of loans guaranteed by a guaranty agency that are in repayment for purposes of computing reimbursement payments to a guaranty agency means the original principal amount of all loans guaranteed by a guaranty agency less: (i) guarantee payments on such loans; (ii) the original principal amount of such loans which have been fully repaid; and (iii) the original amount of such loans for which the first principal installment payment has not become due.

The amount of such insurance or reinsurance payments is subject to reduction based upon the annual claims rate of the guaranty agency, calculated to equal the amount of federal reinsurance as a percentage of the original principal amount of guaranteed loans in repayment on the last day of the prior fiscal year. The formula generally applicable under the 1998 Amendments is as follows:

| **Claims Rate** | **Federal Payment** |
| --- | --- |
| **0 percent up to 5 percent** | **95 percent of claim amounts** |
| **5 percent up to 9 percent** | **95 percent of claims up to 5 percent, 85 percent of claims of 5 percent and over** |
| **9 percent and over** | **95 percent of claims up to 5 percent, 85 percent of claims of 5 percent to 9 percent, and 75 percent of claims of 9 percent and over** |

The claims experience is not accumulated from year to year, but is determined solely on the basis of claims in any one federal fiscal year compared with the original principal amount of loans in repayment at the end of the prior federal fiscal year.

Notwithstanding the foregoing, the Secretary will reimburse a guaranty agency: (i) with respect to loans that are transferred from an insolvent guaranty agency pursuant to a plan approved by the Secretary at rates which are equivalent to those set forth above plus 5 percent; and (ii) with respect to loans made pursuant to a qualifying lender-of-last-resort program at a rate of 100 percent of claim amounts.

The Higher Education Act authorizes and, in some instances, requires guaranty agencies to retain certain fees with respect to FFELP Loan origination or other functions. These provisions have been the subject of frequent amendment. In addition, some of these provisions may be superseded with respect to a specific guaranty agency by the terms of a voluntary flexible agreement entered into by the Secretary with such guaranty agencies on a negotiated basis.

Guaranty agencies are required to maintain specific reserve fund levels. If the agency fails to achieve the minimum reserve level in any of two consecutive years, if the agency's federal reimbursements are reduced to 85 percent or if the Secretary determines the agency's administrative or financial condition jeopardizes its continued ability to perform its responsibilities, the Secretary may require the agency to submit and implement a management plan to address the deficiencies. The Secretary may terminate the agency's agreements with the Secretary if the agency fails to submit the required plan, or fails to improve its administrative or financial condition substantially, or if

the Secretary determines the agency is in danger of financial collapse. In such event, the Secretary is authorized to undertake specified actions to assure the continued payment of claims, including the transfer of guarantees to another agency, or transfer of guarantees to the Department itself.

The Higher Education Act contains provisions to the effect that, notwithstanding any other provision of law, a substantial portion of the reserve funds of the guaranty agencies, and any assets purchased with such portion of such reserve funds, regardless of who holds or controls the reserves or assets, are the property of the United States, to be used in the operation of the FFEL Program or as otherwise provided by federal legislation. Such portion of such reserves will be required to be maintained by each guaranty agency to pay lender claims, to fund default aversion fees and, subject to certain restrictions, to fund guaranty agency operating costs on a no-interest loan basis. The Higher Education Act grants the Secretary broad powers over the administration and application of such portion of such reserves and, under certain conditions, of all guaranty agency reserves.

The Higher Education Act allows the Secretary to terminate a guaranty agency's agreement if the Secretary determines that termination is necessary to protect the federal financial interest or to ensure the continued availability of loans to student or parent borrowers. The Secretary is authorized to provide the guaranty agency with additional advance funds with such restrictions on the use of such funds as are determined appropriate by the Secretary in order to meet the immediate cash needs of the guaranty agency, ensure the uninterrupted payment of claims, or ensure that the guaranty agency will make loans as the lender-of-last-resort.

The Higher Education Act provides that if the Secretary has terminated or is seeking to terminate a guaranty agency's agreement, or has assumed a guaranty agency's functions, notwithstanding any other provision of law: (i) no state court may issue an order affecting the Secretary's action with respect to that guaranty agency; (ii) any contract entered into by the guaranty agency with respect to the administration of the agency's reserve funds or assets acquired with reserve funds shall provide that the contract is terminable by the Secretary upon 30 days' notice to the contracting parties if the Secretary determines that such contract includes an impermissible transfer of funds or assets or is inconsistent with the terms or purposes of this law; and (iii) no provision of state law shall apply to the actions of the Secretary in terminating the operations of the guaranty agency. Finally, notwithstanding any other provision of law, the Higher Education Act provides that the Secretary's liability for any outstanding liabilities of a guaranty agency (other than outstanding student loan guarantees under Part D of Title IV of the Higher Education Act) the functions of which the Secretary has assumed, shall not exceed the fair market value of the reserves of the guaranty agency, minus any necessary liquidation or other administrative costs.

The Balanced Budget Act of 1997 required the Secretary to recall $1 billion in reserve funds from guaranty agencies on September 1, 2002. The 1998 Amendments required the Secretary to recall an additional $250 million in reserve funds from guaranty agencies by federal fiscal year 2007. Each of the Balanced Budget Act and the 1998 Amendments contained detailed provisions as to the allocation of amounts to be so recalled among guaranty agencies. In addition, the 1998 Amendments required the Secretary to transfer all funds in the Student Loan Insurance Fund as of October 7, 1998 to the Treasury. There can be no assurance that future legislation will not require the recall and transfer of substantially all federal funds, including the federal portion of guaranty agency reserve funds, which are immediately available to fund guaranty agency and federal payment obligations arising in connection with the FFEL Program.

### *Education Loans Generally Not Subject to Discharge in Bankruptcy*

Under the United States Bankruptcy Code, education loans are not generally dischargeable. Title 11 of the United States Code at Section 523(a)(8) provides, with respect to cases initiated on or after October 7, 1998, and in connection with: (i) "a loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution"; or (ii) "any other education loan that is a qualified education loan, as defined in Section 211(d)1 of the Internal Revenue Code of 1986 ...", as follows:

A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any [such] debt ... unless excepting such debt from discharge ... would impose an undue hardship on the debtor and the debtor's dependents...

### Servicer Provisions and Third-Party Servicer Requirements

On April 29, 1994, the Department published regulations amending the Student Assistance General Provisions and FFEL Program regulations which, among other things, establish requirements governing contracts between holders of FFELP Loans and third-party servicers, establish standards of administrative and financial responsibility for third-party servicers that administer any aspect of a guaranty agency's or lender's participation in the FFEL Program, and establish sanctions for third-party servicers.

Under these regulations, a third-party servicer is jointly and severally liable with its client lenders, guaranty agencies and educational institutions, as applicable, for liability to the Department arising from the servicer's violation of applicable requirements. In addition, if a servicer fails to meet standards of financial responsibility or administrative capability included in the new regulations, or violates other FFEL Program requirements, the new regulations authorize the Department to fine the servicer or limit, suspend, or terminate the servicer's eligibility to contract to service FFELP Loans. The effect of such a limitation, suspension, or termination on a servicer's eligibility to service loans already on its system, or to accept new loans for servicing under existing contracts, is unclear.

The 1998 Amendments provide that an eligible lender or guaranty agency that contracts with another entity to perform any of its functions with respect to the FFEL Program or otherwise delegates the performance of such functions shall not be relieved of its duty to comply with the requirements of the Higher Education Act and shall monitor the activities of such other entity for compliance with such requirements.

### Loan Origination and Servicing Procedures Applicable to FFELP Loans

The Higher Education Act, including the implementing regulations thereunder, imposes specified requirements, guidelines and procedures with respect to originating and servicing FFELP Loans. Generally, those procedures require that completed loan applications be processed, a determination of whether an applicant is an eligible borrower under applicable standards be made, the borrower's responsibilities under the loan be explained to him or her, the promissory note evidencing the loan be executed by the borrower and then that the loan proceeds be disbursed in a specified manner by the lender. After the loan is made, the lender must establish repayment terms with the borrower, properly administer deferments and forbearance and credit the borrower for payments made thereon. If a borrower becomes delinquent in repaying a loan, a lender or a servicing agent must perform certain collection procedures (primarily telephone calls and demand letters) which vary depending upon the length of time a loan is delinquent. Numerous federal and state consumer protection laws and related regulations impose substantial requirements upon lenders and servicers involved in consumer finance. Also, some state laws impose finance charge ceilings and other restrictions on certain consumer transactions and require contract disclosures in addition to those required under federal law. These requirements impose specific statutory liabilities upon lenders who fail to comply with their provisions. In certain circumstances, a lender may be liable for certain violations of consumer protection laws that apply to the Loans, either as assignee or as the party directly responsible for obligations arising after the transfer.

### The Federal Direct Student Loan Program

Under the FDSL Program, a variety of direct federal loans with terms and conditions generally similar to those available under the FFEL Program may be obtained by students, or parents of students, attending participating Institutions of Higher Education ("IHE") through the applicable IHE or through an alternative originator designated by the Secretary, without application to an outside lender. The FDSL Program is funded and administered by the Secretary. The FDSL Program provides for a variety of repayment plans from which borrowers may choose, including repayment plans based on income. In addition, the Secretary is authorized to offer a FFELP borrower a consolidation loan with income sensitive terms under the FDSL Program if a FFELP lender has denied the borrower's application for a Consolidation Loan or for a Consolidation Loan with income sensitive repayment terms. Prior to the adoption of the 2006 Amendments, however, the Higher Education Act only permitted the Secretary to offer such loans to borrowers, if the borrower was also consolidating an FDSL Program loan or if such consolidation would resolve a default. The 2002 Amendments provide that the interest rate formulas for loans made under the FDSL Program are extended to loans disbursed before July 1, 2006. Interest rates for loans disbursed on or after July 1, 2006 have been changed to fixed rates.

## DEFINITIONS OF CERTAIN TERMS

The following are definitions of certain terms used in this Official Statement. Capitalized terms that are not otherwise defined herein shall have the meanings given to those terms in the Indenture.

"Account" means any of the special trust accounts, or funds therein, created and established by, or pursuant to, the Indenture.

"Accountant" or "Auditor" means any independent certified public accountant, or a firm of those accountants, duly licensed to practice and practicing as such under the laws of the State, selected by the Authority, who is independent and not under the domination or control of the Authority and who does not have any substantial interest, direct or indirect, in the Authority, but who may be regularly retained to make annual or similar audits of the books or records of the Authority.

"Act" means Chapter 417-F of Title 20-A of the Maine Revised Statutes of 1964, as hereafter amended.

"Additional Obligations" means any Obligations other than the Initial Obligations which shall be authenticated and delivered on original issuance pursuant to the Indenture or thereafter authenticated or delivered in lieu of or in substitution for any such Obligation pursuant to the Indenture.

"Applicable Law" means: (i) with respect to Student Loans originated pursuant to the Federal Family Education Loan Program, the Higher Education Act and the Act; and (ii) with respect to any other Student Loans, the Act, any other state or federal law applicable thereto or any regulation promulgated thereunder.

"Auction Rate Bonds" means any Series of the 2007 Bonds bearing interest at an Auction Rate.

"Authority" means the Finance Authority of Maine, a body corporate and politic and a public instrumentality of the State, created and existing under and pursuant to Chapter 110 of Title 10 of the Maine Revised Statutes of 1964, as heretofore or hereafter amended, or any body, agency, authority or instrumentality of the State that shall hereafter succeed to the powers, duties and functions of the Authority with respect to education loans financed under the Indenture.

"Authorized Officer" means the Chair, Vice-Chair, Chief Executive Officer, any Director, or Manager with direct responsibility for education lending or for finance or accounting, General Counsel and Deputy General Counsel of the Authority, and any other of its members, directors, officers, agents or employees duly authorized by the by-laws or by a resolution of the Authority to perform the act or sign the document in question.

"Beneficial Owner" means the purchaser of a beneficial ownership interest in any Bond.

"Bonds" means debt obligations of the Authority, whether or not so designated, other than Notes or Other Obligations, issued to finance or refinance the making or purchase of Student Loans by the Authority pursuant to the Indenture.

"Business Day" means, with respect to each Series of Obligations, any day except a day on which banks located in any of: (i) the State of Maine; (ii) the city in which the principal corporate trust office of each Fiduciary applicable to such Series of Obligations or the city in which another office as may be designated by any such Fiduciary in accordance with the Indenture; (iii) the city in which the principal offices of the Authority; and (iv) the city in which the principal offices of each Obligation Facility Provider applicable to such Series are located are required or authorized by law to remain closed or on which the New York Stock Exchange is closed, except as otherwise provided with respect to any Series by the Supplemental Indenture authorizing such Series.

"Cash Flow Projection" means a schedule prepared on behalf of the Authority by a nationally recognized investment banking firm or other entity selected by the Authority and delivered to the Trustee accompanied by a Rating Affirmation which: (i) sets forth, through the last final maturity of any Series of Outstanding Obligations (or such shorter period as shall not prevent the delivery of a Rating Affirmation by any Rating Agency), (A) all anticipated Revenues, (B) the application of all such Revenues in accordance with the Indenture and (C) the resulting balances for each period for which prepared and on a cumulative basis; and (ii) evidences that Revenues and other moneys available under the Indenture will be sufficient to pay all debt service on the Obligations when due and to make all other payments required by the terms of the Indenture. Each Cash Flow Projection shall be based on the assumptions used in the cash flow projections delivered to the Rating Agencies at the time of issuance of the most recently issued Series of Obligations (or on such other assumptions as may be proposed by the Authority and shall not prevent the delivery of a Rating Affirmation by any Rating Agency) which assumptions shall, in each case, have been approved in writing by each Designated Obligation Facility Provider, and upon actual Account balances.

"Certificate" means: (i) a signed document either certifying or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to the Indenture; or (ii) the report of an accountant as to audit or other procedures called for by the Indenture.

"Class" means all Obligations having the same priority of claim as to payment under the Indenture.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. Each reference to a section of the Code in the Indenture shall be deemed to include the United States Treasury Regulations, including temporary and proposed regulations, relating to such section which are applicable to the Obligations or the use of the proceeds thereof. A reference to any specific section of the Code shall be deemed also to be a reference to the comparable provisions of any enactment which supersedes or replaces the Code thereunder from time to time.

"Controlling Obligations" means, at any time: (i) if any Senior Obligations are then Outstanding, such Senior Obligations; and (ii) if no Senior Obligations are then Outstanding, the Class of Senior Subordinate Obligations or Subordinate Obligations then Outstanding having the most senior priority as to payment under the Indenture.

"Costs of Issuance" means all items of expense, directly or indirectly payable or reimbursable by or to the Authority and related to the authorization, sale and issuance of Obligations, including, but not limited to, printing costs, costs of preparation and reproduction of documents, filing and recording fees, initial fees and charges of any Fiduciary, of the Auction Agent, of the Broker-Dealer or of their respective counsel, legal fees and charges, fees and expenses of underwriters, fees and disbursements of consultants and professionals, costs of credit ratings, fees and charges for preparation, execution, transportation and safekeeping of Obligations, costs and expenses of refunding, premiums, fees, expenses or other similar charges payable to any Obligation Facility Provider (other than Reimbursement Obligations or Other Obligations) or a Swap Provider (other than Swap Payments or Other Obligations), financing charges, accrued interest with respect to the initial investment of proceeds of Obligations and any other cost, charge or fee in connection with the original issuance of Obligations.

"Counsel's Opinion" means a written opinion signed by Hawkins, Delafield & Wood LLP or by another attorney or firm of attorneys of recognized standing in the field of law relating to municipal, state and public agency financing, selected by the Authority and reasonably satisfactory to the Trustee and any applicable Obligation Facility Provider.

"Debt Service Reserve and Liquidity Account" means the special trust account so denominated established pursuant to the Indenture.

"Debt Service Reserve Fund" means the fund so denominated within the Debt Service Reserve and Liquidity Account.

"Defeasance Securities" means obligations described in paragraph (i) of the definition of Investment Securities included under the Indenture.

"Designated Obligation Facility Provider" means, with respect to any provision in the Indenture and to any Series of Bonds or Notes, any Obligation Facility Provider so designated by the Supplemental Indenture authorizing the issuance of such Series of Bonds or Notes. As of the Issue Date, Ambac Assurance Corporation will be the sole Designated Obligation Facility Provider with respect to any Series of Bonds.

"DTC" means The Depository Trust Company (a limited purpose trust company), New York, New York.

"Earnings Account" means, with respect to each Tax-Exempt Series or Subseries of Obligations, the special trust account so denominated established pursuant to the Indenture.

"Eligible Lender" means the Authority and all other entities described as eligible lenders in the Higher Education Act which have in force a contract with a Guarantee Agency providing for loan guarantees to be issued by a Guarantee Agency to the subject lender under the Higher Education Act and the Act.

"Event of Default" means any of the events specified in the Indenture.

"Excess Coverage" means, as of any date of calculation, the condition under which the sum of the value of (a) the Loans (valued as set forth in the Indenture) credited to the Loan Account and (b) all cash and Investment Securities held in the Accounts (valued as set forth in the Indenture, plus accrued interest, but excluding amounts irrevocably set aside to pay particular Obligations pursuant to the Indenture and excluding amounts on deposit in the Rebate Account and Earnings Account) shall be at least equal to: (i) at any time when all Series of Outstanding Bonds and Notes are secured by an Obligation Facility to which no Obligation Facility Provider Default applies, such sum as may be the subject of an Obligation Facility Provider Approval by each Designated Obligation Facility Provider; or (ii) at any time when any, but not all, Series of Outstanding Bonds and Notes are secured by an Obligation Facility to which no Obligation Facility Provider Default applies, such sum as may satisfy each of clauses (i) and (iii) of this definition; or (iii) otherwise, such sum as may be at least equal to each of the following three sums: (x) 106% of the sum of the principal of and accrued interest on all Outstanding Senior Obligations plus all accrued but unpaid Program Expenses; (y) 104% of the sum of the principal of and accrued interest on all Outstanding Senior Obligations and Senior Subordinate Obligations plus all accrued but unpaid Program Expenses; and (z) 103% of the sum of the principal of and accrued interest on all Outstanding Obligations plus all accrued but unpaid Program Expenses; provided, in each instance, that such percentages may be changed as shall be established by the last delivered of: (i) the most recently adopted Supplemental Indenture authorizing the issuance of Bonds that sets forth such percentages; or (ii) the most recently delivered Certificate of an Authorized Officer to the Trustee accompanied by a Rating Affirmation that addresses such percentages.

"Federal Family Education Loan Program" or "FFELP" means the program currently authorized by Title IV, Part B of the Higher Education Act, as heretofore or hereafter amended.

"Fiduciary" means the Trustee, any Paying Agent and any such additional fiduciary as may be authorized under the Indenture, or any or all of them as may be appropriate.

"Fiscal Year" means the fiscal year of the Authority for general financial reporting purposes as modified from time to time and as evidenced by a Certificate of an Authorized Officer delivered to the Trustee. As of the date of the Indenture the Authority's Fiscal Year is July 1 to June 30.

"Fitch" means Fitch, Inc., its successors and assigns and if such entity shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "Fitch" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Authority, by notice to the Trustee, and each other Fiduciary and each applicable Obligation Facility Provider.

"Guaranty Agency" or "Guarantee Agency" means: (i) the Authority; (ii) any other entity that: (a) is eligible to act as a "guaranty agency" as defined for purposes of the Higher Education Act; (b) has in effect all agreements with the Secretary of Education necessary to permit it to so act and to qualify for reinsurance under the Higher Education Act; (c) has not had its qualification to act as a guaranty agency suspended or terminated; and (d) has a guarantee

agreement in effect with the Authority, the Trustee or an eligible lender trustee on behalf of the Authority or the Trustee; and (iii) any successor to the obligations of any such Guaranty Agency under the Higher Education Act.

"Higher Education Act" means the Higher Education Act of 1965, as amended from time to time, and the regulations promulgated thereunder.

"Holder" or "Owner", or words of similar import, means, when used with reference to: (i) a Bond or Note, the registered owner of such Obligation; (ii) a Reimbursement Obligation, the Obligation Facility Provider; (iii) a Swap Payment, the Swap Provider; and (iv) an Other Obligation, the person entitled to payment thereof.

"Indenture" means the Indenture of Trust dated as of December 1, 2003, as amended and supplemented by the Third Supplemental Indenture dated as of May 1, 2007, and as from time to time amended or supplemented in accordance with the terms and provisions of the Indenture.

"Initial Obligations" means all Obligations authorized pursuant to the Third Supplemental Indenture.

"Investment Securities" means, as provided by the Third Supplemental Indenture with respect to the 2007 Bonds, prior to an Obligation Facility Provider Default by Ambac Assurance Corporation, any of the following:

    (1)      Cash (insured at all times by the Federal Deposit Insurance Corporation);

    (2)      Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

> — U.S. treasury obligations
> — All direct or fully guaranteed obligations
> — Farmers Home Administration
> — General Services Administration
> — Guaranteed Title XI financing
> — Government National Mortgage Association (GNMA)
> — State and Local Government Series;

    (3)      Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

> — Export-Import Bank
> — Rural Economic Community Development Administration
> — U.S. Maritime Administration
> — Small Business Administration
> — U.S. Department of Housing & Urban Development (PHAs)
> — Federal Housing Administration
> — Federal Financing Bank;

    (4)      Direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

> — Senior debt obligations issued by the Federal National Mortgage
>   Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).
> — Obligations of the Resolution Funding Corporation (REFCORP)
> — Senior debt obligations of the Federal Home Loan Bank System
> — Senior debt obligations of other government sponsored agencies
>   approved by Ambac Assurance Corporation;

    (5)      U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of

"P-1" by Moody's and "A-1" or "A-1 +" by S&P and maturing not more than 360 calendar days after the date of purchase (Ratings on holding companies are not considered as the rating of the bank);

(6)     Commercial paper which is rated at the time of purchase in the single highest classification, "P-1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(7)     Investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P;

(8)     Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(A)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

(B)     (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph A(2) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in the Indenture on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(9)     Municipal obligations rated "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P;

(10)    Investment agreements approved in writing by Ambac Assurance Corporation (supported by appropriate opinions of counsel);

(11)    With respect to amounts allocable to the 2003 Series A Bonds, the 2003 Series B Bonds, the 2005 Series A-1 Bonds, the 2005 Series A-2 Bonds and the 2005 Series B Bonds, any applicable investment contract between the Authority and Trinity Funding Company, LLC which is in effect upon the effective date of the Third Supplemental Indenture;

(12)    The government investment pool (commonly known as the Treasurer's Cash Pool) administered by the Treasurer of the State; and

(13)    Any other investment (including repurchase agreements) approved in writing by Ambac Assurance Corporation.

"Issue Date" means the date of initial delivery of the 2007 Bonds.

"Liquidity Fund" means the fund so denominated within the Debt Service Reserve and Liquidity Account.

"Loan" means any Student Loan or other loans credited to the Loan Account.

"Loan Account" means the special trust account so denominated established pursuant to the Indenture.

"Loan Program" means the Authority's financing program with respect to Student Loans pursuant to the Act, as the same may be amended from time to time consistent with the Indenture, but only to the extent that such program is financed through the issuance of Obligations or from amounts otherwise available out of the moneys and assets held or pledged pursuant to the Indenture.